IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

        v.

JEFFREY O. FRIEDLAND,
GLOBAL CORPORATE STRATEGIES LLC, AND
INTIVA PHARMA LLC,

        Defendants,

 and

LANE 6552 LLC,
KATHY B. FRIEDLAND,
ASPEN UPPER RANCH LLC,
ASSURANCE MANAGEMENT, LLC, AND
THE JEFFREY AND KATHY FRIEDLAND IRREVOCABLE TRUST,

        Relief Defendants.

---

## COMPLAINT

---

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission") alleges as follows against Jeffrey O. Friedland, Global Corporate Strategies LLC, and Intiva Pharma LLC (collectively, "Defendants"), and Lane 6552 LLC, Kathy B. Friedland, Aspen Upper Ranch LLC, Assurance Management, LLC, and The Jeffrey And Kathy Friedland Irrevocable Trust (collectively, the "Relief Defendants"):

## I.      SUMMARY

1.      Jeffrey O. Friedland ("Friedland") engaged in a nearly $7 million securities fraud scheme to conceal the nature of his interest in an Israeli medical marijuana company, OWC Pharmaceutical Research Corp. ("OWC"), to allow him to unload his considerable holdings in OWC stock into a market that he helped artificially inflate. As part of his scheme, Friedland

touted OWC to investors while misrepresenting both the nature of his investments in OWC and his professional relationship with the company.

2.      In August 2014, Friedland acquired more than 1.3 million shares of restricted OWC stock when he made an early investment in OWC through one of his companies, Intiva Pharma LLC ("Intiva").

3.      In February 2016, Friedland acquired another 5.1 million shares of restricted OWC stock through one of his other companies, Global Corporate Strategies LLC ("Global"), as compensation for a January 2016 agreement to handle OWC's media and investor relations in the United States for a period of two years.

4.      Between February 2016 and September 2017, Friedland participated in interviews, made presentations, and sent out emails discussing his early investment in OWC and touting OWC to media, industry, and investors.  Through these efforts, Friedland created the false impression that he was merely an early investor in OWC and, as a result of that investment and his experience and expertise in the nascent medical marijuana industry, he was asked by OWC to become a member of its advisory board.  In fact, Friedland had been paid millions of shares of stock by OWC to promote the company to the press and investing public, and that stock constituted more than 75% of his holdings, dwarfing his direct investment interest in OWC.

5.      Friedland also made material false statements to potential and actual OWC investors to induce them either to purchase OWC stock or refrain from selling shares they already held.  Indeed, as OWC's closing stock price increased from the fall of 2016 to its peak in early March 2017, Friedland made numerous public appearances on behalf of OWC using his perceived stature and expertise as an advisor to the company to support its increasing share price, making false statements to investors that he was a buy-and-hold long-term investor in OWC when he was in fact making preparations to sell—and at later points actually selling—his OWC

holdings. Friedland proceeded to communicate to investors that his was a long-term investment in OWC as its share price declined, going so far as to say they needed to be patient investors like he has been, while he was in the process of selling virtually his entire stake in the company.

6. Under the federal securities laws, it is illegal for a person to give publicity to a company's stock for compensation without disclosing both the retention to give such publicity and the amount of compensation received for such efforts.

7. It also violates the federal securities laws for a person to publicly promote a stock while at the same time selling the company's stock without any contemporaneous disclosure.

8. Between February 2016 and August 2017, however, Friedland sent emails and participated in interviews on OWC's behalf without ever disclosing that he had been hired by OWC to handle its media and investor relations and had been paid to do so with millions of shares of OWC stock.

9. Friedland also never disclosed that he was in the process of liquidating his OWC holdings and, in fact, told investors his investment in OWC was "long term" and "we believed in it then, we believe in it now" on or around days when he was selling OWC stock.

10. Friedland compounded his misrepresentations and omissions by taking deceptive steps to sell Global's OWC stock into the market that he helped artificially inflate. While Friedland later sold Intiva's OWC stock through an account opened in Intiva's name, he took a much more convoluted route to sell Global's OWC stock. Indeed, rather than simply open a trading account for Global, Friedland (1) helped his wife open brokerage accounts at two broker dealers for Lane 6552 LLC, a brand new company they created with no apparent business purpose and Kathy Friedland as its sole owner; (2) transferred ownership of Global's OWC stock to Lane 6552, providing false information and a misleading opinion letter from a disbarred attorney to the transfer agent in order to get the restricted legend removed from the stock; (3)

deposited and sold Global's OWC's shares out of Lane 6552's second brokerage account after the first broker dealer would not sell the stock because it had been earned by Global for doing investor relations that appeared to be ongoing; and (4) transferred the proceeds first to a Lane 6552 bank account and then to a Lane 6552 investment account.

11.     In total, Friedland received nearly $7 million from his illegal sales of the OWC stock he acquired as an early investor and as compensation for agreeing to handle OWC's media and investor relations for two years.

12.     Friedland and his wife used these ill-gotten proceeds to (1) make an all-cash purchase of a $1.8 million home in Snowmass, Colorado; (2) make an all-cash purchase of a $687,000 Denver area condo; (3) pay off more than $350,000 of credit card and personal credit debt, and purchase two cars and a piano for $100,000; (4) transfer more than $300,000 to their children, their personal trust, and their family foundation; and (5) transfer more than $500,000 to Global and other entities and associates.  They also have more than $3 million of the ill-gotten proceeds invested in an account at Fidelity that they opened for Lane 6552.

13.     Because Friedland, in his role as Managing Director of both Global and Intiva, failed to disclose – in the course of touting OWC to investors – that he had been hired to handle OWC's media and investor relations in exchange for more than 5.1 million shares of its stock, Friedland, Global, and Intiva violated Section 17(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(b)].

14.     In addition, because Friedland (1) made materially false or misleading statements or omitted to state material information about both his relationship with and ownership interest in OWC; (2) offered and sold OWC securities in the secondary market while at the same time touting OWC to investors; and (3) engaged in deceptive acts in order to sell Global's OWC stock, Friedland, Global, and Intiva violated Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], as

well as Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §
78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

      15.     Because the Relief Defendants, among others, received proceeds of the
Defendants' fraudulent activity without providing *bona fide* services or consideration in
exchange, they were unjustly enriched and must disgorge those ill-gotten monies.

