IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action  No.  _____

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

       v.

JEFFREY O. FRIEDLAND,
GLOBAL CORPORATE STRATEGIES LLC, AND
INTIVA PHARMA, LLC,

       Defendants,

 and

LANE 6552 LLC,
KATHY B. FRIEDLAND,
ASPEN UPPER RANCH LLC,
ASSURANCE MANAGEMENT, LLC, AND
THE JEFFREY AND KATHY FRIEDLAND IRREVOCABLE TRUST,

       Relief Defendants.

---

## PLAINTIFF'S EMERGENCY MOTION
## FOR AN *EX PARTE* ASSET FREEZE AND OTHER EMERGENCY RELIEF

**TABLE OF CONTENTS**

I.  PRELIMINARY STATEMENT ...............................................................2

II.  STATEMENT OF FACTS ...................................................................5

  A. Defendants, Relief Defendants, and Relevant Entity...............................5

  B. Friedland Made Material Misrepresentations and Omissions About His OWC Affiliation And Stock Ownership While Selling His OWC Holdings ..........7

    1.  Friedland Made Material Misrepresentations and Omissions. .........................7

    2.  Friedland And  His Wife Took Deceptive Measures to Sell Global's OWC Stock While He Touted OWC to Investors  .........................................12

    3.  Friedland Sold Intiva's OWC Stock While Touting OWC to Investors..........15

    4.  The Friedlands Spent, Invested, Or Transferred to Others Virtually All of the Proceeds from Friedland's Fraudulent Sales of OWC Stock ..........16

III.  LEGAL ARGUMENT.........................................................................17

  A. Friedland Violated Section 17(b) of the Securities Act By Touting OWC Without Disclosing Compensation from OWC............................................18

    i.  Friedland Touted OWC Without Disclosing Compensation ..........................19

    ii.  Friedland Used the Means of Interstate Commerce.........................................20

  B. Friedland Violated Section 10(b) of the Exchange Act and Rule 17(a) of the Securities Act By Making Material Misrepresentations and Omissions. ........21

    i.  Friedland Made Misrepresentations and Omissions......................................21

    ii.  Friedland's Misrepresentations and Omissions Were Material ......................23

    iii. Friedland Acted With Scienter.....................................................................25

  C. Friedland Engaged in a Scheme to Defraud ...........................................26

    i.  Friedland Engaged In Deceptive Acts ..........................................................27

    ii.  Friedland Acted With Scienter in his scheme to defraud ...............................28

  D. An Immediate Asset Freeze is Necessary to Prevent Further Dissipation of Proceeds.............................................................................29

  E. An Accounting is Necessary to Identify the Location of Proceeds .....................33

  F. Expedited Discovery, Alternative Means of Service, and a Prohibition Against the Destruction or Alteration of Documents is Necessary to Prepare for a Hearing to Show Cause .................................................................33

  G. Entry Of An Order *Ex Parte* Is Appropriate.......................................34

IV.  CONCLUSION....................................................................................34

CERTIFICATION UNDER F.R.C.P. 65(b)(1) ...............................................35

## TABLE OF AUTHORITIES

**STATUTES AND RULES:**

15 U.S.C. § 77q(a) [Section 17(a)] ...............................................................5, 17, 21, 26

15 U.S.C. § 77q(b) [Section 17(b)]........................................................... 4, 18-21, 26

15 U.S.C. § 77t(b) [Section 20(b)] ........................................................................ 1

15 U.S.C. § 78j(b) [Section 10(b)].........................................................5, 17, 21, 25, 28

15 U.S.C. § 78u(d)(1) [Section 21(d)(1)] ............................................................. 1

17 C.F.R. § 240-10b-5 [Rule 10b-5]...................................................... 5, 21, 28

Fed. R. Civ. P. 65 ................................................................................... 1, 33

**CASE LAW:**

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) .................................. 17

*In re Level 3 Commc'ns Sec. Litig.*, 667 F.3d 1331 (10th Cir. 2012) ............................. 17, 25, 28

*SEC v. C. Jones & Co.*, 2009 WL 539615 (D. Colo.),
*aff'd sub nom. SEC v. Curshen*, 372 F. App'x 872 (10th Cir. 2010) ....................................*Passim*

*SEC v. Abellan*, 674 F.Supp.2d 1213 (W.D. Wash. 2009) .........................................23

*SEC v. Blavin,* 760 F.2d 706 (6th Cir. 1985) ...................................................23

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963)................................23

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ................................................. 29

*SEC v. Corporate Relations Group*, 2003 WL 25570113 (M.D. Fla. Mar. 28, 2003) .................23

*SEC v. Credit Bancorp Ltd.*, 2010 WL 768944 (S.D.N.Y. Mar. 8, 2010) ................................. 30

*SEC v. Czarnik*, 2010 WL 4860678 (S.DN.Y. Nov. 29, 2010) ..............................................27, 29

*SEC v. Drucker*, 1983 WL 1369 (S.D.N.Y. Sept. 26, 1983) ........................................28

*SEC v. Esposito*, 260 F. Supp. 3d 79 (D. Mass. 2017) .........................................27-28

*SEC v. Gagnon*, 2012 WL 994892 (E.D. Mich. Mar. 22, 2012) .................................................18

*SEC v. Hedén*, 51 F. Supp. 2d 296 (S.D. N.Y. 1999) .............................................30

*SEC v. Huttoe*, No. 96-2543(GK), 1998 U.S. Dist. Lexis 23211 (D.D.C. Sept. 14, 1998) ..........23

*SEC v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000) ............................................... 29

*SEC v. Int'l Swiss Inv. Corp.*, 895 F.2d 1272 (9th Cir. 1990)  ...................................... 33

*SEC v. Liberty Capital Group, Inc.,* 75 F.Supp.2d 1160 (W.D. Wash.1999)..............................18

*SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342 (D.N.J. 2009)  .................................... 26

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972)  ..................................  29-30

*SEC v. Mantria Corp.*, 2011 WL 3439348 (D. Colo. Aug. 5, 2011)............................................20

*SEC v. McDuffie*, 2014 WL 4548723 (D. Colo. Sept. 15, 2014)  ........................................ 17, 26

*SEC v. Miller*, 808 F.3d 623, 635 (2d Cir. 2015)..........................................................29

*SEC v. Park*, 99 F. Supp. 2d 889 (C.D. Ill. 2000)............................................................23

*SEC v. Presto Telecomm., Inc.*, 153 F. App'x 428 (9th Cir. Nov. 2, 2005)  ................................ 29

*SEC v. Shields*, 2011 WL 3799061 (D. Colo. Aug. 26, 2011)  ..................................... 17

*SEC v. Smart*, 678 F.3d 850 (10th Cir. 2012)  .................................................. 17, 24, 26

*SEC v. Sullivan*, 68 F. Supp. 3d 1367 (D.Colo. 2014)....................................................... 26

*SEC v. Unifund Sal*, 910 F.2d 1028 (2d Cir. 1990)  ..................................................... 30

*SEC v. Wencke*, 622 F.2d 1363 (9th Cir. 1980)  ........................................................ 29

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008)  .......................................................17

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011) ........................................................... 17, 29

*Stoneridge Inv. Partners, L.L.C. v. Sci.-Atlanta, Inc.*, 552 U.S. 148 (2008)  ............................. 26

*United States v. Amick*, 439 F.2d 351 (7th Cir. 1971) ...................................................18

*United States v. Naftalin*, 441 U.S. 768, 772-73 (1979)..................................................27

*United States v. Wenger*, 427 F.3d 840 (10th Cir. 2005) ...................................... *Passim*

Plaintiff, the United States Securities and Exchange Commission ( "Commission" or "SEC"), hereby moves the Court, on an emergency basis, for an order freezing assets and for other emergency relief against Jeffrey O. Friedland ("Friedland"), Global Corporate Strategies LLC, and Intiva Pharma, LLC (collectively, "Defendants"), as well as Relief Defendants Lane 6552 LLC, Kathy B. Friedland, Aspen Upper Ranch LLC, Assurance Management, LLC, and The Jeffrey And Kathy Friedland Irrevocable Trust (collectively, "Relief Defendants"), in order to prevent further dissipation of the ill-gotten proceeds from Friedland's fraudulent sales of securities and provide a corpus for recovering these funds.

This motion is made pursuant to Rule 65 of the Federal Rules of Civil Procedure, Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)(1)], and is supported by: the Commission's Complaint; the Declarations of Michael T. Grimes ("Grimes Decl."), Charles J. Felker ("Felker Decl."), and Shipra Wells ("Wells Decl."), and exhibits attached thereto; all of which are submitted with this Motion.

