IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  _____

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

        v.

JEFFREY O. FRIEDLAND,
GLOBAL CORPORATE STRATEGIES LLC, AND
INTIVA PHARMA LLC,

        Defendants,

 and

LANE 6552 LLC,
KATHY B. FRIEDLAND,
ASPEN UPPER RANCH LLC,
ASSURANCE MANAGEMENT, LLC, AND
THE JEFFREY AND KATHY FRIEDLAND IRREVOCABLE TRUST,

        Relief Defendants.

---

## DECLARATION OF MICHAEL T. GRIMES

---

      I, Michael T. Grimes, do hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct, and I am competent to testify to the matters stated herein:

      1.     I am employed as a Staff Attorney in the Washington, D.C. office of the Division of Enforcement of the United States Securities and Exchange Commission ("SEC").  I have been employed by the SEC in the Division of Enforcement since September 2016 and have conducted investigations of potential violations of federal securities laws.  I am one of the Staff Attorneys assigned to investigate *OWC Pharmaceutical Research Corp.* (HO-13159).

      2.     As part of my duties, I investigated the activities of Jeffrey Friedland and OWC Pharmaceutical Research Corp. ("OWC") related to potential violations of federal securities

laws.  I believe the facts in this declaration to be true and correct based on the evidence obtained

to date from that investigation, including but not limited to the evidence cited herein.

3.      I make this Declaration based upon personal knowledge, information and belief.

The sources of my information and the bases of my belief are documents obtained and reviewed

by myself and other SEC staff, interviews of witnesses conducted by myself and SEC staff, and

information provided to me by other members of the SEC staff.  The statements of others set

forth herein are described in substance and in part, and not verbatim.  To the extent that there are

assertions herein concerning dates and numbers, they are approximate, based upon information

and evidence gathered to date.  Because the SEC submits this Declaration for the limited purpose

of supporting its Application for an Asset Freeze, I have not set forth each and every fact that I

know about the investigation.

4.      As part of the SEC's investigation into Friedland's trading activities, SEC staff

created Exhibits B and C using the sources listed in Exhibit A.  To reference the trading price of

OWC stock, I attached to this Declaration Exhibit D, which is a true and correct copy of

Bloomberg Historical Prices for 2017 for the stock of OWC.

**The Friedlands' Control Over Various Entities and OWC Stock**

5.      Based on a review of filings with the SEC, OWC Pharmaceutical Research Corp.

("OWC") is an Israeli medical marijuana company that was incorporated in Delaware on March

7, 2008 with its principal office in Petach Tikva, Israel, under the name Dynamic Applications.

On February 13, 2013, its securities were registered with the Commission under Section 12(g) of

the Securities Exchange Act of 1934 (the "Securities Act").  On November 25, 2014, Dynamic

Applications changed its name to OWC Pharmaceutical Research Corp.—OWC stands for One

World Cannabis—and OWC's stock is quoted on the OTCQB using the symbol "OWCP."  For

the purposes of this declaration, "OWC" will be used in reference to either Dynamic Applications or OWC.

6.     Based on a review of publicly available documents and other documents obtained during the investigation:

    a.   Jeffrey Friedland is a Colorado resident and founder and Managing Director of Global Corporate Strategies LLC ("Global") and Intiva Pharma LLC ("Intiva"), both Colorado companies he organized in 2011 and 2014, respectively, with principal offices at 3773 Cherry Creek North Dr., 575, Denver, CO 80209. Friedland describes himself in his online interviews as the "CEO" of Intiva.

    b.   Jeffrey Friedland also is the founder, Chairman, President and Chief Executive Officer ("CEO") of, among others, INTIVA Inc., an Ontario, Canada Corporation, and Intiva USA, Inc., a Colorado corporation.  All references to "Intiva" in this declaration refer to Intiva Pharma, LLC unless otherwise noted.

    c.   In 1984, without admitting or denying liability, Friedland consented to the entry of Final Judgment in the U.S. District Court for the District of Columbia permanently enjoining him from violating, among other things, the antifraud provisions of the Securities Act.  *S.E.C. v. Gary A. Agron, et. al.*, USDC DC, Civil Action No. 84-3025.  *See* Litigation Release No. 10543 (S.E.C. Release No.), 31 S.E.C. Docket 580, 1984 WL 470960.

    d.   Intiva was organized by Friedland on March 8, 2014 as Marijuana Brands LLC, before he changed its name to Intiva Pharma LLC on April 30, 2014.  Friedland is the sole manager of Intiva, which has its principal office at 3773 Cherry Creek North Dr., Suite 575, Denver, CO 80209.  According to the Amended and Restated Operating Agreement of Intiva Pharma LLC, dated March 8, 2014,

Friedland is Intiva's sole Manager with "full and complete authority, power, and discretion to manage and control the business, affairs, and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incidental to the management of the Company's business."

e.  Global is a Colorado company organized by Jeffrey Friedland, its founder and Managing Director, on April 15, 2011.  Kathy Friedland also serves as a member of Global.  Global has a principal office street address of 3773 Cherry Creek North Dr., 575, Denver, CO 80209.

f.  Kathy Friedland is a Colorado resident, wife of Jeffrey Friedland, and the founder and sole member of both Lane 6552 LLC (""Lane 6552") and Aspen Upper Ranch LLC ("Aspen").  She is also a member of Global.