## II.      JURISDICTION AND VENUE

      16.     The Court has jurisdiction pursuant to Section 22(a) of the Securities Act [15
U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d),
78(e) and 78aa].

      17.     The Defendants and the Relief Defendants directly or indirectly made use of the
means or instrumentalities of interstate commerce, of the mails, or of the means or instruments of
transportation or communication in interstate commerce, in connection with the acts, practices,
and courses of business set forth in this Complaint.

      18.     Venue lies in this Court pursuant to 15 U.S.C. §§ 77v(a) and 78aa, and 28 U.S.C.
§ 1391(b)(2).  Friedland and Relief Defendant Kathy Friedland are residents of Colorado,
Defendants Global and Intiva are entities organized in Colorado, and the other Relief Defendants
are Colorado entities or residents as well.  Finally, many of the acts and practices described in
this Complaint occurred in the District of Colorado, including an investor presentation made by
Friedland featuring OWC as an investment opportunity to potential investors and a luncheon
with OWC executives and prospective investors.

## III.      DEFENDANTS

      19.     **Jeffrey Owen Friedland**, age 67, is a Colorado businessman.  He is the founder
and Managing Director of Global Corporate Strategies LLC and Intiva Pharma LLC, both
Colorado companies.  In November 2015, Friedland published a book called *Marijuana: The*

*World's Most Misunderstood Plant*, based in part on his experience owning two retail cannabis stores in Colorado ski towns Breckenridge and Crested Butte, as well as a cannabis cultivation facility in Steamboat Springs.  Over the past ten years, Friedland has filed Reports of Foreign Bank and Financial Accounts (FBARs) with the Internal Revenue Service (IRS) disclosing his roles with or investments in foreign penny stock companies, as well as his ownership or control over numerous bank and investment accounts in foreign jurisdictions, including Hong Kong, Germany, and Switzerland.  In 1984, without admitting or denying liability, Friedland consented to the entry of Final Judgment in the U.S. District Court for the District of Columbia permanently enjoining him from violating, among other things, the antifraud provisions of the Securities Act.  *See SEC v. Gary A. Agron, et. al.*, Civil Action No. 84-3025 (D.D.C.); Litigation Release No. 10543, 31 SEC Docket 580, 1984 WL 470960 (Sept. 28, 1984).

20.    **Global Corporate Strategies LLC** ("Global"), is a Colorado company organized by Jeffrey Friedland, its founder and Managing Director, on April 15, 2011.  Kathy Friedland, Frieldland's wife, is a member of Global.  Global has its principal office at 3773 Cherry Creek North Dr., Suite 575, Denver, CO 80209.

21.    **Intiva Pharma, LLC** ("Intiva"), is a Colorado company that Friedland organized on March 8, 2014 as Marijuana Brands LLC, before changing its name to Intiva Pharma LLC on April 30, 2014.  Friedland is the Manager of Intiva and is vested "full and complete authority, power, and discretion to manage and control the business, affairs, and properties of [Intiva]."  Friedland describes himself in his online interviews as the "CEO" of Intiva.  Intiva is a wholly-owned subsidiary of Intiva USA Inc., a Colorado company, which is a wholly-owned subsidiary of INTIVA Inc., a Canadian corporation.  Intiva has its principal office at 3773 Cherry Creek North Dr., Suite 575, Denver, CO 80209.

## IV.    RELIEF DEFENDANTS

22.    **Kathy B. Friedland**, age 67, is a Colorado resident and the wife of Friedland. She is the founder and sole member and principal of Relief Defendant Lane 6552 LLC, and is the registered agent and principal of Relief Defendant Aspen Upper Ranch LLC.  She is also a member of Global.

23.    **Lane 6552 LLC,** is a Colorado company organized on January 3, 2017, with Kathy Friedland listed as the sole member and principal.  Lane 5552 has an address of 7 Polo Field Lane, Denver, CO 80209.

24.    **Aspen Upper Ranch LLC**, is a Colorado company organized on June 27, 2017, with Kathy Friedland listed as the registered agent and principal.  Aspen has an address of 7 Polo Field Lane, Denver, CO 80209.

25.    **Assurance Management, LLC,** is a Colorado company organized on March 23, 2016 by Beryl Zyskind, with the same principal office address as Global and Intiva: 3773 Cherry Creek North Dr., Suite 575, Denver, CO 80209.  Assurance Management received more than $330,000 of proceeds from Friedland's sale of OWC stock for no apparent consideration.

26.    **Jeffrey and Kathy Friedland Irrevocable Trust ("Friedland Trust"),** is a trust controlled by the Friedlands that received $112,000 of proceeds from Friedland's sale of OWC stock for no apparent consideration.

## V.    RELEVANT ENTITY

27.    **OWC Pharmaceutical Research Corp. ("OWC")** is a medical marijuana company with its principal office in Petach Tikva, Israel that was incorporated in Delaware in March 2008 under the name Dynamic Applications.  On February 13, 2013, its securities were registered with the Commission under Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)]. On November 25, 2014, Dynamic Applications changed its name to OWC Pharmaceutical

Research Corp.—OWC stands for One World Cannabis—and OWC's stock is quoted on the OTCQB using the symbol "OWCP." For the purposes of thisComplaint, "OWC" will be used in reference to either Dynamic Applications or OWC.

## VI.   FACTS

### A.   FRIEDLAND OBTAINED OWC STOCK AS AN EARLY INVESTOR AND AS PAYMENT FOR HANDLING OWC'S MEDIA AND INVESTOR RELATIONS

28.      In June 2014, Friedland and his wife hosted a dinner at their home in Denver, Colorado, where a presentation was made about the developing field of medical marijuana research by a doctor who later became OWC's chief science officer. The guests at this dinner included approximately 25 potential investors, among them doctors and business people, two of whom made private investments in OWC (then called Dynamic Applications) via subscription agreements shortly after the dinner at Friedland's house.

29.      In August 2014, Friedland purchased 1,322,222 shares of restricted OWC stock for $119,000 pursuant to a subscription agreement that he signed on behalf of Intiva, and the ownership of these securities was identified in OWC's SEC filings (albeit with "Invita" rather than Intiva). On or around August 18, 2014, OWC provided an opinion letter to its transfer agent from a disbarred attorney in connection with its issuance of stock to Intiva.