The SEC seeks an Order: (1) freezing funds and other assets of Defendant and Relief Defendants, wherever located, that are derived directly or indirectly from the proceeds of Friedland's fraudulent sale of securities alleged in the Commission's Complaint; (2) requiring Defendants and Relief Defendants to provide an accounting of such funds and other assets; (3) prohibiting the destruction or alteration of all electronic communications and electronic and hard-copy documents; (4) providing for expedited discovery; (5) providing alternative service by the Commission; and (6) setting this matter for a further hearing to allow Defendant and Relief Defendants to show cause why the asset freeze should not remain in place pending final resolution of this matter.

# I.     PRELIMINARY STATEMENT

Jeffrey O. Friedland ("Friedland") engaged in a nearly $7 million securities fraud scheme to conceal the nature of his interest in an Israeli medical marijuana company, OWC Pharmaceutical Research Corp. ("OWC"), to allow him to unload his considerable holdings in OWC stock into a market that he helped artificially inflate.  As part of his scheme, Friedland touted OWC to investors while misrepresenting both the nature of his investments in OWC and his professional relationship with the company.

In August 2014, Jeffrey O. Friedland acquired more than 1.3 million shares of restricted stock in OWC when he made an early private placement investment through one of his companies, Intiva Pharma LLC ("Intiva").[1]  Friedland acquired another 5.1 million shares of restricted OWC stock in February 2016 through one of his other companies, Global Corporate Strategies LLC ("Global"), as compensation for a January 2016 agreement that he signed to handle OWC's media and investor relations in the United States for a period of two years.

Between February 2016 and September 2017, Friedland participated in interviews, made presentations, sent out emails discussing his early investment in OWC, and touted OWC to media, industry, and investors.  Through these efforts he created the false impression that he was merely an early investor in OWC and, as a result of that investment and his experience and expertise in the nascent medical marijuana industry, was asked by OWC to become a member of its advisory board.  In fact, Friedland had been paid millions of shares of stock by OWC to

---

[1]   Restricted securities are securities acquired in unregistered, private sales from the issuing company or from an affiliate of the issuer. Investors typically receive restricted securities through private placement offerings, Regulation D offerings, employee stock benefit plans, as compensation for professional services, or in exchange for providing "seed money" or start-up capital to the company.  When an investor acquires restricted securities, they must find an exemption from the SEC's registration requirements to sell them in a public marketplace.

promote the company to the press and investing public, and that stock constituted more than 75% of his holdings, dwarfing his direct investment interest in OWC.

Friedland also made material false statements to potential and actual OWC investors to induce them either to purchase OWC stock or refrain from selling shares they already held. Indeed, as OWC's closing stock price increased from the fall of 2016 to its peak in late March 2017, Friedland made numerous public appearances on behalf of OWC using his perceived stature and expertise as an advisor to the company to support its increasing share price, making false statements to investors that he was a buy-and-hold long-term investor in OWC when he was in fact making preparations to sell—and at later points actually selling—his OWC holdings. Friedland proceeded to communicate to investors that his was a long-term investment in OWC as its share price declined, going so far as to say they needed to be patient investors like he has been, while he was in the process of selling virtually his entire stake in the company.

Under the federal securities laws, it is illegal for a person to give publicity to a company's stock for compensation without disclosing both the retention to give such publicity and the amount of compensation received for such efforts, and to do so while selling the company's stock without any contemporaneous disclosure. *See, e.g.*, *U.S. v. Wenger*, 427 F.3d 840, 854 (10th Cir. 2005). Between February 2016 and August 2017, however, Friedland sent emails and participated in interviews on OWC's behalf without ever disclosing that OWC had hired him to handle its media and investor relations and been paid to do so with millions of shares of OWC stock. Friedland also never disclosed that he was in the process of liquidating his OWC holdings and, in fact, told investors his investment in OWC was "long term" and "we believed in it then, we believe in it now" on or around days when he was selling OWC stock.

Friedland compounded his misrepresentations and omissions by taking deceptive steps to sell Global's OWC stock into the market that he helped artificially inflate.  While Friedland later sold Intiva's OWC stock through an account opened in Intiva's name, he took a much more convoluted route to sell Global's OWC stock and provided inaccurate and misleading information to brokers and the stock transfer agent in the process.  Indeed, rather than simply open a trading account for Global, Friedland,

   (1)   helped his wife open brokerage accounts at two broker dealers for Lane 6552 LLC, a brand new company they created with no apparent business purpose and Kathy Friedland as its sole owner,

   (2)   transferred ownership of Global's OWC stock to Lane 6552, and provided the transfer agent with false information and a misleading opinion letter from a disbarred attorney in order to get the restricted legend removed from the stock;

   (3)   provided inaccurate and misleading information when opening brokerage accounts about how Global and Lane 6552 came into possession of the OWC stock and how much stock was beneficially owned and controlled;

   (4)   deposited and sold Global's OWC's shares out of Lane 6552's second brokerage account after the first broker dealer would not sell the stock because it had been earned by Global for doing investor relations that appeared to be ongoing; and

   (5)   transferred the proceeds first to a Lane 6552 bank account and then to a Lane 6552 investment account.

After completing these tasks, Friedland and his wife spent millions of dollars on all-cash purchases of two homes, purchased two vehicles and a classic piano, and paid off hundreds of thousands of dollars of debt, and transferred hundreds of thousands of dollars to family, friends, and affiliated entities.

Because Friedland, in his role as Managing Director of both Global and Intiva, routinely failed to disclose – in the course of touting OWC to investors – that he had been hired to handle OWC's media and investor relations in exchange for more than 5.1 million shares of its stock, Friedland, Global, and Intiva also violated Section 17(b) of the Securities Act [15 U.S.C. §77q(b)]. In addition, because Friedland (1) made materially false or misleading statements or

omitted to state material information about both his relationship with and ownership interest in OWC; (2) offered and sold OWC securities in the secondary market while at the same time touting the company; and (3) engaged in deceptive acts in order to sell Global's OWC stock, Friedland, Global, and Intiva violated Section 17(a) of the Securities Act[15 U.S.C. §77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

Emergency relief in the form of an asset freeze is necessary to preserve the ill-gotten proceeds of Friedland's fraud and any assets procured using those proceeds.

## II.    STATEMENT OF FACTS

**A.    Defendant, Relief Defendants, and Relevant Entity.**

Jeffrey O. Friedland is a Colorado businessman and the founder and Managing Director of Global Corporate Strategies, LLC ("Global") and Intiva Pharma LLC ("Intiva"), both Colorado companies.  Grimes Decl. ¶ 6.a.  In November 2015, Friedland published a book called *Marijuana: The World's Most Misunderstood Plant*, based in part on his experience owning two retail cannabis stores in Colorado ski towns Breckenridge and Crested Butte, as well as a cannabis cultivation facility in Steamboat Springs.  Over the past ten years, Friedland has filed Reports of Foreign Bank and Financial Accounts (FBARs) with the Internal Revenue Service (IRS) disclosing his roles with or investments in foreign penny stock companies, as well as his ownership or control over numerous bank and investment accounts in foreign jurisdictions, including Hong Kong, Germany, and Switzerland.  Grimes Decl. ¶ 82.  In 1984, without admitting or denying liability, Friedland consented to the entry of Final Judgment in the U.S. District Court for the District of Columbia, *SEC v. Gary A. Agron, et. al.*, Civil Action No. 84-3025 (D.D.C.), permanently enjoining him from violating, among other things, the antifraud

provisions of the Securities Act.  *See* Litigation Release No. 10543, 31 SEC Docket 580, 1984 WL 470960 (Sept. 28, 1984)

Relief Defendant Kathy B. Friedland is a Colorado resident and the wife of Defendant Friedland, a member of Defendant Global, and the sole owner of Relief Defendant Lane 6552 LLC and principal of Relief Defendant Aspen Upper Ranch LLC ("Aspen").  Grimes Decl. ¶ 6.f. Lane 6552 is a Colorado company organized in January 2017 with Kathy Friedland as its sole member and principal, and Friedland helped his wife create brokerage accounts for Lane 6552 so they could sell Global's OWC stock.  *Id*. ¶¶ 6.g, 20.  Aspen is a Colorado company organized in June 2017, with Kathy Friedland listed as its registered agent and principal.  *Id*. ¶ 6.h.  The Friedlands transferred to Aspen the ownership of the nearly $2 million Snowmass, Colorado home that they purchased for cash in August 2017 using proceeds from Friedland's fraudulent sales of OWC stock.  *Wells* Decl. ¶ 5.k.  The Jeffrey and Kathy Friedland Irrevocable Trust received $112,000 of proceeds from Friedland's fraudulent sales of OWC stock for no apparent consideration.   Wells Decl. ¶ 5.l.

Assurance Management, LLC ("Assurance"), is a Colorado company organized in March 2016 by Beryl Zyskind,[2] with the same principal office address as Global and Intiva: 3773 Cherry Creek N Dr., Suite 575, Denver, CO 80209.  Grimes Decl. ¶ 6.i.  In August 2017, Assurance received more than $330,000 of proceeds from Friedland's fraudulent sales of OWC stock for no apparent consideration.  Wells Decl. ¶¶ 10.c-10.e.