g.  Lane 6552 LLC, is a Colorado company organized on January 3, 2017 with Kathy Friedland listed as the sole member and principal.  Lane 5552 has an address of 7 Polo Field Lane, Denver, CO 80209.

h.  Aspen Upper Ranch LLC, is a Colorado company that Kathy Friedland organized on June 27, 2017, with Kathy Friedland listed as the sole member and principal registered agent and principal of Aspen Upper Ranch LLC.  Aspen has an address of 7 Polo Field Lane, Denver, CO 80209.

i.  Assurance Management, LLC, is a Colorado company organized by Beryl Zyskind on March 23, 2016 with the same principal office address as Global and Intiva: 3773 Cherry Creek North Dr., Suite 575, Denver, CO 80209.  In November 1996, Beryl Zyskind was sentenced to 30 months imprisonment

following his conviction for bank fraud, misappropriation of funds held as a

fiduciary, and theft of federal funds. *United States v. Zyskind,* Case No. 1:95-cr-

175 (E.D.N.Y.), *aff'd,* No. 1614, Dkt. 96-1770 (Jul. 2, 1997).

7.      According to an interview with one of the participants, in June, 2014, Friedland

and his wife hosted a dinner at their home in Denver, Colorado, where a presentation was made

about the developing field of medical marijuana research by a doctor who later became OWC's

chief science officer.[1]  The guests at this dinner included approximately 25 potential investors,

among them doctors and business people, two of whom made private investments in OWC (then

called Dynamic Applications) via subscription agreements shortly after the dinner at Friedland's

house.

8.      In August 2014, Friedland purchased 1,322,222 shares of restricted OWC stock

for $119,000 pursuant to a subscription agreement that he signed on behalf of Intiva, and the

ownership of these securities was identified in OWC's SEC filings (albeit with "Invita" rather

than Intiva).  On or around August 18, 2014, OWC provided an attorney opinion letter to V

Stock Transfer, LLC (OWC's Transfer Agent) from a disbarred attorney in connection with the

issuance of OWC's stock to Intiva.

9.      In a Form 8-K filing with the SEC on August 13, 2015, OWC reported that Intiva

owned 1,322,222 shares of OWC stock under the sole control of Richard Greenberg.  However,

Friedland signed Intiva's subscription agreement, and Intiva's Amended and Restated Operating

Agreement indicates that Friedland has "full and complete authority, power, and discretion to

manage and control the business, affairs, and properties" of Intiva.

---

[1] On November 7, 2014, OWC issued 5,134,375 restricted shares to the doctor who made the presentation.

10.     In November 2015, Friedland published a book called *Marijuana: The World's Most Misunderstood Plant,* which appears to be based in part on Friedland's experience owning two retail cannabis stores in Colorado ski towns Breckenridge and Crested Butte, as well as a cannabis cultivation facility in Steamboat Springs.  In virtually all of the emails and appearances listed below where Friedland discussed investment opportunities in the medical marijuana industry in general and OWC in particular, Friedland mentions his book and Intiva's early investment in OWC.

11.     On January 21, 2016, Friedland and his company Global entered into a two-year "Media, Public Relations and Investor Relations Services Agreement" with OWC (hereinafter, the "Global PR/IR Agreement").  Attached to this declaration is a true and correct copy of the Global PR/IR Agreement between Global and OWC that Friedland signed (Exhibit 1).

12.     Under the terms of the Global PR/IR Agreement, Friedland agreed to develop a media, public relations, and investor relations program to create interest in OWC on the part of financial journalists, institutional investors, and the general investment community.  In this role, Friedland agreed to "create a higher level awareness of [OWC], as well as the anticipated impact with the investors[;] [Global] will provide both an introduction of the company to the overall American population, as well as specifically target investors."  The agreement also states that Friedland would assist OWC in reaching investors by writing news releases, shareholder letters, corporate summaries, profiles, and website copy, and would establish OWC's Facebook and Twitter accounts.  The Global PR/IR Agreement further states that it can only be amended if executed by the parties in writing.  Ex. 1 at SEC-SEDWARDS-E-0004025.

13.     Pursuant to the compensation terms of the Global PR/IR Agreement, OWC transferred 5,134,375 OWC shares to Global on February 5, 2016.  Ex. 1 at SEC-SEDWARDS-

E-0004026.  OWC provided an attorney opinion letter to OWC's transfer agent from a disbarred attorney in connection with the issuance of OWC's stock to Global.

14.     OWC disclosed in its February 12, 2016 Form S-1, February 16, 2016 Form S-1A, and June 16, 2016 Form S-1A that Global owned 5,134,375 shares (6.30%) of OWC common stock, with Friedland as CEO of Global having voting and dispositive control over those securities.  There does not appear to have been any information disclosed to investors about how or why Global came to own these shares.  Notably, the Transfer Agent cancelled the 5,134,375 shares that had been issued to the doctor who presented at Friedland's house and reissued them to Friedland.

15.     Between the Intiva purchase of OWC stock in 2014 and the shares issued to Global pursuant to Global PR/IR Agreement, Friedland directly or indirectly owned and controlled 6,456,597 shares of OWC stock as of February 5, 2016.