30.      In November 2015, Friedland published a book called *Marijuana: The World's Most Misunderstood Plant*, based in part on his experience owning two retail cannabis stores in Colorado ski towns Breckenridge and Crested Butte, as well as a cannabis cultivation facility in Steamboat Springs.   In virtually all of the appearances discussed below, Friedland mentions his book and Intiva's early investment in OWC when discussing investment opportunities in the medical marijuana industry in general and OWC in particular.

31.     On January 21, 2016, Friedland and his company Global entered into a two-year "Media, Public Relations and Investor Relations Services Agreement" with OWC (hereinafter, the "Global PR/IR Agreement"), which Friedland signed as Managing Director of Global. Under the terms of the Global PR/IR Agreement, Friedland agreed to develop a media, public relations, and investor relations program to create interest in OWC on the part of financial journalists, institutional investors, and the general investment community.  In this role, Friedland agreed to "create a higher level awareness of [OWC], as well as the anticipated impact with the investors[;] [Global] will provide both an introduction of the company to the overall American population, as well as specifically target investors."  The agreement also states that Global would assist OWC in reaching investors by writing news releases, shareholder letters, corporate summaries, profiles, and website copy, and would establish OWC's Facebook and Twitter accounts.  The Global PR/IR Agreement stated that it could only be amended if executed by the parties in writing.

32.     Pursuant to the compensation terms of the Global PR/IR Agreement, OWC transferred 5,134,375 OWC shares to Global on February 5, 2016.  OWC provided an attorney opinion letter to OWC's transfer agent from a disbarred attorney in connection with the issuance of OWC's stock to Global.  OWC disclosed in reports it filed with the SEC in February 2016 that Global owned these shares of stock – 6.3% of OWC's common stock at that time – and that Friedland controlled them as Global's President and CEO, but neither OWC, Friedland, nor Global made any disclosure as to how the shares were acquired by Global.

33.     Between the Intiva purchase of OWC stock in 2014 and the shares issued to Global pursuant to Global PR/IR Agreement, Friedland directly or indirectly owned and controlled 6,456,597 shares of OWC stock by the beginning of February 2016.

**B.   FRIEDLAND PROMOTED OWC WITHOUT DISCLOSING HIS MEDIA AND INVESTOR RELATIONS AGREEMENT**

34.     On February 29, 2016, Cannabis FN Media in Seattle, Washington posted to its website a videotaped interview of Friedland.  At the outset of this interview, Friedland was introduced as "Mr. Jeffrey Friedland from OWC Pharmaceutical Research Corp. and author of *Marijuana: The World's Most Misunderstood Plant*."  Cannabis FN Media is an entity that was paid by OWC to promote OWC to investors, and it disclosed on its website the compensation that it received from OWC.

35.     During this Cannabis FN interview, Friedland mentioned, among other things, Intiva's 2014 investment in OWC and that he had recently become more involved with OWC.  But Friedland failed to disclose that he had just been hired to handle OWC's media and investor relations in the United States for two years and had been paid more than 5.1 million shares of OWC stock to do so:

> Early on when OWC Pharmaceutical Research was being formed, ***I invested in the company through a company I run in the United States called Intiva***.  And quite a few of my friends invested.  ***We believed in the company's vision.***  We believed in what was happening in Israel, and that's how I initially got involved.  ***And more recently, I've gotten more involved in the company.  After my book that you mentioned got published, they asked me to come in and help them to*** -- since I'm in the same time zone as American investors to be able -- and I speak English natively -- even though I'm from Colorado -- ***if I could help them out in the United States to interface both with the cannabis community as well as with the financial community***. . . .  (Emphasis added.)

In this Cannabis FN interview, Friedland further discussed his belief in OWC and its long-term prospects for investors:

> [***W***]***hat the world needs and what OWC Pharmaceutical Research is bringing to the table is real medicine based on real science***.  And again Mike, for the most part, that cannot be done in the United States.
>
> ******
>
> The -- this is the bottom line Mike, and I, I think you, you know, ***investors need to take a look at what this company is truly about***.  Number 1, it's about real

pharmaceuticals, real delivery -- drug delivery systems based on real science -- bullet point one, Mike. . . . **This company, OWC Pharmaceutical Research leading edge, Israeli science tied into all of this.** Virtually impossible to do research in the United States still.  It's all about Israel.  Number 3, **this company has a very pragmatic business plan.  And that pragmatic business plan is about generating revenues now**.  They're not going to cover all the costs of all this research because we all know that medical research clinical trials are expensive, but **the company is generating money**.

\*\*\*\*\*\*\*

Mike, **I think investors need to put this on the radar screen**.  **I think they have to watch for news**.  I think they need to look at this company in the context of the platform that exists of the people that are involved and stay tuned for the future developments.  (Emphasis added.)

36.     On March 15, 2016, OWC issued a press release via PR Newswire announcing that Friedland had joined OWC's Advisory Board to advise on business development efforts, and that Friedland would serve as the Company's U.S. representative.  OWC's CEO stated in the press release, "Jeffrey is an active investor and advisor to the cannabis sector, bringing a wealth of knowledge and insight to OWC Pharmaceuticals.  His experience in both the cannabis and financial markets will be invaluable as we work to commercialize our proprietary products and technologies."  Friedland was quoted in the press release discussing OWC's competitive advantage:

> Because OWC Pharmaceutical is headquartered in Israel, where cannabis research is not only allowed, but encouraged, they have been able to implement a research and development program of the caliber associated with the pharmaceutical industry.  **I believe this approach provides OWC Pharmaceutical with a significant competitive advantage** and I look forward to working with the Company in their efforts to advance the medical use of cannabis.  (Emphasis added.)

The press release mentioned Friedland's book and provided his phone number and an OWC email address under contact information for OWC in the United States, but did not mention that OWC hired Friedland and Global to handle its media and investor relations in the United States for two years and paid him more than 5.1 million shares of OWC stock for taking on this role.