OWC Pharmaceutical Research Corp. ("OWC") is an Israeli medical marijuana company that was incorporated in Delaware in March 2008 under the name Dynamic Applications. Grimes Decl. ¶ 5.  On February 13, 2013, its securities were registered with the Commission

---

[2]  In November 1996, Beryl Zyskind was sentenced to 30 months imprisonment following his conviction for bank fraud, misappropriation of funds held as a fiduciary, and theft of federal funds.  *United States v. Zyskind,*Case No. 1:95-cr-175 (E.D.N.Y.), *aff'd*, No. 1614, Dkt. 96-1770 (Jul. 2, 1997).

under Section 12(g) of the Securities Act. *Id.* In November 2014, Dynamic Applications

changed its name to One World Cannabis Pharmaceutical Research Corp. and OWC's stock is

presently quoted on the over-the-counter stock quotation billboard (OTCQB) using the symbol

"OWCP." *Id.* For the purposes of this action, "OWC" will be used in reference to either

Dynamic Applications or OWC.

**B.     Friedland Made Material Misrepresentations and Omissions About His OWC
         Affiliation And Stock Ownership While Selling His OWC Holdings.**

**1.     Friedland Made Material Misrepresentations and Omissions.**

In August 2014, Friedland purchased 1.4 million shares of restricted OWC stock when he

made an early investment in OWC through one of his companies, Intiva, and the ownership of

these securities was identified in OWC's SEC filings (albeit as "Invita" rather than Intiva).

Grimes Decl. ¶ 8. Approximately sixteen months later, in January 2016, Friedland was hired by

OWC through one of his other companies, Global, to handle OWC's media, public relations, and

investor relations strategy in the United States for the next two years. *Id.* ¶ 11.

In this role, Friedland agreed to "create a higher level awareness of the company, as well

as the anticipated impact with the investors[;] [Global] will provide both an introduction of the

company to the overall American population, as well as specifically target investors." *Id.* ¶ 12.

Friedland also agreed to establish a Facebook page and Twitter account for OWC, and assist

OWC in reaching investors by writing news releases, shareholder letters, corporate summaries,

and website copy. *Id.* In February 2016, Global received 5.1 million shares of stock from OWC

pursuant to the compensation terms of the agreement. *Id.* ¶ 14. OWC disclosed in reports filed

with the SEC that Global owned these securities – which amounted to roughly 6.3% of OWC's

common stock at that time – and that Friedland controlled them as Global's President and CEO,

but made no disclosure as to how they were acquired. *Id.* ¶ 16.

During a February 2016 internet interview with Seattle-based Cannabis FN Media, Friedland was introduced as "Jeffrey Friedland from OWC," and explained that Intiva made its 2014 investment in OWC because "we believed in the company's vision." *Id.* ¶ 16 & Ex. 2 at 3:8-9. Friedland further explained how he had "recently . . . gotten more involved in the company"– "[a]fter my book . . . got published, they asked me to come in and help them . . . out in the United States to interface both with the cannabis community as well as with the financial community." *Id.* at 3:11-18. Friedland described OWC as "leading edge" in the medical marijuana delivery space with a "pragmatic business plan" and a "company [that] is generating money." *Id.* at 11:5-13. Friedland added, "what the world needs and what OWC Pharmaceutical Research is bringing to the table is real medicine based on real science," and "investors need to put [OWC] on their radar screen," "watch for news," and "stay tuned for the future developments." *Id.* at 5:21-22, 11:22-24. At no point during this interview did Friedland disclose that he and Global had just been *hired* by OWC to handle media and investor relations and *paid* more than 5.1 million shares of stock to do so. *Id.*

On March 15, 2016, OWC issued a press release announcing that Friedland had joined OWC's Advisory Board to advise on business development efforts. *Id.* ¶ 17. OWC's CEO stated in the press release, "Jeffrey is an active investor and advisor to the cannabis sector, bringing a wealth of knowledge and insight to OWC Pharmaceuticals. *Id.* His experience in both the cannabis and financial markets will be invaluable as we work to commercialize our proprietary products and technologies." *Id.* The press release mentioned Friedland's book and listed his email address and telephone number under contact information for OWC in the United States, but did not mention that OWC had just hired Friedland and Global to handle its media

and investor relations in the United States and paid more than 5.1 million shares of OWC stock for those activities.  *Id.*

On January 4, 2017, Cannabis FN Media posted an interview with Friedland in which he explained Intiva's investment in OWC: "So, we sat down with the management team and the company that I am still CEO of, Intiva, we made a private placement investment in OWC Pharmaceutical Research early summer of 2014.  We bought the stock in a private placement. ***It's restricted stock.  We're still sitting with the stock.  For us, it's a very, very long-term situation* . . . ."**  *Id.* ¶ 22 & Ex. 4 at 4:24-5:5 (emphasis added).  In this interview, Friedland explained "***that 2017 is going to be a fabulous, fabulous year*** globally in the cannabis industry, and *__especially for companies like OWC Pharmaceutical Research__ that have an incredibly good business model and business plan.*"  *Id.* ¶ 22 & Ex. 4 at 3:25-4:4 (emphasis added).  He further stated "the real money in this industry is not going to be on the recreational side . . . it's really about pharmaceuticals. . . .  *And that's where the real future and real potential of OWC is*."  *Id.*¶ 22 & Ex. 4 at 8:13-14 (emphasis added).  At no point during this interview did Friedland disclose his media and investor relations agreement with OWC or the 5.1 million shares of stock he received as compensation.  *Id.* ¶ 22.[3]

On March 6, 2017, Friedland appeared as a featured speaker in an internet interview with New Jersey-based Pot Stock Radio and a link to this interview was posted to OWC's Facebook page and Twitter feed that same day.  *Id.* ¶ 45 & Ex. 5 .  During his hour-long Pot Stock Radio interview, Friedland told the host and listeners that he was not an officer or director of OWC, and was "not doing investor relations for the company."  *Id.* ¶ 45 & Ex. 5 at 20:16-18.  Friedland said that he had been asked to join OWC's advisory board in February 2016, "because the

---

[3]   Cannabis FN Media re-broadcast this interview on March 27, 2017.  Grimes Decl. ¶ 54.

company that I'm CEO of, a private company in the United States called Intiva Inc. . . [w]e

invested in OWC . . . during the early summer of 2014, almost three years ago.  So, *we*

*believed in it then, we believe in it now*."  *Id. ¶* 45 & Ex. 5 at 20:19-21:1.  Friedland proceeded

to discuss OWC's debt-free finances and compared it to vastly larger publicly-traded

pharmaceutical companies:

> OWC has $2 million in the bank.  How many companies are debt-free that you
> have – on your show?  *OWC is – debt free*. . . . *OWC is a small company, but,*
> *um, I am comfortable in – I would tell, you know, your listeners*, um, you
> know, look at the 10- the 8-Ks over the last twelve months.  *Look at the news*
> *releases.  Do their research*.  Come to their own conclusions, and if they can –
> understand *if they can buy into my vision – and my vision being that the real*
> *money's going to made in the cannabis sector in pharmaceutical development*
> *– if people can be patient investors*, they can see why I can talk about Insys
> Therapeutics, INSYS on NASDAQ – GW Pharm, GWPH, and *I can talk about*
> *OWC Pharmaceutical Research, OWCP in the same sentence* ….

*Id. ¶* 45 & Ex. 5 at 53:25-55:8 (emphasis added).  At no point in this interview did Friedland

say that OWC had hired him in January 2016 to handle its media and investor relations in

exchange for 5.1 million shares of OWC stock.

On July 4, 2017, Friedland was interviewed by Minneapolis-based "Wall Street Raw"

to discuss OWC's recent market readiness announcement regarding its topical cream, which

Wall Street Raw broadcast on July 8.  *Id. ¶* 69.  Friedland was introduced as the managing

director of Friedland Capital, an advisory board member of OWC, and the CEO of Intiva,

which made an early stage investment in OWC in 2014.  *Id. ¶* 69 & Ex. 7 at 2:6-12.  During this

interview, Friedland discussed OWC and its connection to the Israeli pharmaceutical

development environment:  "OWC is . . . a pharmaceutical development company, and

[listeners] have to also understand that it's about Israel, it's about sciences, and it's about the

cannabis space in Israel, and I think that is the key, and *OWC and its management team over*

*there, um, are incredibly plugged in to what's happening in Israel, which is leading edge on*

*pharma development world-wide*." *Id.* ¶ 69 & Ex. 7 at 4:4-10 (emphasis added).  At no point

during this interview did Friedland mention that OWC had hired him to handle its media and

investor relations for 5.1 million shares of OWC stock, nor did he mention that that he had sold

all of that stock and was in the process of selling Intiva's entire investment as well.