16.      On February 29, 2016, Cannabis FN Media in Seattle, Washington posted to its website a videotaped interview of Friedland.  At the outset of this interview, Friedland was introduced as "Mr. Jeffrey Friedland from OWC Pharmaceutical Research Corp. and author of Marijuana: The World's Most Misunderstood Plant."  Attached to this declaration is a true and correct copy of a transcription of the February 29, 2016 interview prepared by a court reporting service hired by the SEC, at 1 (Exhibit 2).  Cannabis FN Media is an entity that was paid by OWC to promote OWC to investors, and it discloses on its website the compensation that it has received from OWC.

17.     On March 15, 2016, OWC issued a press release via PR Newswire announcing that Friedland had joined OWC's Advisory Board to advise on business development efforts, and would serve as the Company's U.S. representative.  OWC's CEO stated in the press release,

"Jeffrey is an active investor and advisor to the cannabis sector, bringing a wealth of knowledge and insight to OWC Pharmaceuticals.  His experience in both the cannabis and financial markets will be invaluable as we work to commercialize our proprietary products and technologies."

Friedland is quoted in the press release discussing OWC's competitive advantage:

> Because OWC Pharmaceutical is headquartered in Israel, where cannabis research is not only allowed, but encouraged, they have been able to implement a research and development program of the caliber associated with the pharmaceutical industry.  I believe this approach provides OWC Pharmaceutical with a significant competitive advantage and I look forward to working with the Company in their efforts to advance the medical use of cannabis.

The press release mentioned Friedland's book and provided his phone number and an OWC email address under contact information for OWC in the United States, but did not mention that OWC hired Friedland and Global to handle its media and investor relations in the United States for two years and paid him more than 5.1 million shares of OWC stock for taking on this role.

18.     On November 18, 2016, OWC issued a press release via PR Newswire announcing "OWC Pharmaceutical Research Advisory Board Member to Participate in the First Bloomberg Intelligence Sponsored Cannabis Event."  The press release quoted Friedland, "There are many cannabis companies that are publicly-traded, from GW Pharmaceuticals (GWPH) to smaller public companies such as OWC, which Intiva invested in during the summer of 2014…. I joined the Company's advisory board earlier this year."  The release continues, "Subject to his schedule, Mr. Friedland may be available to meet privately with OWC shareholders to discuss his view of OWC's future."  Nowhere in OWC's press release did Friedland or OWC disclose that he and Global had just been hired to handle OWC's media and investor relations in the United States and been paid more than 5.1 million shares of OWC stock to do so.

19.     On November 22, 2016, Friedland used his Global email to inform a listserve group of his participation in the "AFund Special Investments Conference in New York."  In the

email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations in exchange for 5.1 million shares of stock.

20.     On or about January 3, 2017, Kathy Friedland organized Lane 6552 LLC, a company with no apparent business purpose or operations, with herself listed as the company's sole member and principal.

21.     On January 4, 2017, Friedland used his Global email to inform a listserve group of his participation in the "Cowen and Company Cannabis Colloquium."  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock.  Attached to this declaration is a true and correct copy of Friedland's January 4, 2017 email (Exhibit 3).

22.     On January 4, 2017, Cannabis FN Media posted to its website another video interview of Friedland, and OWC's Facebook and Twitter page posted a link to this interview that same day.  At no point during this interview did Friedland mention his agreement with OWC

to handle its OWC's media and investor relations in the United States nor thein exchange for 5.1 million shares of OWC stock he received as compensation of stock.  Attached to this is a true and correct copy of a transcription of the January 4, 2017 interview prepared by a court reporting service hired by the SEC (Exhibit 4).

23.     On January 12, 2017, Friedland used his Global email to inform a listserve group of his participation in the "inaugural Institutional Capital & Cannabis Investment Conference on March 28 and 29 in San Jose, CA."  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock.

24.     On or about January 14, 2017, Friedland submitted a request to OWC's transfer agent to reissue Global's 5,134,375 shares of OWC stock to Lane 6552 LLC and remove the restricted legend from the securities.  Friedland provided the transfer agent with a purported opinion letter signed by a disbarred attorney that stated Global received the shares in September 2015, and that Global "has no economic interest in nor does it have any control over Lane."

25.     In a Transfer Instruction Form provided to the transfer agent, Friedland indicated that Global acquired the stock from OWC in January 2016 at a cost of $51,343.75.  The terms of Global's agreement with OWC indicate the stock was compensation for media and investor relations services and not in exchange for any payment and the SEC has not discovered any record of a payment from Global to OWC in this amount.

26.     Friedland further represented to the transfer agent that the OWC stock was not being transferred from Global to Lane 6552 as a gift, inheritance, or wash sale, but were instead acquired by Lane 6552 on January 13, 2017 at a cost of $205,375.  The SEC has not discovered any record of a payment from Lane to Global in this amount on or around that date.

27.     Sometime on or around January 18, 2017, Friedland first appeared on the "Our Leadership Team" tab of the OWC Website, where he was listed along with company executives and described as an advisory board member of the company.  Prior to this time, Friedland did not appear on OWC's website as part of the Leadership Team.

28.     On January 21, 2017, Friedland used his Intiva email to invite a listserve group to an OWC promotional lunch presentation that he would (and later did) host in Denver on January 28, 2017.  In the email, Friedland stated, "In 2014 INTIVA invested in OWC Pharmaceutical Research."  Friedland's email did not mention his and Global's agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock.