37.     On November 18, 2016, OWC issued a press release via PR Newswire announcing "OWC Pharmaceutical Research Advisory Board Member to Participate in the First Bloomberg Intelligence Sponsored Cannabis Event."  The press release quoted Friedland, "There are many cannabis companies that are publicly-traded, from GW Pharmaceuticals (GWPH) to smaller public companies such as OWC, which Intiva invested in during the summer of 2014…. I joined the Company's advisory board earlier this year."  The release continues, "Subject to his schedule, Mr. Friedland may be available to meet privately with OWC shareholders to discuss his view of OWC's future."  Nowhere in OWC's press release did Friedland or OWC disclose that he and Global had just been hired to handle OWC's media and investor relations in the United States and been paid more than 5.1 million shares of OWC stock to do so.

38.     On November 22, 2016, Friedland used his Global email to inform a listserve group of his participation in the "AFund Special Investments Conference in New York."  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock.

39.     On or about January 3, 2017, Kathy Friedland organized Lane 6552 LLC, a company with no apparent business purpose or operations, with herself listed as the company's sole member and principal.

40.     On January 4, 2017, Friedland used his Global email to inform a listserve group of his participation in the "Cowen and Company Cannabis Colloquium."  In the email, Friedland

stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014." Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock.

     41.    On January 4, 2017, Cannabis FN Media broadcast over the internet another video interview of Friedland, and OWC's Facebook and Twitter page posted a link to this interview that same day. During this interview, Friedland told the host and viewers:

> So, ***I think that 2017 is going to be a fabulous, fabulous year*** globally in the cannabis industry, and ***<u>especially for companies like OWC Pharmaceutical Research</u> that have an incredibly good business model and business plan***.
>
> \*\*\*\*\*
>
> ***The other big thing about OWC Pharmaceutical Research***, ***in addition, Mike, to the short-term revenue opportunity*** both starting in the United States through state licensed marijuana businesses as well as what they're doing in Europe, ***is the pharmaceutical play***.
>
> \*\*\*\*\*
>
> ***I think that ultimately the real money in this industry*** is not going to be on the recreational side, although that will be a very large industry, but ***it's really about pharmaceuticals***. When people have the ability to obtain their medicine with dosage information tied to a specific medical condition or disorder. ***<u>And that's where the real future and the real potential of OWC is.</u>  That's what I'm looking forward to, that's a long-term situation***.
>
> \*\*\*\*\*
>
> So, we sat down with the management team and the company that I am still CEO of, Intiva, ***we made a private placement investment in OWC Pharmaceutical Research early summer of 2014.*** We bought the stock in a private placement. It's restricted stock. ***<u>We're still sitting with the stock</u>.  <u>For us, it's a very, very long-term situation</u>*** . . . .

(Emphasis added.)  At no point during this interview did Friedland mention his agreement to handle OWC's media and investor relations in exchange for 5.1 million shares of stock.

42.     On January 12, 2017, Friedland used his Global email to inform a listserve group of his participation in the inaugural Institutional Capital & Cannabis Investment Conference in March 2017 in San Jose, CA.  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock.

43.     On or about January 14, 2017, Friedland submitted a request to OWC's transfer agent to reissue Global's 5,134,375 shares of OWC stock to Lane 6552 LLC and remove the restricted legend from the securities.

44.     Restricted securities are securities acquired in unregistered, private sales from the issuing company or from an affiliate of the issuer.  Investors typically receive restricted securities through private placement offerings, Regulation D offerings, employee stock benefit plans, as compensation for professional services, or in exchange for providing "seed money" or start-up capital to the company.  When investors acquire restricted securities, they must find an exemption from the SEC's registration requirements to sell the securities in a public marketplace.

45.     In order to sell his restricted shares in the public marketplace, Friedland needed to have OWC's transfer agent remove the restricted legend on Global's 5,134,375 shares.

46.     Friedland provided the transfer agent with a purported attorney opinion letter that included inaccurate information about Global's acquisition of OWC stock and misleading information about the connection between Friedland, Global, and Lane 6552.  The letter was signed by a disbarred attorney.

47.     On January 21, 2017, just days after Friedland was for the first time identified on OWC's website as a member of its leadership team, Friedland used his Intiva email to invite a listserve group to an OWC promotional lunch presentation that he would (and later did) host in Denver on January 28, 2017.  In the email, Friedland stated, "In 2014 INTIVA invested in OWC Pharmaceutical Research."  Friedland's email included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock.

48.     Friedland also indicated on forms signed by his wife that were provided to the transfer agent that Global purchased the stock from OWC in January 2016 at a cost of $51,343.75, but there is no evidence of such payment from Global to OWC.  The terms of Global's agreement with OWC indicate the stock was compensation for media and investor relations services and not in exchange for any payment.

49.     Friedland further represented to the transfer agent on these forms that the OWC stock was not being transferred from Global to Lane 6552 as a gift, inheritance, or wash sale, but were instead acquired by Lane 6552 on January 13, 2017 at a cost of $205,375.  There is no evidence of any payment to Global from Lane 6552 in that amount or on that date.

50.     On or around January 30, 2017, Friedland helped open a trading account for Lane 6552 with a broker dealer ("Broker Dealer A").  Friedland filled out and submitted various forms including the Seller's and Broker's Representation Letters, the Opinion Letter, and a Transfer Instruction Form, some of which Kathy Friedland signed on behalf of Lane 6552, and Friedland served as the sole point of contact between Lane 6552 and Broker Dealer A.

51.     On February 3, 2017, OWC's transfer agent, relying on the information provided by Friedland, removed the restrictive legend from Lane 6552's stock.

52.     After the restricted legend was removed from Lane 6552's stock, Broker Dealer A asked its clearing firm ("Clearing Firm A") to sell the 5,134,375 shares of unrestricted OWC stock out of the Lane 6552 account.

53.     Clearing Firm A declined to execute the sell order because it had concerns that Lane 6552 might be trying to sell into to an inflated market and, among other things, the shares had been acquired by Friedland in exchange for performing investor relations services that appeared to be ongoing.  Additionally, the shares were being deposited after a spike in the stock price following OWC's release of a letter to shareholders and the drafting and release of the letter may have been controlled by Friedland.