On July 29, 2017, Friedland participated in an interview on YouTube-based "Looking at

the Markets," about the marijuana industry and OWC. During the interview, Friedland made

the following statements about being patient investor in OWC:

> I am an investor and --- obviously in a lot of companies, and Intiva, Inc., a
> company I've been CEO of since first quarter of 2014, *we made an investment
> during the summer of 2014 in an Israeli company*, Israeli-based company, and
> Israel, as I'm sure many of your viewers know, is sort of the -- basically the center
> of pretty much all real cannabis research. *And that company is OWC
> Pharmaceutical Research.*  I'm not here to suggest anybody buy it or any holders
> sell it, but I have -- *we invested in 2014.  We still own the stock. A lot of the
> marijuana stocks have been hit over the last couple of weeks.  <u>I like what
> they're doing</u>.  I like that they're bringing in some science to this cannabis
> space*, and their first product, which they're seeking marketing and distribution
> globally with is a cream, a proprietary cream, for psoriasis.  *So with a full
> disclaimer, you know, we're shareholders.  I find it intriguing.  <u>I think they're
> ready to go</u>.*  I think a lot of investors who've been involved in the company are
> not as patient as I am, because when you're talking about drug development,
> you're talking about pharmaceuticals, it takes time, you know?  It just takes time.

*Id*. ¶ 74 & Ex. 8 at 12:10-13:10 (emphasis added).  At no point during this interview did

Friedland mention his agreement to handle OWC's media and investor relations in exchange for

5.1 million shares of OWC stock, nor did he mention that that he had sold all of that stock and

was in the process of selling Intiva's entire investment as well.

Between January 2017 and September 2017, Friedland used his Global and Intiva email

accounts to invite listserve recipients to attend an OWC promotional event and announce

upcoming appearances at conferences relating to the cannabis or medical marijuana industries.

Id. ¶¶ 19, 21, 23, 28, 34, 38, 43, 49, 50, 51, 53, 57, 62, 65, 66, 72, 76, 78, 79.  For example, on

January 4, 2017, Friedland used his Global email to inform recipients of his upcoming

participation in the "Cowen and Company Cannabis Colloquium."  On February 8, 2017, Friedland used his Global email to announce that he would soon "Speak on 'Investing in Israeli Know-How' at CannaTech in Tel Aviv."  *Id.* ¶ 21.  Similarly, on March 23, 2017, Friedland invited recipients to "Attend Jeffrey Friedland's Panel: 'Public Markets: Investments in the Cannabis Sector" in San Jose, California.  *Id.* ¶ 34.  In all of these emails, Friedland mentioned Intiva's 2014 investment in OWC and, in virtually all of them, provided a lengthy description of virtually all of his work experience, and asserted that he was "a member of the advisory board of OWC Pharmaceutical Research."  *Id.* ¶ 53.  In none of these emails, however, did Friedland ever disclose his role with Global or his January 2016 agreement through Global to handle OWC's media and investor relations or the 5.1 million shares of stock he received from OWC as compensation for taking on these responsibilities.  *Id.* ¶¶ 19, 21, 23, 28, 34, 38, 43, 49, 50, 51, 53, 57, 62, 65, 66, 72, 76, 78, 79.  Moreover, in emails from June through September 2017, while Friedland mentioned Intiva's 2014 investment, he failed to disclose either that he was in the process of selling (or had already completely sold) Intiva's entire investment.  *Id.* ¶ 65, 66, 72, 76, 78, 79.

### 2. Friedland And His Wife Took Deceptive Measures to Sell Global's OWC Stock While He Touted OWC to Investors.

On or about January 3, 2017, Kathy Friedland organized Lane 6552 LLP, a new company with her as its sole member and principal.  *Id.* ¶ 20.  On or about January 14, 2017, Friedland submitted a request from Lane 6552 to OWC's transfer agent to reissue Global's 5,134,375 shares of OWC stock to Lane 6552 LLC.  *Id.* ¶ 24.  In order to get the restrictive legend lifted from the securities, Friedland provided the transfer agent with an opinion letter from a disbarred attorney that included factual inaccuracies about the timing of Global's acquisition of OWC stock and suggested Friedland was uninvolved with Lane 6552 and Kathy Friedland was

uninvolved with Global. *Id.* Friedland also told the transfer agent that Global purchased the stock from OWC in January 2016 for $51,343.75, but there has been no evidence of such payment and the terms of Global's agreement with OWC indicate the stock was compensation for media and investor relations services and not in exchange for any payment. *Id.* ¶ 25. Friedland further represented to the transfer agent that the shares were not being transferred from Global to Lane 6552 as a gift, inheritance, or wash sale, but were instead acquired by Lane 6552 on January 13, 2017 for $205,375. *Id.* ¶ 26. Here too, there has been no evidence of any such payment by Lane 6552 (which on January 13 was a brand new entity with no business operations), nor any such payment received by Global (from Lane 6552 or otherwise). Wells Decl. Ex. B.

On or around January 30, 2017, Friedland purported to act as an authorized representative of Lane 6552 in communications with a broker dealer ("Broker Dealer A") about selling Global's OWC stock, and provided his personal credit card for use with that broker dealer. *Id.* ¶ 29. Friedland helped his wife open a trading account for Lane 6552 with Broker Dealer A, filling out and submitting by email various forms including the Seller's and Broker's Representation Letters, a Transfer Instruction Form that Friedland filled out but his wife signed, as well as an opinion letter from a disbarred attorney stating that the shares should be transferred without any restrictive legend because Global had no economic interest in or control over Lane 6552. *Id.* ¶ 24, 29.

Very soon thereafter, on February 3, 2017, OWC's transfer agent reissued the 5,134,375 restricted OWC shares to Lane 6552, and agreed to a request from Broker Dealer A to remove the restrictive legend after which Broker Dealer A asked its clearing firm ("Clearing Firm A") to sell the shares. *Id.* ¶ 30. Clearing Firm A refused to execute the sell order because it had

concerns that Lane 6552 was trying to sell into to an inflated market and, among other things, the stock had been acquired by Global in exchange for performing investor relations services for OWC and it appeared to the clearing firm that those investor relations services were still being performed. *Id.* ¶ 31.  On February 6, 2017, Friedland emailed the broker at Broker Dealer A asserting that while the "initial intent" of his agreement with OWC "was to provide public relations and related services, the agreed upon task was switched by mutual consent to one on assisting the company with strategic direction primarily in Canada, in approximately July 2016." *Id.* ¶ 32.  Friedland further represented that he "ha[s] no role in the public relations or IR side, but at some events mention the company as well as other companies."  Friedland did not send any documentation to substantiate the professed change to his role with OWC.  *Id.*

On or around February 16, 2017, after Broker Dealer A rejected the Friedlands' efforts to sell Global's OWC shares out of the Lane 6552 account at that firm, Friedland helped his wife open another account for Lane 6552 at another broker dealer, Spencer Edwards, Inc., and attempted to deposit the 5.1 million shares.  *Id.* ¶ 35.  Friedland acted as the point of contact in communications with a broker at Spencer Edwards and sent all requisite forms and wire transfers, and disclosed that Broker Dealer A Clearing Firm A had rejected their prior attempt to sell the shares.  *Id.*  On February 23, 2017, the clearing firm for Spencer Edwards ("Clearing Firm B") received an attorney opinion letter from one of its attorneys approving sales of OWC stock out of the Lane 6552 account at Spencer Edwards – noting the relationship between Friedland and Global, on the one hand, and Kathy Friedland and Lane 6552, on the other – after which Clearing Firm B agreed to sell the shares.  *Id.* ¶ 39.

On March 2, 2017, the 5.1 million shares of unrestricted OWC stock were deposited into the Lane 6552 account, and the Friedlands immediately sold 173,807 shares for net proceeds

(after broker commissions and fees) of $284,817.  *Id.* ¶ 41.  Between March 2, 2017 and March 22, 2017, during and around times when Friedland was touting OWC in interviews and describing Intiva's early investment in OWC in interviews and emails, the Friedlands sold the entire 5,134,375 shares of OWC stock out of the Lane 6552 account at Spencer Edwards for total net proceeds of $6,490,396.  *Id.* ¶ 52.

### 3.      Friedland Sold Intiva's OWC Stock While He Touted OWC to Investors.

In April and May 2017, Friedland began taking steps to sell the 1.3 million shares of stock that Intiva acquired with its early investment in OWC in 2014.  Grimes Decl. ¶ 55.  On April 13, 2017, Friedland sent an email to another investor indicating his intention to work with a broker at Spencer Edwards to "in liquidating [I]ntiva's OWC position."  *Id.*  On May 10, 2017, Friedland sent a follow up email about opening the account, confirming that "Evan Wasoff, Intiva's CFO will handle this."  *Id.* ¶ 58.  In May 2017, Friedland engaged a disbarred attorney to sign an opinion letter recommending the removal of the restrictive legend from Intiva's stock certificate.  *Id.* ¶ 59.