29.     On or around January 30, 2017, Friedland helped open a trading account for Lane 6552 with a broker dealer ("Broker Dealer A") and requested to sell the 5.1 million shares held by Lane 6552.  Although Kathy Friedland signed the Transfer Instruction Form, Seller's Representation Letter – Non-Affiliate, and the Seller's Representation letter, based on a review of the handwriting, it appears that Jeffrey Friedland filled out these forms.  Additionally, Jeffrey Friedland provided his credit card information and signed the Credit Card Information Form that accompanied the Seller's Representation Letter as an authorized representative of Lane 6552 LLC.  Finally, based on documents and information from Broker Dealer A, Jeffrey Friedland served as the sole point of contact between Lane 6552 and Broker Dealer A: Jeffrey Friedland submitted all of the forms, requested and received all status updates, and made all

communications to Broker Dealer A.  In fact, Broker Dealer A informed the Staff that, "[t]here are no communications in connection with email address Kathy.friedland@gmail.com," but "[t]here are twenty-seven (27) communications in connection with email address: Jeffreyofriedland@gmail.com from period [January 30, 2017] through [February 22, 2017]."

30.     On February 3, 2017, OWC's transfer agent, relying on information provided by Friedland, removed the restrictive legend from Lane 6552's stock, at which point Broker Dealer A asked its clearing firm ("Clearing Firm A") to sell the 5,134,375 shares of unrestricted OWC stock out of the Lane 6552 account.  Friedland represented to Clearing Firm A that the transfer from Global to Lane was a gift from an entity owned by a family member.  Friedland also represented and that the total number of shares beneficially owned or controlled in the past twelve months by the client, family member, or their related entities was 5,134,375—omitting the number of shares owned by Intiva.

31.     Clearing Firm A declined to execute the sell because it had concerns that Lane 6552 might be trying to sell into to an inflated market and, among other things, the stock had been acquired by Friedland in exchange for performing investor relations services that appeared to be ongoing, and were being deposited after a spike in the stock price following OWC's release of a letter to shareholders and the drafting and release of the letter may have been controlled by Friedland.

32.     On February 6, 2017, Friedland sent Broker Dealer A an email asserting that while the "initial intent" of the Global PR/IR Agreement "was to provide public relations and related services, the agreed upon task was switched by mutual consent to one on assisting the company with strategic direction primarily in Canada, in approximately July 2016."   Friedland did not provide Broker Dealer A with any documentation showing this alleged change to his

agreement, but further represented that he "ha[s] no role in the public relations or IR side, but at some events mention the company as well as other companies."

33.    On February 7, 2017, OWC issued a press release listing Friedland as OWC's U.S. contact.

34.    On February 8, 2017, Friedland used his Global email address to inform a listserve group that he would "to Speak on 'Investing in Israeli Know-How' at CannaTech in Tel Aviv" on March 20-22, 2017.  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] Intiva Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention that he and Global had been hired by OWC to handle its media and investor relations in the United States nor that they had received 5.1 million shares of OWC stock for taking on this role.

35.    On or around February 16, 2017, after Broker Dealer A declined to sell the OWC shares out of the Lane 6552 account, Friedland sought to open another trading account for Lane 6552 at a different broker dealer, Spencer Edwards Inc. ("Spencer Edwards"), and attempted to deposit for sale the 5.1 million shares of OWC stock.   Again, while Kathy Friedland signed the Deposited Securities Representation Form and the Equity Authentication and Certificate Deposit Form, based on a review of the handwriting, it appears that Jeffrey Friedland filled out these forms.  Additionally, Jeffrey Friedland appears to have served as the sole point of contact between Lane 6552 and Spencer Edwards: Jeffrey Friedland submitted all of the forms, requested and received all status updates, made all communications, and requested all wire

transfers to Spencer Edwards.  In fact, Spencer Edwards' production contained over 43 emails between Jeffreyofriedland@gmail.com and Spencer Edwards in connection with the sale of Lane 6552's shares.  Spencer Edwards' production, however, contained zero communications between Kathy.friedland@gmail.com, or any other email address associated with Kathy Friedland.  In one of these emails from Jeffrey Friedland, he disclosed to Spencer Edwards that the clearing firm for Broker Dealer A had rejected their prior attempt to sell the shares.

36.     As part of the materials provided to Spencer Edwards on or around February 16, 2017, Friedland filled out forms signed by Kathy Friedland indicating that Lane 6552 acquired the OWC stock from OWC through Global and pursuant to Global's services agreement with OWC and that the dollar amount of the purchase price or value of services provided was $125,000.  Friedland also provided the disbarred attorney's opinion letter.

37.     On February 17, 2017, OWC issued a press release titled "OWC Pharmaceutical Research to Present at Lyons Capital's Wall Street Conference" in Boca Raton, Florida, on March 1, 2017, "the premiere conference in the venture capital arena and Small Cap marketplace."  The sub-heading of OWC's press release stated, "Industry Leader And OWC Advisory Board Member, Jeffrey Friedland, To Speak At The Conference And Introduce OWC Management."

38.     On February 22, 2017, Friedland used his Global email to inform a listserve group that he was "to Speak on March 1st in Boca Raton on Public Company Cannabis Investments" at The Wall Street Conference.  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research, which is expected to provide an investor update at the Conference."  Friedland's email also stated that he "is the CEO of Intiva Inc. which made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."

Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations for two years nor their compensation of more than 5.1 million shares of OWC stock.

39.     On February 23, 2017, the clearing firm for Spencer Edwards sought and obtained an attorney opinion that discussed the relationship between Friedland and Global, on the one hand, and Kathy Friedland and Lane 6552, on the other, before approving the sale of the OWC stock, after which Spencer Edwards agreed to sell the 5.1 million OWC shares.

40.     On March 1, 2017, Friedland appeared at The Wall Street Conference and made his presentation standing in front of a screen that displayed the OWC logo, with a photo from Friedland's presentation publicized on OWC's Facebook and Twitter page.

41.     On March 2, 2017, 5,134,375 shares of now-unrestricted OWC stock were deposited into a Lane 6552 account at Spencer Edwards, immediately after which 173,807 shares were offered and for net proceeds (after commissions and fees) of $284,817.86.  Ex. B at line 1.

42.     On March 3, 2017, the Lane 6552 account at Spencer Edwards offered and sold 436,509 shares of OWC stock for net proceeds of $562,190.33.  Ex. B at line 2.

43.     On March 5, 2017, Friedland used his Global email to inform a listserve group of his participation in the "'Public Company Investments in the Cannabis Industry' at the Institutional Capital & Cannabis Investment Conference."  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014." Friedland's email from his Global email account included an extensive listing of his business

activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock, nor that he had begun selling that stock.

44.     On March 6, 2017, the Lane 6552 account at Spencer Edwards offered and sold 500,000 shares of OWC for net proceeds of $684,539.02.  Ex. B at lines 3 to 5.

45.     On March 6, 2017, Friedland appeared as a featured speaker in an internet interview with New Jersey-based Pot Stock Radio, which OWC's Facebook and Twitter pages posted a link to later that day.  At no point during this interview did Friedland inform listeners that he and Global had been hired by OWC in January 2016 to handle its media and investor relations for two years and received 5.1 million shares of stock from OWC for taking on this role, much less that he was in the process of selling all of the shares.  Attached to this declaration is a true and correct copy of transcript of Friedland's March 6, 2017 interview prepared by a court reporting service hired by the SEC, at 20 (Exhibit 5).

46.     On March 7, 2017, Jeffrey Friedland contacted Fidelity about opening  an account for Lane 6552 listing Kathy Friedland as the only owner on the account.

47.     On March 7, 2017, the Lane 6552 account at Spencer Edwards offered and sold 80,000 shares of OWC stock for net proceeds of $113,671.86.  Ex. B at line 6.

48.     Between March 8, 2017, and March 21, 2017, the Lane 6552 account at Spencer Edwards offered and sold another 3,944,059 shares of OWC stock for net proceeds of $4,845,177.08.  Ex. B at lines 7 to 39.

49.     On March 9, 2017, Friedland used his Global email address to inform a listserve group of his participation in the "'Investing in Israeli Know-How' at CannaTech in Tel Aviv.'"

In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014." Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock, much less that he was selling these shares.

50.     On March 15, 2017, Friedland used his Global email address to inform a listserve group of Friedland's participation in the "CannaTech on Monday, March 20th in Tel Aviv: 'Investing in Israeli Know-How." In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014." Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock, much less that he had sold nearly all of these shares in the preceding three weeks.

51.     On March 21, 2017, Friedland used his Global email address to inform a listserve group of his participation as the chair to "the Panel 'Public Company Investments in the Cannabis Industry' at the Institutional Capital & Cannabis Investment Conference." In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014." Friedland's email from his Global email account

included an extensive listing of his business activities in the cannabis industry, described his

book, and explained his extensive international business experience, but did not discuss his role

with Global or mention the agreement to handle OWC's media and investor relations for two

years in exchange for 5.1 million shares of stock, much less that he had sold nearly all of these

shares in the prior three weeks

52.     In total, between March 2, 2017 and March 22, 2017, the Lane 6552 account at

Spencer Edwards offered and sold 5,134,375 shares of OWC stock for net proceeds of

$6,490,396.15. Ex. B at line 41.

53.     On March 23, 2017, Friedland used his Global email to invite a listserve group

"To Attend Jeffrey Friedland's Panel: 'Public Markets: Investments in the Cannabis Sector," on

March 28, 2017 in San Jose, California.  In the email, Friedland stated that he is "a member of

the advisory board of OWC Pharmaceutical Research . . . . [and] Intiva Inc. made an early-stage

investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email

from his Global email account included an extensive listing of his business activities in the

cannabis industry, described his book, and explained his extensive international business

experience, but did not discuss his role with Global or mention the agreement to handle OWC's

media and investor relations for two years in exchange for 5.1 million shares of stock, much less

that he sold all of these shares in the preceding three weeks.

54.     On March 27, 2017, Cannabis FN Media, an entity paid by OWC to promote

OWC to stock investors, rebroadcasted its January 4, 2017 interview with Friedland.

55.     In April 2017, Friedland began taking steps to sell the OWC stock that Intiva had

acquired in 2014.  On April 13, 2017, Friedland sent an email to another OWC investor—one of

the investors present at Friedland's OWC-Dinner in 2014—explaining that he "was speaking

with [a Spencer Edwards broker] today as we're going to hopefully work with [him] in liquidating [I]ntiva's OWC position."