54.     On February 6, 2017, Friedland sent Broker Dealer A an email asserting that while the "initial intent" of the Global PR/IR Agreement "was to provide public relations and related services, the agreed upon task was switched by mutual consent to one on assisting the company with strategic direction primarily in Canada, in approximately July 2016."  Friedland did not provide Broker Dealer A with any documentation showing this alleged change to his agreement, but further represented that he "ha[s] no role in the public relations or IR side, but at some events mention the company as well as other companies."  The next day, OWC identified Friedland in a press release as its contact in the United States.

55.     On February 8, 2017, Friedland used his Global email to inform a listserve group that he would "Speak on 'Investing in Israeli Know-How' at CannaTech in Tel Aviv" on March 20-22, 2017.  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] Intiva Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but

did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of OWC stock.

56.     On or around February 16, 2017, after Broker Dealer A declined to sell the OWC shares out of the Lane 6552 account, Friedland helped open another trading account for Lane 6552 at a different broker dealer, Spencer Edwards Inc., and attempted to deposit for sale the 5.1 million shares of OWC stock.  Friedland again acted as the sole point of contact with Spencer Edwards, filled out and sent all requisite forms, and requested all wire transfers. In the process, Friedland disclosed that he and his wife already had been unsuccessful in selling the shares.

57.     As part of the materials provided to Spencer Edwards on or around February 16, 2017, Friedland filled out forms indicating that Lane 6552 acquired the OWC stock from OWC through Global and pursuant to Global's services agreement with OWC and that the dollar amount of the purchase price or value of services provided was $125,000.  Friedland also provided an opinion letter from a disbarred attorney that included inaccurate information about when the stock was acquired by Global and that Friedland was uninvolved with Lane 6552.

58.     On February 17, 2017, OWC issued a press release titled "OWC Pharmaceutical Research to Present at Lyons Capital's Wall Street Conference" in Boca Raton, Florida, on March 1, 2017, "the premiere conference in the venture capital arena and Small Cap marketplace."  The sub-heading of OWC's press release stated, "Industry Leader And OWC Advisory Board Member, Jeffrey Friedland, To Speak At The Conference And Introduce OWC Management."  The press release further asserted:

> ***Jeffrey Friedland***, a leader in the cannabis sector, author of Marijuana: The World's Most Misunderstood Plant, ***and a member of the Company's Advisory Board***, is a featured speaker at the Conference.  He is expected to discuss the opportunities for public company investments in the cannabis sector, and the positive impact that Israeli science and companies are

having on the U.S. and Canadian cannabis markets. ***Mr Friedland is CEO of Intiva Inc., which was an early-stage investor in OWC, and which made its investment in the Company during the summer of 2014.*** When asked about his participation at the conference, Mr. Friedland stated, "The legal cannabis market has expanded considerably over the past two years, generating significant and growing investor interest. However, ***there are only a handful of publicly-traded companies focused on cannabinoid-based, pharmaceutical development and a true scientific approach to product development. I intend to discuss what I see as the publicly-traded cannabis opportunities at the Conference***." (Emphasis added.)

59.     On February 22, 2017, Friedland used his Global email to inform a listserve group that he was "to Speak on March 1st in Boca Raton on Public Company Cannabis Investments" at The Wall Street Conference. In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research, which is expected to provide an investor update at the Conference." Friedland's email also stated that he "is the CEO of Intiva Inc. which made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014." Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of OWC stock.

60.     On February 23, 2017, the clearing firm for Spencer Edwards sought and obtained an attorney opinion that relied on the information provided by Freidland, discussed the relationship between Friedland and Global, on the one hand, and Kathy Friedland and Lane 6552, on the other, before approving the sale of the OWC stock, after which Spencer Edwards agreed to sell the 5.1 million OWC shares.

61.     On March 1, 2017, Friedland appeared at The Wall Street Conference and made his presentation standing in front of a screen that displayed the OWC logo, with a photo from Friedland's presentation publicized on OWC's Facebook and Twitter page later that day.

**C.     FRIEDLAND CONTINUED PROMOTING OWC WHILE SECRETLY SELLING HIS OWC STOCK HOLDINGS**

62.     On March 2, 2017, the 5.1 million shares of now-unrestricted OWC stock were deposited into a Lane 6552 account at Spencer Edwards.  Immediately after the shares were deposited, Friedland directly or indirectly offered and sold 173,807 shares for net proceeds of $284,817.

63.     On March 3, 2017, Friedland directly or indirectly offered and sold another 436,509 shares of OWC stock through the Lane 6552 account at Spencer Edwards for net proceeds of $562,190.

64.      On March 5, 2017, Friedland used his Global email to inform a listserve group of his participation in the "'Public Company Investments in the Cannabis Industry' at the Institutional Capital & Cannabis Investment Conference."  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014." Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock, nor that he had begun selling that stock.

65.     On March 6, 2017, Friedland appeared as a featured speaker in an internet interview with New Jersey-based Pot Stock Radio, which OWC's Facebook and Twitter pages posted a link to later that day.

66.     At the outset of his hour-long Pot Stock Radio interview on March 6, 2017, Friedland told the host and listeners that he is not an officer or director of OWC, and was "not doing investor relations for the company."  Friedland said that he had been asked to join OWC's Advisory Board in February 2016 because Intiva "invested in OWC Pharmaceutical Research during the early summer of 2014, almost three years ago.  *So, we believed in it then, we believe in it now*."  He further explained how OWC asked, "*Would you join our advisory board?'  And I agreed to that about last February, because we had an investment in the company*, and I was incredibly impressed with the management team, who I met in Israel." (Emphasis added.)  Friedland added: "So that's sort of bringing it full circle to why I'm on tonight, rather than as an officer or director of OWC Pharmaceutical Research.  We wrote a check, we made an investment in this company through Intiva in the early summer of '14."