On May 22, 2017, Intiva's CFO opened an account with Spencer Edwards in Intiva's name, listing himself as the primary authorized person on the account and Friedland as the secondary authorized person.  *Id.* ¶ 60.  On May 24, 2017, Intiva filed a request with Clearing Broker B to deposit 1,322,222 shares of OWC stock.  *Id.* ¶ 61.  The documents submitted with this request falsely represented that neither Intiva nor any person affiliated with Intiva had sold any securities of the same class during the prior three months.  *Id.*  In fact, in the prior three months, Friedland who was Intiva's President and CEO, had sold the 5.1 million shares of OWC stock that Global received as compensation for his agreement to handle OWC's media and investor relations.  *Id.* ¶ 52.  Intiva further represented that it is not currently promoting OWC nor, at any time while selling the securities on deposit in the account, did it plan to promote or

engage a third party to promote OWC (whether through social media, print publications, emails, tweets, or any other means). *Id.* ¶ 61.

On June 12, 2017, OWC's stock transfer agent, relying in part on the attorney opinion letter from a disbarred attorney obtained by Friedland to remove the restrictive legend from Intiva's OWC stock, issued to Intiva a new certificate for *unrestricted* shares for deposit at Clearing Broker B. *Id.* ¶ 64.  On June 27, 2017, Friedland opened an account with First American State Bank for Intiva, listing Friedland and Intiva's CFO as agents. *Id.* ¶67.  That same day, Intiva sold 136,053 shares of OWC stock through Spencer Edwards for net proceeds of $93,804, which were wire-transferred to the new Intiva account at First American Bank. *Id.* ¶ 68; Wells Decl. ¶ 9.

In total, between June 27 and September 22, 2017, during and around times when Friedland was touting OWC in interviews and describing Intiva's early investment in OWC in interviews and emails, Friedland directly or indirectly offered and sold 1,297,222 shares of Intiva's OWC stock for net proceeds of more than $479,000, of which more than $475,000 was wire-transferred to the Intiva account at First American Bank. *Id.* ¶ 80; Wells Decl. ¶¶ 9-10

### 4.   The Friedlands Spent, Invested, Or Transferred to Others Virtually All of the Proceeds from Friedland's Fraudulent Sales of OWC Stock.

As outlined above, Friedland and his wife received more than $6.9 million in total net proceeds from Friedland's direct or indirect offer and sale of more than 6.4 million shares of OWC stock, which he owned or controlled through Intiva's 2014 early investment in OWC and as compensation for his January 2016 agreement to take on OWC's media and investor relations. Grimes Decl. ¶¶ 52, 80.  Kathy Friedland wire-transferred roughly $6.5 million of these proceeds from the Lane 6552 brokerage account with Spencer Edwards to a Lane 6552 bank account that Friedland helped her open at First American State Bank while they were selling the stock.  Wells

Decl. ¶ 4.  She then immediately transferred approximately $4,100,000 to a Lane 6552

investment account at Fidelity that Friedland also helped her open around the same time, where

more than $3 million remains as of March 1, 2018.  *Id.* ¶ 5.c.

The Friedlands also used proceeds from the fraudulent sale of OWC stock to make large

purchases and transfers.  Specifically, the Friedlands:

- Paid cash for a $1.8 million home in Snowmass, Colorado (that they quickly deeded to Relief Defendant Aspen);

- Paid cash for a $687,000 condo in the Denver area;

- Paid roughly $100,000 cash for a classic piano and two vehicles;

- Transferred hundreds of thousands of dollars to relatives, associates, and entities under their control in exchange for no apparent consideration.  *Id.* ¶¶ 5-7.

### III.   LEGAL ARGUMENT

The antifraud provisions of the federal securities laws are "to be construed 'not

technically and restrictively' but flexibly to effectuate their remedial purposes."  *Affiliated Ute*

*Citizens v. United States*, 406 U.S. 128, 151 (1972) (internal quotation omitted).  "Fundamentally,

both Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act are designed to

protect 'investors from fraudulent practice.'"  *SEC v. McDuffie*, No. 12-cv-02939, 2014 WL

4548723, *8 (D. Colo. Sept. 15, 2014) (quoting *SEC v. Wolfson*, 539 F.3d 1249, 1257 (10th Cir.

2008); *SEC v. Smart*, 678 F.3d 850, 856 (10th Cir. 2012).  Friedland's scheme to fraudulently

sell OWC stock, use of deceptive devices, and misrepresentations and omissions violated both of

these provisions, and this emergency action seeks an immediate asset freeze and other relief to

preserve the proceeds of Friedland's fraudulent conduct.  Such relief turns, in part, on the

showing of at least an inference that Friedland has violated the securities laws.  *See, e.g.*, *Smith v.*

*SEC*, 653 F.3d 121, 128 (2d Cir. 2011); *SEC v. Shields*, No. 11-cv-02121, 2011 WL 3799061, *1

(D. Colo. Aug. 26, 2011).  As demonstrated below, the Commission has made such a showing.

A.    **Friedland Violated Section 17(b) of the Securities Act By Touting OWC Without Disclosing Compensation from OWC.**

Section 17(b) of the Securities Act makes it unlawful for "any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to . . . give publicity to, or circulate any . . . communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer . . . without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof."  15 U.S.C. § 77q(b); *United States v. Wenger*, 427 F.3d 840, 850 (10th Cir. 2005).  The elements of a Section 17(b) claim are: "(1) publication of communication concerning a security; (2) failure to disclose compensation received; and (3) use of interstate commerce."  *SEC v. C. Jones & Co.*, No. CIVA03CV00636-WDMKLM, 2009 WL 539615, at *5 (D. Colo. Mar. 3, 2009), *aff'd sub nom. SEC v. Curshen*, 372 F. App'x 872 (10th Cir. 2010) (*citing SEC v. Gorsek,* 222 F.Supp.2d 1099, 1105 (C.D.Ill.2001); *SEC v. Liberty Capital Group, Inc.,* 75 F.Supp.2d 1160, 1163 (W.D. Wash.1999) (*scienter* not an element); *SEC v. Gagnon*, No. 10-CV-11891, 2012 WL 994892, at *10 (E.D. Mich. Mar. 22, 2012) (*scienter* not an element).

As the Tenth Circuit has explained, "[t]he disclosure requirement imposed by Section 17(b) is . . . reasonably related to the goal of fraud prevention."  *Wenger*, 427 F.3d at 850. "Telling a listener or reader that the promoter has been bought and paid for, and for how much, directly informs prospective purchasers of the speaker's biases.  The listener is free to make an informed investment decision in light of that knowledge." *Id.*; *United States v. Amick*, 439 F.2d 351, 365 (7th Cir. 1971) (affirming conviction for violating Section 17(b): "The substantial interest of the investing public in knowing whether an apparently objective statement in the press concerning a security is motivated by promise of payment is [o]bvious.").  "Telling a listener or

reader that the promoter has been bought and paid for, and for how much, directly informs prospective purchasers of the speaker's biases," *Wenger*, 427 F.3d at 850, and "a simple one-sentence statement can do the trick." *Id*. at 852. "The listener is free to make an informed investment decision in light of that knowledge." *Id*. "A publicist who fails to disclose that he has an interest in the companies he promotes will almost always mislead his audience into thinking that his advice is disinterested." *Id.* at 845. This District Court has recently held that, "the reasonable investor would consider it important whether to buy or sell stock that the individual promoting the sale was being compensated for the promotion and is selling the same stock for his own benefit." *SEC v. C. Jones*, 2009 WL 539615 at *5.

### i. Friedland Touted OWC Without Disclosing Compensation.

In the present case, as explained above, between February 2016 and September 2017, Friedland touted OWC in numerous emails and media interviews, mentioning Intiva's early investment in OWC and his role on OWC's advisory board as a result of that investment, without disclosing the compensation he received to give publicity to OWC. Most significantly, in February 2016, shortly after agreeing to handle OWC's media and investor relations and receiving 5.1 million shares of stock to do so, Friedland explained to investors listening to Cannabis FN that OWC is "leading edge" with a "pragmatic business plan [that] is about generating revenue now," and advising "investors need to take a look at what [OWC] is really about" and "investors need to put it on their radar screen" and "watch for news." Grimes Decl. ¶ 16 & Ex. 2 at 3:3, 11:8-10, 10:19-20, 11:22-24. Similarly, in January 2017, as he was making preparations to sell Global's OWC stock, Friedland extolled OWC to Cannabis FN listeners:

"*2017 is going to be a fabulous, fabulous year globally in the cannabis industry, and especially for companies like OWC Pharmaceutical Research that have an incredibly good business*

*model and business plan*.” *Id.*¶ 22 & Ex. 4 at 3:25-4:4.  Friedland further touted OWC in July 2017, after he had sold Global's OWC stock and while he was in the process of selling Intiva's OWC stock: “*[s]o with a full disclaimer*, you know, *we're shareholders.  I find it intriguing.  I think they're ready to go*.” *Id.*¶ 74 & Ex. 8 at 13:5-6 (Emphasis added.)