56.     On April 21, 2017, the Spencer Edwards broker emailed Friedland stating, "I hope your trip is going well.  Did you get squared away yet on the documents for Intiva on OWCP.  I haven't heard anything from your CFO."  Friedland responded, "Not yet.  I'm in China nie [sic] returning to Hong Kong today, and will be back in Denver Sunday."

57.     On April 27, 2017, Friedland used his Global email to inform a listserve group that he was "to Speak on 'New Money for New Hemp and CBD Ventures' at the 3rd Annual CBD Outlook" on April 30, 2017.  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] Intiva Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock, much less that he had already sold all of the shares the prior month.

58.     On May 10, 2017, Friedland sent a follow up email to Spencer Edwards about opening an account for Intiva, confirming that "Intiva's CFO will handle this."

59.     On May 11, 2017, a disbarred attorney signed an attorney's opinion letter to facilitate the removal of the restrictive legend from Intiva's OWC stock.

60.     On or around May 22, 2017, Intiva's CFO applied to open an account with Spencer Edwards in the name of Intiva.  Intiva's CFO listed himself as the primary authorized person and Friedland as the secondary authorized person on the account.

61.     On or around May 24, 2017, Intiva's CFO filed an OTC Securities Deposit Request for Intiva with Clearing Broker B to deposit 1,322,222 shares of OWC stock.  Among other representations, Intiva's CFO represented that neither Intiva nor any person affiliated with Intiva had sold any securities of the same class during the prior three months.  Intiva's CFO further represented that Intiva is not currently promoting the securities on deposit in the account, nor does it plan to promote or engage a third party to promote OWC securities OWC securities (whether through social media, print publications, emails, tweets, or other means or media).

62.     On May 30, 2017, Friedland used his Global email address to inform a listserve group of his participation in an online conversation discussing "President Donald Trump, Jeff Sessions and the Future of America's Marijuana Policy."  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations for two years in exchange for more than 5.1 million shares of stock, much less that he sold all those shares only a few months earlier.

63.     On June 9, 2017, 1,322,222 shares of OWC stock were deposited into an account at Spencer Edwards in the name of Intiva Pharma LLC.

64.     On June 12, 2017, OWC's transfer agent relied on the disbarred attorney's opinion letter to remove the restrictive legend from by Intiva's OWC stock and issued a new "clean" stock to Intiva for deposit at Clearing Firm B.

65.     On June 17, 2017, Friedland used his Global email address to inform a listserve group of his participation in an online conversation discussing "What Cannabis Investors Are Now Looking For."  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations for two years in exchange for more than 5.1 million shares of stock, much less that he sold all those shares only a few months earlier.

66.     On June 26, 2017, Friedland used his Global email address to inform a listserve group of his participation in another online conversation.  Attached to this declaration is a true and correct copy of Friedland's Email Correspondence dated June 26, 2017 (Exhibit 6).  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations for two years in exchange for more than 5.1 million shares of stock, much less that he sold all those shares only a few months earlier.

67.     On June 27, 2017, Friedland opened an account with First American State Bank for Intiva, listing Friedland and Intiva's CFO as agents.

68.     On June 27, 2017, the Intiva account offered and sold 136,053 shares of OWC stock for net proceeds of $93,804.85.  Exhibit C at lines 1 and 2.

69.     On Saturday, July 4, 2017, Friedland participated in an audio/video interview that Minneapolis-based Wall Street Raw broadcast on July 8, 2017, to discuss OWC's recent market readiness announcement regarding its topical cream.  One day later, OWC's Facebook and Twitter page posted a link to this interview.

70.     During this Wall Street Raw interview, Friedland was introduced as the managing director of Friedland Capital, an advisory board member of OWC, and the CEO of Intiva, which made an early stage investment in OWC in 2014.  At no point during his July 8 Wall Street Raw interview did Friedland mention his and Global's agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock, much less that he had sold all of those shares only a few months earlier and had begun to sell off Intiva's OWC stock.  Attached to this declaration is a true and correct copy of a transcript of Friedland's Interview on Wall Street Raw prepared by a court reporting service hired by the SEC (Exhibit 7).

71.     On July 9, 2017, a purported investor relations representative for OWC sent an email from an OWC email account to a listserve group that included a number of employees of Spencer Edwards, with a link to Friedland's July 8 interview on Wall Street Raw.

72.     On July 21, 2017, Friedland used his Global email address to inform a listserve group of his participation in another interview.  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his

business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations for two years in exchange for more than 5.1 million shares of stock, nor that he sold all those shares only a few months earlier, much less that he had begun to sell off Intiva's OWC stock.

73.     Between July 10, 2017 and July 28, 2017, the Intiva account at Spencer Edwards offered and sold 609,459 shares of OWC stock for net proceeds of $230,498.96.  Ex. C at lines 3 to 21.

74.     On or around July 29, 2017, the YouTube-based "Looking at the Markets" broadcast an interview with Friedland about the marijuana industry and OWC.  Friedland's webpage posted a link to this interview and so did OWC's Facebook and Twitter page.  At no point during this July 29 "Looking at the Markets" interview did Friedland mention his and Global's agreement to handle OWC's media and investor relations for two years in exchange for 5.1 million shares of stock, nor that he sold all those shares only a few months earlier and had begun to sell off Intiva's OWC stock.  Attached to this declaration is a true and correct copy of a transcript of Friedland's July 29, 2017 Interview prepared by a court reporting service hired by the SEC, at 12-13 (Exhibit 8).