67.     During the March 6, 2017 Pot Stock Radio interview, Friedland discussed OWC's financial prospects and compared it to much larger NASDAQ-traded pharmaceutical companies:

> [Y]ou know, when I look at OWC Pharmaceutical Research, there's two things – you know, obviously you were talking about penny stocks before I came on the air here, and there's two things.  You know, how many of the stocks you have on have $2 million in the bank?  You know, I – the company had $2 million.  *OWC has $2 million in the bank.  How many companies are debt-free that you have – on your show?  OWC is – debt free*.  You know – those are facts.  They can be verified with the last 10-Q filed with – I mean, the 10-K filed with the SEC, or the last – 10-Q quarterly financial statement, so, again, this is a – *OWC is a small company, but, um, I am comfortable in – I would tell, you know, your listeners, um, you know, look at the 10- the 8-Ks over the last twelve months.  Look at the news releases.  Do their research*.  Come to their own conclusions, and if they can – *understand if they can buy into my vision – and my vision being that the real money's going to made in the cannabis sector in pharmaceutical development* – if people can be patient investors, they can see why I can talk

about Insys Therapeutics, INSYS on NASDAQ – GW Pharm, GWPH, *and I can talk about OWC Pharmaceutical Research, OWCP in the same sentence* …. (Emphasis added.)

68.     Later in this Pot Stock Radio interview, Friedland added, "I would say to investors, whether its OWC they want to buy, or they want a bigger pharma player like GW to look at from a longer term perspective stocks that are truly involved in real science in this cannabis space, because that's where I believe the real money will be made."

69.     At no point during this March 6, 2017 interview on Pot Stock Radio did Friedland inform listeners that he and Global had been hired by OWC in January 2016 to handle its media and investor relations for two years and received 5.1 million shares of stock from OWC for taking on this role, much less that he was in the process of selling these shares.

70.     On March 6, 2017, Friedland directly or indirectly offered and sold 500,000 shares of Global's OWC stock through the Lane 6552 account at Spencer Edwards for net proceeds of $684,539.

71.     On March 7, 2017, Friedland directly or indirectly offered and sold 80,000 shares of Global's OWC stock through the Lane 6552 at Spencer Edwards for net proceeds of $113,671.

72.     Also on March 7, 2017, Friedland and his wife opened an account at Fidelity in the name of Lane 6552 listing Kathy Friedland as the only owner on the account.

73.     Between March 8, 2017, and March 21, 2017, Friedland directly or indirectly offered and sold another 3,944,059 shares of Global's OWC stock through the Lane 6552 account at Spencer Edwards for net proceeds of $4,845,177.

74.     On March 9, 2017, Friedland used his Global email address to inform a listserve group of his participation in the "'Investing in Israeli Know-How' at CannaTech in Tel Aviv.'" In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC

Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock, much less that he was selling these shares.

75.     On March 15, 2017, Friedland used his Global email address to inform a listserve group of Friedland's participation in the "CannaTech on Monday, March 20th in Tel Aviv: 'Investing in Israeli Know-How."  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock, much less that he had sold nearly all of these shares in the preceding three weeks.

76.     On March 21, 2017, Friedland used his Global email address to inform a listserve group of his participation as the chair to "the Panel 'Public Company Investments in the Cannabis Industry' at the Institutional Capital & Cannabis Investment Conference."  In the email, Friedland stated that he is "a member of the advisory board of OWC . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to

handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock, much less that he had sold nearly all of these shares in the prior three weeks.

77.     In total, between March 2, 2017 and March 22, 2017, Friedland directly or indirectly offered and sold Global's 5,134,375 shares of OWC stock through the Lane 6552 account at Spencer Edwards for net proceeds of $6,490,396.

78.     Between March 7, 2017 and March 24, 2017, Friedland wire-transferred $6,489,798.73 of proceeds from the sale of Global's OWC stock out of the Lane 6552 account at Spencer Edwards into the Lane 6552 account at First American State Bank.

79.     Friedland directly or indirectly offered and sold all of the 5.1 million shares of stock acquired when he and Global agreed to handle OWC's media and investor relations right after its price spiked at record highs (as reflected in the following charts):



80.     On March 23, 2017, Friedland used his Global email to invite a listserve group "To Attend Jeffrey Friedland's Panel: 'Public Markets: Investments in the Cannabis Sector,'"

on March 28, 2017 in San Jose, California.  In the email, Friedland stated that he is "a member

of the advisory board of OWC Pharmaceutical Research . . . . [and] Intiva Inc. made an early-

stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's

email from his Global email account included an extensive listing of his business activities in

the cannabis industry, described his book, and explained his extensive international business

experience, but did not discuss his role with Global or the agreement to handle OWC's media

and investor relations for two years in exchange for 5.1 million shares of stock, much less that he

sold all of these shares in the preceding three weeks.

81.     On March 27, 2017, Cannabis FN Media, an entity paid by OWC to promote

OWC to cannabis stock investors, rebroadcasted its January 4, 2017 interview with Friedland.

## D.    FRIEDLAND CONTINUED TO PROMOTE OWC WHILE HE SECRETLY LIQUIDATED INTIVA'S OWC STOCK

82.     In April, Friedland began taking steps to sell the OWC stock that Intiva had

acquired in 2014.  On April 13, 2017, Friedland sent an email to another OWC investor—one

of the investors present at Friedland's OWC dinner in 2014—explaining that he "was speaking

with [a Spencer Edwards broker] today as we're going to hopefully work with him in

liquidating [I]ntiva's OWC position."

83.     On April 21, 2017, the Spencer Edwards broker emailed Friedland stating, "I

hope your trip is going well.  Did you get squared away yet on the documents for Intiva on

OWCP.  I haven't heard anything from your CFO."  Friedland responded, "Not yet.  I'm in

China nie [sic] returning to Hong Kong today, and will be back in Denver Sunday."

84.     On April 27, 2017, Friedland used his Global email to inform a listserve group

that he was "to Speak on 'New Money for New Hemp and CBD Ventures' at the 3rd Annual

CBD Outlook" on April 30, 2017.  In the email, Friedland stated that he is "a member of the

advisory board of OWC Pharmaceutical Research . . . . [and] Intiva Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014." Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock, much less that he had already sold all of the shares the prior month.

85.     On May 10, 2017, Friedland sent a follow up email to the Spencer Edwards broker about opening an account for Intiva, confirming that "Intiva's CFO will handle this."

86.     On May 11, 2017, a disbarred attorney signed an opinion letter to facilitate the removal of the restrictive legend from Intiva's OWC stock.

87.     On or around May 22, 2017, Intiva's CFO applied to open an account with Spencer Edwards in the name of Intiva.  Intiva's CFO listed himself as the primary authorized person on the account, with Friedland as the secondary authorized person on the account.