Friedland was far from providing “a full disclaimer” to investors because in none of his broadcast interviews or emails, from February 2016 through September 2017, did he ever disclose his agreement to handle OWC's media and investor relations for two years or the millions of shares of stock he received as compensation for doing so.  Friedland's conduct is virtually indistinguishable from the consultant in *Wenger* who was found criminally guilty for violating Section 17(b) when he received millions of shares of stock in exchange for helping to publicize an issuer without disclosing the amount of shares received.  *Wenger*, 427 F.3d at 844, 853; *see also SEC v. C. Jones & Co.*, 2009 WL 539615, at *5 (“The Defendant's internet messages touting Freedom Golf violated § 17(b) because of his failure to disclose his compensation.”).

### ii.    Friedland Used the Means of Interstate Commerce.

In the course of touting OWC to investors, Friedland undertook the following acts:

- sent emails to listserve distribution groups;
- participated in internet-based interviews with entities located in states other than Colorado;
- communicated with broker dealers by email and phone to open trading accounts for Lane 6552, and then deposit, offer, and sell Global's OWC stock out of one of those accounts;
- communicated with a broker by email and phone about establishing a trading account for Intiva and then arranging for the deposit, offer, and sale of Intiva's OWC stock; and
- wire transferred the proceeds of his fraudulent sales of OWC stock to banks, credit card companies, and other individuals and entities.

Through these efforts, Friedland directly or indirectly used the means of interstate commerce or the mails.  *See, e.g.*, *SEC v. Mantria Corp.*, 2011 WL 3439348, at *6 (D. Colo. Aug. 5, 2011) (finding that email and radio broadcasts constitute use of instruments or communication in interstate commerce).

**B.      Friedland Violated Section 10(b) of the Exchange Act and Rule 17(a) of the Securities Act By Making Material Misrepresentations and Omissions.**

Section 10(b) of the Exchange Act and Rule 10b-5 make it unlawful, in connection with the purchase or sale of securities, using the means or instruments of interstate commerce,[4] directly or indirectly, to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240-10b-5(b).  Sections 17(a)(2) of the Securities Act prohibits similar conduct in the offer or sale of securities. 15 U.S.C. § 77q(a)(2).

**i.      Friedland Made Misrepresentations and Omissions.**

As outlined above, between February 2016 and September 2017, Friedland touted OWC in emails and media interviews, described Intiva's early investment in OWC, and indicated that he had joined OWC's advisory board, but never once disclosed his media and investor relations agreement with OWC and the compensation he received for taking on these responsibilities. Indeed, in a February 2016 interview with CFN Media, Friedland touted OWC stock to investors: "investors need to take a look at what this company is truly about" and "put this on their radar screen," Friedland said he had "recently . . . gotten more involved in [OWC]" after being asked "to help them out in the United States to interface both with the cannabis community as well as with the financial community."  Grimes Decl. ¶ 16 & Ex. 2 at 3:11-18, 11:8-10, 10:19-20, 11:22-24.  Friedland failed to disclose in this interview that he had just received millions of

---

[4]   The above discussion of Friedland's use of use of the means or instruments of interstate commerce with respect to Section 17(b) liability applies equally to his liability for misrepresentations and omissions.

shares of stock for agreeing to handle media and investor relations for the company.  *Id*.

Likewise, in a March 6, 2017 interview on Pot Stock Radio, Friedland  told listeners only that he

had been asked in February 2016 to join OWC's advisory board and agreed to do so "because we

had an investment in the company, and I was incredibly impressed with the management team,

who I met in Israel," again failing to disclose that he had been paid millions of shares of stock

to handle OWC's media and investor relations, much less that he was in the process of selling

all of the shares.  *Id*. ¶ 45.  As the Tenth Circuit explained, "[a] publicist who fails to disclose

that he has an interest in the companies he promotes will almost always mislead his audience into

thinking that his advice is disinterested."  *Wenger*, 427 F.3d at 845.

   As also discussed above, Friedland participated in interviews where he talked about

OWC's current and future prospects and mentioned that he was an advisory board member of

OWC due to his early investment in the company through Intiva.  *Id*. ¶¶ 6, 22, 45, 69, 70, 74.

For example, in an interview with Cannabis FN Media posted to its website on both January 4,

2017 (and again on March 27, 2017), Friedland touted OWC to listeners when he explained that

"***2017 is going to be a fabulous, fabulous year*** globally in the cannabis industry, and ***especially***

***for companies like OWC Pharmaceutical Research*** t***hat have an incredibly good business***

***model and business plan***."  *Id*. ¶ 22.  Friedland also talked about the future of the cannabis

industry being in pharmaceuticals, adding "***[a]nd that's where the real future and the real***

***potential of OWC is***.  That's what I'm looking forward to, ***that's a long-term situation***."  *Id*.

(Emphasis added.)  While perhaps true at that time with respect to Intiva's OWC stock,

Friedland had begun efforts on January 3, 2017 to sell Global's OWC when he appears to have

helped his wife create Lane 6552 so they could sell the stock, and Friedland spent the rest of

January, February, and the first three weeks of March 2017 opening brokerage accounts and

selling all of Global's 5.1 million shares of OWC stock through Lane 6552.  *Id.* ¶¶ 20-52.

Likewise, in a July 8, 2017 interview with Wall Street Raw, and a July 29, 2017

interview about the marijuana industry and OWC on YouTube-based "Looking at the

Markets," Friedland discussed Intiva's early investment in OWC: "I'm not here to suggest

anybody buy it or any holders sell it, but I have -- ***we invested in 2014.  We still own the stock***."

*Id.* ¶¶ 69, 70, 74 & Ex. 8 at 12:19-22. (Emphasis added.)  These statements were false and

misleading because Friedland directly or indirectly offered and sold 136,053 shares of Intiva's

OWC stock on June 27, 2017, and another 202,003 shares of on July 27th and July 28th – the

two days preceding his "Looking at the Markets" interview.  Grimes Decl. Ex. C lines 18-

21Similarly, in emails sent between June and the end of September 2017, Friedland persisted in

mentioning Intiva's 2014 investment on OWC, but he failed to disclose that he was in the

process of selling (or had already completely sold) Intiva's entire investment.  Grimes Decl. ¶¶

65, 66, 72, 76, 78, 79.

     **ii.**    **Friedland's Misrepresentations and Omissions Were Material.**

Friedland's undisclosed selling of OWC stock against his explicit and implicit

recommendations or endorsements of OWC constitutes fraud or deceit under the federal

securities laws.  *See, e.g.*, *SEC v. Blavin*, 760 F.2d 706, 711-12 (6th Cir. 1985); *SEC v. Capital

Gains Research Bureau, Inc.*, 375 U.S. 180, 181 (1963); *SEC v. Park*, 99 F. Supp. 2d 889, 900

(C.D. Ill. 2000); "[A] person who intends to engage in scalping assumes a duty to disclose his

interest in the targeted stock."  *SEC v. Huttoe*, No. 96-2543(GK), 1998 U.S. Dist. Lexis 23211,

27-28 (D.D.C. Sept. 14, 1998); *SEC v. Abella*n, 674 F.Supp.2d 1213 (W.D. Wash. 2009).  The

fraud lies not in the practice of selling stocks contrary to recommendations but in the failure to

disclose that practice to potential investors. *SEC v. Corporate Relations Grou*p, 2003 WL 25570113, at *9 (M.D. Fla. Mar. 28, 2003).

An investor who purchased OWC stock between January and March 2017 recently testified that Friedland was a big name in the cannabis industry and his endorsement of OWC was important and noteworthy in the cannabis community and to cannabis stock investors given his experience in the industry and reputation from publishing his book. Id. ¶ 84.a. That same investor testified that he would have wanted to know if Friedland was selling OWC stock at the same time the investor was buying it, and that it might have limited his purchases of OWC stock, particularly because the investor had begun buying OWC stock at its highest price. *Id.* ¶¶ 84.g-m. He also testified that if he had learned of selling by any of the OWC team members that would have been a big red flag and might have compelled him to sell his OWC stock as well. *Id.* ¶¶ 84.g-h Notably, this District Court has recently held that, "the reasonable investor would consider it important whether to buy or sell stock that the individual promoting the sale was being compensated for the promotion ***and is selling the same stock for his own benefit***." *SEC v. C. Jones & Co.*, 2009 WL 539615, at *5. Here, as in *Wenger* and *Jones*, Friedland materially misled prospective investors when he touted OWC while failing to disclose not only that OWC had hired him to handle its media and investor relations and received millions of shares of stock as compensation to do so, misleading investors about his affiliation with the company, and selling OWC stock at times he was encouraging them to buy. *Wenger*, 427 F.3d at 854; *Jones*, 2009 WL 539615, at *5.