75.     On July 31, 2017, the Intiva account at Spencer Edwards offered and sold 25,000 shares of OWC stock for net proceeds of $8,041.53.  Ex. C at line 22.

76.     On July 31, 2017 and August 6, 2017, Friedland used his Global email address to inform a listserve group of his participation in an online interview.  Attached to this declaration is a true and correct copy of Friedland's Email Correspondence dated July 31, 2017 (Exhibit 9).  In the email, Friedland stated that he is "a member of the advisory board of OWC

Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014." Friedland's emails from his Global email included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations in the United States in exchange for more than 5.1 million shares of stock, nor that he sold all those shares only a few months earlier and had begun to sell off Intiva's OWC stock.

77.     Between August 11, 2017, and September 22, 2017, the Intiva account at Spencer Edwards offered and sold  525,000 shares of OWC stock for net proceeds of $145,723.38.  Ex. C at lines 23 to 44.

78.     On August 12, 2017, Friedland used his Global email address to inform a listserve group of his participation in an online conversation discussing "Aphria and Hemp Inc."  In the email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's emails from his Global email included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations in the United States in exchange for more than 5.1 million shares of stock, nor that he sold all those shares only a few months earlier and had sold virtually all of Intiva's OWC stock.

79.     On August 20, 2017, Friedland used his Global email address to inform a listserve group of Friedland's participation in an online discussion about "two publicly-traded cannabis stocks, Canada-based Aurora Cannabis (ABCFF) and Medical Marijuana Inc. (MJNA)."  In the

email, Friedland stated that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email from his Global email account included an extensive listing of his business activities in the cannabis industry, described his book, and explained his extensive international business experience, but did not discuss his role with Global or mention the agreement to handle OWC's media and investor relations for two years in exchange for more than 5.1 million shares of stock, nor that he sold all those shares only a few months earlier, much less that he had begun to sell off Intiva's OWC stock.

80.     In total, between June 27, 2017 and September 22, 2017, the Intiva account at Spencer Edwards offered and sold 1,297,222 shares of OWC stock for net proceeds of $479,025.91.  Ex. C at line 46.

81.     As of September 30, 2017, Intiva held 25,000 shares of OWC in its Spencer Edwards trading account.

82.     In each year from 2013 through 2017, Friedland filed a Report of Foreign Bank and Financial Accounts (FBAR) with the Internal Revenue Service (IRS) indicating that he either owned or had signature authority over more than a dozen bank or brokerage accounts in Hong Kong, as well as accounts in Switzerland and Germany, with the signature authority accounts being owned by foreign private companies.  The combined account value for all of these accounts exceeded $10,000,000.

83.     On or around February 15, 2018, Kathy Friedland closed on an all-cash purchase of a Denver area condominium for approximately $687,000, with Friedland in attendance at the closing.

**INVESTOR TESTIMONY ABOUT FRIEDLAND AND OWC STOCK**

84.     The SEC Staff took sworn testimony on February 16, 2018 of an investor

("Investor A") who purchased OWC stock around the time Friedland was both touting OWC and

selling his holdings in OWC.

> a.      Investor A testified:
>
>> Jeffrey Friedland is an emerging market pioneer.  He's tried to make himself out as the world's most renowned informed person on Cannabis on the planet and he wrote the book and it's been a huge success.  So he's got a lot of name recognition.  So obviously aligning himself on the advisory board member with OWCP that was one thing that I looked at and said, well, if he's the world's leading—you know, world's leading imminent knowledgeable person on cannabis and the book was so successful and he's aligned with OWCP, then he must be some validity there as to where they're going and what their success is going to be, and now he has—and that was all last year, okay.
>
> b.      When asked what Friedland's position as an advisory board member

meant to him and whether he considered the position to be an officer or director

of OWCP, Investor A stated:

>> I've worked for multiple Fortune 500 companies . . . .I don't think he's an officer.  I think he's just an adviser, whatever that means, you know.
>
> c.      When asked whether he knew Jeffrey Friedland was an investor in the

OWC, the investor stated:

>> I don't know if OWCP gave him those shares for his marketing support and his investor relations and being an advisor going around the world touting OWCP.  So I don't know if he paid for those shares or if he was given those shares . . . .I read where he's a . . . . significant holder of OWCP shares . . . .
>
> d.      Investor A was asked whether Jeffrey Friedland's statements that he was

responsible for an investment in OWC on his own initiative was important to him

in continuing to buy OWC:

> Oh, yeah, it is just another validator that here's the world's most leading cannabis expert that's noted CFN Financial News and they're bringing in the most highly trained cannabis researchers and here's this guy that wrote this book and he's authored this book on medical cannabis.  So if you're believing in the whole cannabis industry, yeah, by him being associated by OWCP that influenced me further to continue buying.

e.     When asked whether it was important to know that Jeffrey Friedland owned over six million shares of OWCP stock, Investor A stated, "sure, at the time [spring 2017]."

f.     Investor A was asked whether it was important to him that OWC's leadership team was holding its stock instead of selling during the spring and summer of 2017:

> I've heard other posters say that there's not been one stock insider share sold in OWCP from the people that—supposedly the people that are involved in this company. . . . Hell, yes, it matters . . . .Because it shows they've got such—they've got a lot of skin in the game and that they're—I mean, when you're doing all this work, working two jobs and doing all this research in trying to put this whole thing together.

g.     When asked if he were to receive information in the spring of 2017, when he was buying shares, that members of OWC's management team were selling shares during time, Investor A stated, "I would have gotten out . . . . That is a dead ringer for a stock when insiders are trading their stock."

h.     When asked how it would have affected him if any of the individuals that were listed on OWC's leadership team, which included Friedland, were selling, he stated it would be a "[b]ig red flag . . . . Huge."

i.     When asked if people care about insiders selling, Investor A stated, "[h]eck, yes, they care about that."

j.      When asked how would it affect his decision if he knew Jeffrey Friedland was the largest shareholder and he was selling and liquidating his shares at the same time you were buying, Investor A stated, "[w]ell, there's a reason he could have had.  If he was trying to start up his own company."

k.      Investor A was asked whether he ever learned or whether there were discussions that he observed on any of the Internet chatter that Jeffrey Friedland was selling stock: "No.  No, that would have come up.  No.  I mean, I was following the chatter every day, seven days a week and that has never ever, ever been mentioned on the IHUB posting boards that I know of."

l.      When asked how, it would have affected his investment decision if he learned, during the spring of 2017 when there was a spike in OWC's stock price and there was a lot of selling activity,  that the stock being sold belonged to Friedland, Investor A stated:

> Well, I would have had to look at that objectively because obviously not knowing the direct relationship that he has with the company.  He's listed as an advisory board member.  I mean, that terminology means that he's not an officer of the corporation and he's a hire—to me, I think, he's a hired paid gun, okay, and because of his popularity in this industry and his name recognition, so he looked at that and saw, wow, if—and I don't know, maybe you guys do—if he bought his own stock or they gave it to him.  You know, if you're just a paid gun and you're not an officer of the corporation or even an employee, okay, specifically, I would say there would be a lot of people if they saw that stock go that high and they owned five million shares that they would -- if they needed some cash, that they would do the same thing. I'd have -- you know, at first glance you're going to say, oh, my God, this guy's supposed to be representing the company, and you know, and he's somehow an executive associated with the company and now he's making a fortune. But he's looking out for himself, you got to remember, and he only -- you know, I think he already had his other company.  And you know, he might have looked at this, if he did this, as an opportunity to cash in and, you know, start his own company up.

m.      When asked whether it would have affected his investing decision if he knew at that time that Jeffrey Friedland acquired 5.1 million shares of stock through a company called Global and that was disclosed by OWC in its corporate filings with the SEC, but in order to sell that stock he transferred it to a company in his wife's name, Anvestor A responded:

> Yeah, it possibly could have—it possibly—I mean, I think it would have—it probably would have limited my investment because from that time period—and I was holding a considerable amount of shares when this stock went up in February of 2017 and my wife and I were jumping all over ourselves looking at our portfolio . . . . So it would have—it probably affected—and I would have delved into this a lot more . . . .I probably would have tried to find out more about why he did that in a more direct manner, and it might have—until that time I might have limited—it might have limited the investment continuances that I went on continually buying until I could justify why that happened or why he did that.

n.      When asked what would have happened on the IHUB board if Jeffrey Friedland or someone posted that he was selling a large block of OWC Stock, Investor A stated, "Oh, yeah, it would make a huge difference in the way people would think of OWCP stock, in general.  I mean, obviously, you know, he's considered God in the cannabis industry . . . ."

o.      When asked whether he thought there would have been an impact at, for example, the Wall Street Conference, if Mr. Friedland said, "I need to preface my remarks because I'm talking about OWC.  I need to make clear that I own six million shares and I am selling millions of those shares now," Investor A stated:

> They wouldn't—I doubt they would have let him . . . . Yeah. Oh, yeah . . . . Because why would—why would—consider him if he was the CEO.  If the CEO goes to a conference, and you're going to announce and say I'm selling a whole bunch of my shares, the whole freaking floor would drop out . . . . From a public relation standpoint for anybody that knew who he was.  I mean, that's why they brought him in, okay, because of his—his—

his fame and stature in the cannabis world through his authoring of that book, okay, and that's referenced all over the place.

85.     The SEC also interviewed numerous investors concerning their decisions surrounding their purchase and sale of OWC securities.  Several investors who were asked whether their investment decisions would have been affected if they knew members of OWC leadership were selling in the Spring of 2017 answered in the affirmative.

    a.     For example, on February 23, 2018, an investor ("Investor B") responded that if management was selling their shares in the Spring of 2017, this would have been a red flag, and it would have affected his decision to hold onto the stock.

    b.     In another interview on February 26, 2018, another investor ("Investor C") testified that, although his original purchase of OWC stock was based on the volume and price of the stock, his decision to hold OWC stock during the Spring of 2017, after the price reached $3.00 and then fell to below $1.00, was due to the fact that OWC's leadership—as shareholders—had more stake in the company than he had, specifically mentioning Friedland and the fact that he was an early investor in OWC.

Pursuant to 28 U.S.C. §1746, I, Michael Thomas Grimes, declare under penalty of perjury that the foregoing is true and correct.

Executed:  March 5, 2018

_____
Michael T. Grimes