88.     On or around May 24, 2017, Intiva's CFO filed an OTC Securities Deposit Request for Intiva with the clearing broker for Spencer Edwards to deposit 1,322,222 shares of OWC stock.  Among other representations, Intiva's CFO represented that neither Intiva nor any person affiliated with Intiva had sold any securities of the same class during the prior 3 months.  Despite Friedland's continued efforts to promote OWC and discuss Intiva's investment in OWC, Intiva's CFO represented that Intiva is not currently promoting the securities on deposit in the account does it plan to promote or engage a third party to promote OWC securities (whether through social media, print publications, emails, tweets, or other means or media).

89.     On May 30, 2017, Friedland used his Global email address to inform a listserve group of his participation in an online conversation discussing "President Donald Trump, Jeff Sessions and the Future of America's Marijuana Policy."  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for more than 5.1 million shares of stock, much less that he sold all those shares only a few months earlier.

90.     On June 12, 2017, OWC's transfer agent relied on the disbarred attorney's opinion letter to remove the restrictive legend from Intiva's OWC stock and issued a new "clean" stock to Intiva for deposit at the clearing broker for Spencer Edwards.

91.     On June 17, 2017, Friedland used his Global email address to inform a listserve group of his participation in an online conversation discussing "What Cannabis Investors Are Now Looking For."  In the email, Friedland again stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for more than 5.1 million shares of stock, much less that he sold all those shares only a few months earlier.

92.     On June 26, 2017, Friedland used his Global email address to inform a listserve group about an online conversation "between Jeffrey Friedland and Bob Hoban."  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for more than 5.1 million shares of stock, much less that he sold all those shares only a few months earlier.

93.     On June 27, 2017, Friedland opened an account with First American State Bank for Intiva, listing Friedland and Intiva's CFO as agents.

94.     On June 27, 2017, Friedland directly or indirectly offered and sold 136,053 shares of Intiva's OWC stock for net proceeds of $93,804, which were wire-transferred to the Intiva account at First American State Bank.

95.     On Saturday, July 8, 2017, Friedland participated in an audio/video interview with by Minneapolis-based Wall Street Raw to discuss OWC's recent market readiness announcement regarding its topical cream.  OWC's Facebook and Twitter page posted a link to this interview.

96.     During his July 8 Wall Street Raw interview, Friedland was introduced as the managing director of Friedland Capital, an advisory board member of OWC, and the CEO of Intiva, which made an early stage investment in OWC in 2014.  During the interview, Friedland touted a recent OWC announcement that it filed a full patent application with the

U.S. Patent Office to replace the provisional patent on OWC's psoriasis cream and emphasized its connection to the leading-edge Israeli market:

> I think people have to understand about what – ***OWC is that it's a pharmaceutical development company, and they have to also understand that it's about Israel***, it's about sciences, and it's about the cannabis space in Israel, and I think that is the key, and ***OWC and its management team over there, um, are incredibly plugged in to what's happening in Israel, which is leading edge on pharma development world-wide***. (Emphasis added.)

97.     At no point during his July 8 Wall Street Raw interview did Friedland mention his agreement to handle OWC's media and investor relations in exchange for 5.1 million shares of stock, much less that he had sold all of those shares only a few months earlier and had begun to sell off Intiva's OWC stock.

98.     On July 9, 2017, a purported investor relations representative for OWC sent an email from an OWC email account to a listserve group that included employees of Spencer Edwards, with a link to Friedland's July 8 interview on Wall Street Raw.

99.     On July 21, 2017, Friedland used his Global email address to inform a listserve group of his participation in another interview.  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for more than 5.1 million shares of stock, nor that he sold all those shares only a few months earlier, much less that he had begun to sell off Intiva's OWC stock.

100.   Between July 10, 2017 and July 28, 2017, Friedland directly or indirectly offered and sold 609,459 shares of Intiva's OWC stock for net proceeds of $230,498, which were wire-transferred to the Intiva account at First American State Bank.

101.   On July 29, 2017, the YouTube-based "Looking at the Markets" broadcast an interview with Friedland about the marijuana industry and OWC.  OWC's Twitter and Facebook page, as well as Jeffrey Friedlad's personal webpage, posted a link to this interview. During the interview, Friedland made the following statements:

> I am an investor and --- obviously in a lot of companies, and ***Intiva, Inc., a company I've been CEO of since first quarter of 2014, we made an investment during the summer of 2014 in an Israeli company***, Israeli-based company, and Israel, as I'm sure many of your viewers know, is sort of the -- basically the center of pretty much all real cannabis research. ***And that company is OWC Pharmaceutical Research.***  I'm not here to suggest anybody buy it or any holders sell it, but I have ***-- we invested in 2014. We still own the stock.*** A lot of the marijuana stocks have been hit over the last couple of weeks.  ***I like what they're doing.  I like that they're bringing in some science to this cannabis space***, and their first product, which they're seeking marketing and distribution globally with is a cream, a proprietary cream, for psoriasis.  ***So with a full disclaimer, you know, we're shareholders.  I find it intriguing.  I think they're ready to go.***  I think a lot of investors who've been involved in the company are not as patient as I am, because when you're talking about drug development, you're talking about pharmaceuticals, it takes time, you know?  It just takes time.  (Emphasis added.)

102.   At no point during this July 29 "Looking at the Markets" interview did Friedland mention his agreement to handle OWC's media and investor relations in exchange for 5.1 million shares of stock, nor that he sold all those shares only a few months earlier and had begun to sell off Intiva's OWC stock.

103.   On July 31, 2017, Friedland directly or indirectly offered and sold 25,000 shares of Intiva's OWC stock for net proceeds of $8,041, which were wire-transferred to the Intiva account at First American State Bank.

104.     On July 31, 2017 and August 6, 2017, Friedland used his Global email address to inform a listserve group of his participation in another interview.  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's emails did not mention that he had been hired by OWC to handle its media and investor relations in the United States in exchange for more than 5.1 million shares of stock, nor that he sold all those shares only a few months earlier and had begun to sell off Intiva's OWC stock.