### iii.    Friedland Acted With Scienter.

Friedland acted with scienter when he made his material misrepresentations and omissions.  As the Tenth Circuit has explained, scienter can be met by a showing of knowledge or recklessness, *Smart*, 678 F.3d at 856-57, and recklessness encompasses "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that it is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Level 3 Comms., Inc. Sec. Lit.*, 667 F.3d 1331, 1343, n.12 (10th Cir. 2012) (quoting *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001)).

Here, Friedland knew he had done more than just "recently . . . gotten more involved in the company," as he claimed in February 2016, because he signed the January 2016 agreement to handle OWC's media and investor relations in exchange for 5.1 million shares of stock.  Grimes Decl. ¶¶ 11-13, 16 & Ex. 2 at 3:11-18.  Likewise, Friedland knew that he and his wife were in the process of selling Global's OWC stock when he talked in January 2017 about being invested in OWC (through Intiva): "We're still sitting with the stock.  For us, it's a very, very long-term situation." *Id*. ¶ 22 & Ex. 4 at 4:24-5:5.  Similarly, Friedland knew that Intiva was selling its OWC stock at the very same time he mentioned Intiva's investment in emails between June and September 2017, and told listeners to his July 2017 interviews that "we invested in 2014[;] *[w]e still own the stock*," and "*with a full disclaimer, you know, we're shareholders*.  I find it intriguing.  *I think they're ready to go*." *Id*. ¶¶ 65, 66, 72, 74 & Ex. 8 at 12:19-22, 76, 78, 79. Friedland has a history investing in private and penny stock companies with related accounts at banks and investment firms in Europe and Asia, *id*. ¶ 82, and he stood to make (and did make) a larger profit selling OWC stock while touting the company to investors.  As a sophisticated investor, Friedland knew or was reckless in not knowing "that information concerning his own

sale . . . would materially affect the investment decisions of his listeners." *Wenger*, 427 F.3d at 854; Jones 2009 WL 539615, at *5 ("Defendant's actions were with knowing intent to manipulate a market for his own benefit or with severe reckless disregard to the investing public and hence acted with *scienter. . . .*").

## C.      Friedland Engaged in a Scheme to Defraud.

Section 10(b) and Rules 10b-5(a) and (c) makes it unlawful to "employ any device, scheme, or artifice to defraud" or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of securities.  17 C.F.R. § 240-10b-5(a) and (c).  Securities Act Sections 17(a)(1) and (3) prohibit similar conduct in the offer or sale of securities. 15 U.S.C. §§ 77q(a)(1) and (3).  "Courts have interpreted these provisions to create what is known as 'scheme liability.'" *McDuffie*, 2014 WL 4548723, at *10; *see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008).  To prove scheme liability, the Commission must prove that Friedland, using the means of interstate commerce,[5] directly or indirectly: (1) committed a deceptive or manipulative act; (2) in furtherance of a scheme to defraud; (3) with scienter.  *McDuffie*, 2014 WL 4548723, at *10; *see also SEC v. Lucent Tech., Inc.*, 610 F. Supp. 2d 342, 360 (D.N.J.2009). In this district, misstatements can be a part of scheme liability when there is deceptive conduct in addition to the misstatements.  *SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1377 (D. Colo. 2014).  To prove liability under Securities Act Section 17(a)(3), the Commission need only prove negligence, rather than scienter.  *McDuffie*, 2014 WL 4548723, at *10; *see also Smart*, 678 F.3d at 857.

---

[5]   The above discussion of Friedland's use of use of the means or instruments of interstate commerce with respect to his Section 17(b) liability applies with equal force to  his scheme liability.

### i.  Friedland Engaged In Deceptive Acts.

As outlined above, Friedland made material misrepresentations and omissions in the course of touting OWC to prospective investors and when he failed to disclose that he was selling the OWC stock that he owned through Intiva and Global.  Friedland engaged in deceptive conduct beyond those misstatements and omissions when he undertook efforts to secretly sell Global's OWC stock through Lane 6552, a company with no apparent business purpose that he appears to have helped his wife establish (with her as sole owner) for the sole purpose of selling Global's OWC stock.  Grimes Decl. ¶ 20.  Friedland transferred Global's OWC stock to Lane 6552 and helped open trading accounts for Lane 6552 at two different broker dealers because the first broker dealer declined to sell the stock in part because Global received it as compensation for doing media and investor relations work for OWC that appeared to be still ongoing.  *Id.* ¶¶ 24, 29-31, 35.  Friedland provided inaccurate information on forms provided to the brokers about how and why Global and then Lane 6552 acquired the stock and what his role was with both companies and misrepresented the total number of shares beneficially owned or controlled in the past twelve months by omitting from the calculus the number of shares owned by Intiva (which would've pushed the percentage owned closer to, but still below, 5%).  *Id.* ¶¶ 25-26, 30.  Further, in order to get the restrictive legend removed from Global's OWC stock, Friedland provided the transfer agent with false information about how the stock was acquired first by Global from OWC and then by Lane 6552 from Global – indicating in both instances it was purchased rather than received as compensation (by Global) and gift (by Lane 6552) – and the opinion letter from the disbarred attorney that contained inaccurate information about Friedland's connection with Lane 6552.  *Id.* ¶¶ 24, 25-26, 30.

Friedland's deceptive conduct and misstatements to the brokers and transfer agent occurred within "the entire selling process," which is sufficiently "in the offer or sale of

securities" and "in connection with the offer or sale of securities." *See, e.g.*, *U.S. v. Naftalin*, 441 U.S. 768, 772-73 (1979) ("[T]he welfare of investors and financial intermediaries are inextricably linked—frauds perpetrated upon either business or investors can redound to the detriment of the other and to the economy as a whole."). The Commission believes a reasonable investor would have considered this deception material in making their investment decisions. *SEC v. Esposito*, 260 F. Supp. 3d 79, 90 (D. Mass. 2017) (defendants "misstatements and omissions were material because they influenced Cannabiz's transfer agent to issue stock certificates without the restriction"); *SEC v. Czarnik*, No. 10-745, 2010 WL 4860678, at *4 (S.DN.Y. Nov. 29, 2010) (holding that"a reasonable investor could consider misstatements to the transfer agent "regarding the validity of issuing unrestricted shares to be important information," and misrepresentations in materials that inform the transfer agent's decision "may be considered important by the reasonable investor"); *SEC v. Drucker,* 1983 WL 1369, at *32 (S.D.N.Y. Sept. 26, 1983) (finding liability for Section 10(b) of the Exchange Act and Rule 10b-5 thereunder for the employment of a scheme that included, among other things, not disclosing material facts to "[the] transfer agent [or] ...the broker-dealer approached to transact the sale").

### ii.    Friedland Acted with Scienter in His Scheme to Defraud.

In addition to the scienter discussed above with respect to Friedland's material misrepresentations and omissions, the scienter in Friedland's scheme to defraud is demonstrated in the efforts he undertook to secretly sell Global's shares of OWC stock through Lane 6552. Indeed, Friedland knew the information he provided to the transfer agent was false because he knew Global had acquired the stock from OWC as compensation and that Lane 6552 (his wife's company) had not paid any money in January 2017 to acquire it from Global. Likewise, Friedland knew the information reflected in the disbarred attorney's opinion letter incorrectly

stated when Global had acquired the OWC stock and misleadingly stated that Global was

independent of Lane 6552 when Friedland knew his wife also was a member of Global and he

had identified himself as a Manager of Lane 6552.  Friedland's extraordinary efforts to sell

Global's OWC stock through Lane 6552 presented a danger of misleading the market about the

true seller of the OWC stock that, if it was not known and intended by Friedland, was "so

obvious that [he] must have been aware of it."  *In re Level 3 Commc'ns Sec. Litig.*, 667 F.3d

1331, 1343 n.12 (10th Cir. 2012); *see also, e.g.*, *Esposito*, 260 F. Supp. 3d at 91 (defendants

"conducted a brazen scheme to . . . to create the deceptive appearance that [issuer's] securities

were not subject to trading restrictions" by submitting fabricated documents and false opinion

letters to induce transfer agent to issue unregistered securities);  *Czarnik*, 2010 WL 4860678, at

*6 ("A reasonable fact finder could conclude that these facts should have alerted Czarnik to the

likelihood of the falsity of misrepresentations . . . in connection with the issuance of unregistered

securities [and] Czarnik cannot "escape liability for fraud by closing his eyes to what he saw and

could readily understand") (citation omitted).