105.     On August 12, 2017, Friedland used his Global email address to inform a listserve group of Friedland's participation in an online conversation with David Moadel and Jeffrey Friedland discussing "Aphria and Hemp Inc."  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for more than 5.1 million shares of stock, nor that he sold all those shares only a few months earlier, much less that he had begun to sell off Intiva's OWC stock.

106.     On August 20, 2017, Friedland used his Global email address to inform a listserve group of Friedland's participation in an online discussion about "two publicly-traded cannabis stocks, Canada-based Aurora Cannabis (ABCFF) and Medical Marijuana Inc. (MJNA)."  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC

Pharmaceutical Research during the summer of 2014." Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or the agreement to handle OWC's media and investor relations for two years in exchange for more than 5.1 million shares of stock, nor that he sold all those shares only a few months earlier, much less that he had begun to sell off Intiva's OWC stock.

107.     Between August 11, 2017, and September 22, 2017, Friedland directly or indirectly offered and sold virtually all of the remaining 525,000 shares of Intiva's OWC stock for net proceeds of $145,723, which were wire-transferred to the Intiva account at First American State Bank.

108.     In total, between June 27, 2017, and September 22, 2017, Friedland directly or indirectly offered and sold 1,297,222 shares of Intiva's OWC stock for total net proceeds of nearly $480,000, of which roughly $475,000 were wire-transferred to the Intiva account at First American State Bank.

**E.     THE FRIEDLANDS USED PROCEEDS FROM THEIR FRAUDULENT OWC STOCK SALES FOR LARGE PURCHASES AND TRANSFERRED MONIES AND ASSETS TO RELIEF DEFENDANTS**

109.     As outlined above, between March 2, 2017 and March 22, 2017, Friedland directly or indirectly offered and sold 5,134,375 shares of OWC stock through Lane 6552 for net proceeds of $6,490,396.

110.     Between March 7, 2017 and March 24, 2017, Kathy Friedland wire-transferred $6,489,793 million from the Lane 6552 account at Spencer Edwards to the Lane 6552 account at First American State Bank.

111.    Between March 7, 2017 and March 24, 2017, Kathy Friedland deposited checks totaling $4,150,000 from the Lane 6552 account at First American State Bank into the Lane 6552 account at Fidelity, where more than $3 million remains as of February 22, 2018.

112.    The Friedlands also used the stock sale proceeds to make large purchases, withdrawals, and transfers, including:

- Paying cash for a nearly $2 million home in Snowmass, Colorado, which they then transferred to Relief Defendant Aspen in August 2017;

- Paying $687,000 cash for a Denver area condominium in February 2018;

- Paying off credit card and personal credit debt in excess of $350,000;

- Spending nearly $100,000 on two automobiles and a piano;

- Transferring more than $300,000 to The Jeffrey and Kathy Friedland Irrevocable Trust, The Kathy and Jeffrey Friedland Foundation, the Friedland's two children, and Kathy Friedland's personal bank account;

- Transferring more than $500,000 to Global, other entities, and friends and associates;

113.    As outlined above, between June 27, 2017, and September 22, 2017, Friedland directly or indirectly offered and sold 1,297,222 shares of Intiva's OWC stock for total net proceeds of nearly $480,000, of which roughly $475,000 were wire-transferred to the Intiva account at First American State Bank.

114.    In August 2017, Friedland transferred $331,000 from Intiva's account at First American State Bank to Intiva Leasing's account at First American State Bank, which was then immediately wired, along with additional funds, to Relief Defendant Assurance Management.

## VI. CLAIMS FOR RELIEF

### CLAIM ONE
**Liability for Nondisclosure of Touting Compensation**
**Violations of Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]**
**(Against Friedland, Global, and Intiva)**

115.    Paragraphs 1 through 114 are re-alleged and incorporated by reference.

116.    Section 17(b) of the Securities Act provides that it shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

117.    By reason of the foregoing, Friedland, Global, and Intiva violated Section 17(b) of the Securities Act.

### CLAIM TWO
**Fraud in the Purchase or Sale of Securities**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Against Friedland, Global, and Intiva)**

118.    Paragraphs 1 through 114 are re-alleged and incorporated by reference.

119.    Section 10(b) of the Exchange Act provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement, any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

120.    Rule 10b-5 provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

121.    By reason of the foregoing, Friedland, Global, and Intiva violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### CLAIM THREE
### Fraud in the Offer or Sale of Securities
### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]
### (Against Friedland, Global, and Intiva)

122.    Paragraphs 1 through 114 are re-alleged and incorporated by reference.

123.    Section 17(a) of the Securities Act provides that it shall be unlawful for any person in the offer in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, directly or indirectly: (a) to employ any device, scheme or artifice to defraud with scienter; (b) to obtain money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were

made, not misleading; or (c) to engage in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

124.    By reason of the foregoing, Friedland, Global, and Intiva violated Section 17(a) of the Securities Act.

## VII.    PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

1.    Finding that the Defendants committed the securities law violations alleged in this Complaint;

2.    Permanently enjoining Defendants from violating, directly or indirectly, Sections 17(a) and 17(b) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5;

3.    Prohibiting Friedland, pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)(1)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)] , from participating in any offering of penny stock;

4.    Ordering that each of the Defendants and the Relief Defendants shall disgorge any and all ill-gotten gains, together with pre-judgment and post-judgment interest, derived from the securities law violations set forth in this Complaint;

5.    Imposing civil monetary penalties against Defendants for each of their securities law violations, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

6.    Granting such other relief as this Court may deem just or appropriate.

## VIII.      JURY DEMAND

The SEC demands a jury in this matter.

Date: March 5, 2018

                              Respectfully submitted,

                              *s/ Christian D. H. Schultz*
                              Christian D. H. Schultz
                              Assistant Chief Litigation Counsel
                              Timothy Halloran
                              Assistant Chief Litigation Counsel
                              Michael C. Grimes
                              Counsel
                              U.S. Securities and Exchange Commission
                              100 F Street NE
                              Washington, DC 20549
                              (202) 551-4740 (Schultz)
                              (202) 551-4414 (Halloran)
                              (202) 551-4861 (Grimes)
                              schultzc@sec.gov
                              hallorant@sec.gov
                              grimesmi@sec.gov