**D.**     **An Immediate Asset Freeze is Necessary to Prevent Further Dissipation of Proceeds.**

The Court has broad equitable powers to prevent violators of the securities laws from

enjoying the fruits of their misconduct, including freezing assets.  *SEC v. Miller*, 808 F.3d 623,

635 (2d Cir. 2015); *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980); *SEC v. Manor Nursing

Centers, Inc.*, 458 F.2d 1082, 1103-1104 (2d Cir. 1972).  In particular, courts may order an asset

freeze to ensure that defendants do not dissipate assets pending final judgment and to ensure that

victims of the securities fraud are compensated.  *Manor Nursing Centers*, 458 F.2d at 1105-06;

*see also SEC v. Presto Telecomm., Inc.*, 153 Fed. App'x 428, 430 (9th Cir. Nov. 2, 2005); *SEC v.

The Infinity Group Co.*, 212 F.3d 180, 197 (3d Cir. 2000).  In addition, "[t]he plenary powers of

a federal court to order an asset freeze are not limited to assets held solely by an alleged

wrongdoer, who is sued as a defendant in an enforcement action." *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011). Those powers extend as well to a person not accused of wrongdoing, a relief defendant, "where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998).

To obtain an asset freeze, the Commission "must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) (internal quotations and citation omitted). This is a lesser showing than is required to obtain a preliminary injunction against future violations of the securities laws. *Id.* Such a burden is appropriate because "the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged." *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990). In addition, "[a] freeze is particularly warranted where the defendant's alleged conduct involves fraud." *SEC v. Credit Bancorp Ltd.*, 2010 WL 768944, at *3 (S.D.N.Y. Mar. 8, 2010) (*citing SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972) ("Because of the fraudulent nature of the appellants' violations, the court could not be assured that appellants would not waste their assets prior to refunding public investors' money.")). Moreover, to the extent the assets held by the Relief Defendants are actually owned by Friedland, such that the Relief Defendants are his "nominees," the Court need not find that the Relief Defendants do not have a legitimate claim to the assets. *SEC v. Hedén*, 51 F. Supp. 2d 296, 299 (S.D. N.Y. 1999). Rather, the Commission need show only a likelihood of success on the merits. *Id.*

As detailed above, the Commission has shown a strong likelihood of succeeding on the merits of its claims that Friedland committed fraud in violation of the federal securities laws. Friedland and his wife spent nearly $2 million of his fraudulent sales process in Summer 2017 to

buy a Snowmass, Colorado home that they then deeded to Relief Defendant Aspen, and just this month (February 2018) paid $687,000 cash for a Denver area condo.  Wells Decl. ¶5.k; Grimes Decl. ¶ 83.  The Friedlands opened an investment account with Fidelity for Lane 6552 from which they wrote checks to buy the condo, where more than $3 million of proceeds remain, spent hundreds of thousands buy cars and pay off personal debt, and transferred hundreds of thousands more to family, friends, associates, and entities with which Friedland has some affiliation for no apparent consideration.  Wells Decl.

To prevent further dissipation of Friedland's ill-gotten proceeds, as set forth in the proposed order filed with this brief, the Commission requests the Court immediately freeze all assets of Friedland and the Relief Defendants that derive, directly or indirectly, from Friedland's securities violations, including certain bank and investment accounts belonging to Defendants and Relief Defendants, real property purchased with Friedland's fraudulent proceeds, and any personal property purchased with Friedland's fraudulent proceeds that is held by the Friedlands, their family members, or any of their associates or entities.

An asset freeze is particularly important given the amount of money generated by Friedland's fraudulent sales, the efforts Friedland undertook to secretly sell Global's OWC stock, and the Friedlands' quick use of the vast majority of those proceeds.  Friedland has demonstrated that he has no compunction about setting up a company with his wife as its sole owner, and trading accounts in that company's name with his wife in sole control, so that they could secretly and fraudulently sell Global's 5.1 million shares of OWC stock.  There is no reason to think Friedland would not be equally willing to transfer those funds to others in an attempt to hide them or make them unavailable for a recovery by the Commission.  This is an acute concern to the Commission given the numerous foreign bank and investment accounts that Friedland has

owned or controlled over the past ten years, particularly numerous accounts in Hong Kong from which recovery would be difficult if not impossible.  Felker Decl. ¶ 9.

The Commission requests that, in order to maintain the *status quo* and prevent further dissipation of Friedland's fraudulent proceeds, the Court freeze all funds, wherever located, as well as all assets traceable to such funds, directly or indirectly, that are under the control of Defendants and/or the Relief Defendants.  Thus far, the Commission is aware that Friedland has deposited investor funds into bank and investment accounts and used significant proceeds to purchase personal and real property.  As a result, the following bank and accounts and real and personal property should be frozen.

| Institution Name | Account Name | Last four digits of Account Number |
|---|---|---|
| Citizens Bank National | Jeffrey Friedland and Kathy Friedland Irrevocable Trust | Unknown |
| Fidelity Brokerage Services LLC | Lane 6552 LLC | 0466 |
| First American State Bank | Global Corporate Strategies LLC | 3215 |
| First American State Bank | Intiva Pharma LLC | 0657 |
| First American State Bank | Kathy Bankoff Friedland | 7593 |
| First American State Bank | Kathy Bankoff Friedland Trust | 4305 |
| First American State Bank | Lane 6552 LLC | 0426 |
| JPMorgan Chase Bank | Assurance Management LLC | 0276 |
| Spencer Edwards Inc. | Intiva Pharma LLC | 4086 |
| Spencer Edwards Inc. | Lane 6552 LLC | 0417 |

- 46 Meadow Road, Snowmass, Colorado 81615

- 2800 S. University Blvd #27, Denver, CO 80210

- Lexus and Mazda automobiles

In addition, Friedland appears to have used his fraudulent proceeds to transfer funds to some of his companies, as well as family, friends, and associates for no apparent consideration. All property purchased with those funds should be frozen, including any personal property held

by Friedland's family, friends, or associates purchased with those monies.  The Commission will continue to investigate other assets purchased with the proceeds of Friedland's fraudulent sales and any additional assets that may be discovered also should be frozen.

**E.      An Accounting is Necessary to Identify the Location of Proceeds.**

The Commission further requests that Defendants and Relief Defendants be ordered to prepare an accounting of, among other things, the proceeds of Friedland's fraudulent sales of OWC stock, the disposition of such funds, and current location of all such funds and assets purchased with such monies.  Courts have the power to order accountings in SEC actions.  *SEC v. Int'l Swiss Inv. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990).  An accounting is a necessary and appropriate aid to identify the location of any remaining proceeds from Friedland's fraudulent conduct or assets purchased with those monies.

**F.      Expedited Discovery, Alternative Means of Service, and a Prohibition against the Destruction or Alteration of Documents is Necessary to Prepare for a Hearing to Show Cause.**

The Commission also requests that the Court set this matter for a hearing to show cause prior to the expiration of the temporary asset freeze.  To allow it to prepare for that hearing, the Commission requests that the Court order expedited document and deposition discovery and permit alternative means of service on Defendants, Relief Defendants, and OWC, including but not limited to service by email.  In addition, the Commission requests that the Court include in its order a general prohibition against the destruction or alteration of any electronic or hard copy documents related to the allegations in the Complaint or the assets, finances, or business operations of the Defendants and Relief Defendants, including but not limited to email and electronic text messages.  This should impose no hardship on the Defendants and Relief Defendants and will help ensure that a full record of this matter can be developed through discovery and at any subsequent hearing or trial.

**G.     Entry Of An Order *Ex Parte* Is Appropriate.**

Under Federal Rule of Civil Procedure 65(b), an *ex parte* order may be entered if (1) it appears from specific facts shown by affidavit that immediate and irreparable injury, loss, or damage will result before the adverse party can be heard in opposition; and (2) the applicant's attorney certifies the reasons supporting the claim that notice should not be required.  As explained in the Certification of Charles J. Felker, which is attached, the Commission is concerned that if the Defendant or Relief Defendants become aware of this action before the asset freezes are instituted, they will move or further dissipate their assets.  Felker Decl. ¶ 10.  Accordingly, *ex parte* relief is necessary to prevent the Defendant and Relief Defendants from dissipating funds and assets.

## IV.     CONCLUSION

For the reasons stated above, the Commission respectfully requests that its motion for emergency relief be granted and that the Court issue an Order in the form attached to this motion.

## CERTIFICATION UNDER F.R.C.P. 65(b)(1)

As explained in the Certification of Charles J. Felker filed herewith, the Commission believes providing Defendants and Relief Defendants with advance notice of this emergency motion seeking asset freeze will allow them to further dissipate or conceal these proceeds. Felker Decl. ¶ 10.  Accordingly, the Commission has not conferred with Defendants or Relief Defendants regarding this *ex parte* Asset Freeze motion.

DATED: March 5, 2018.

Respectfully submitted,

*s/ Christian D. H. Schultz*
Christian D. H. Schultz
Assistant Chief Litigation Counsel
Timothy Halloran
Assistant Chief Litigation Counsel
Michael C. Grimes
Counsel
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-4740 (Schultz)
(202) 551-4861 (Grimes)
schultzc@sec.gov
grimesmi@sec.gov