IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 18-cv-00529-MSK-MEH

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

 Plaintiff,

v.

JEFFREY O. FRIEDLAND,
GLOBAL CORPORATE STRATEGIES, LLC, and
INTIVA PHARMA, LLC,

 Defendants,

and

LANE 6552 LLC,
KATHY B. FRIEDLAND,
ASPEN UPPER RANCH, LLC,
ASSURANCE MANAGEMENT, LLC, and
THE JEFFREY AND KATHY FRIEDLAND IRREVOCABLE TRUST,

 Relief Defendants.

_____

**OPINION AND ORDER REGARDING MOTION FOR TEMPORARY RESTRAINING
ORDER AND ASSET FREEZE**
_____

 **THIS MATTER** comes before the Court pursuant to the Plaintiff's ("SEC") exparte

Emergency Motion for Temporary Restraining Order, Asset Freeze, and Other Relief (**# 2**).

## FACTS

 **A. Substance**

 Although the Complaint (**# 1**) and Motion (**# 2**) are lengthy, the pertinent alleged facts are

fairly straightforward. Defendant Jeffrey Friedland is a businessman and influential figure in the

1

medical marijuana community. As relevant here, he also owns or has substantial control over two businesses: Global Corporate Strategies ("Global") and Intiva Pharma ("Intiva").

In 2014, Mr. Friedland became involved with a company now named OWC Pharmaceutical Research Corp. ("OWC"), which is active in the field of marijuana-based pharmaceutical products. In August 2014, Intiva ( at Mr. Friedland's direction) purchased approximately 1.3 million shares of OWC.

Then in January 2016, Mr. Friedland and OWC entered into a contract by which Mr. Friedland promised to provide public relations services to OWC, touting OWC to investors, journalists, and others. In exchange for his services, OWC transferred approximately 5.1 million shares of OWC stock to Global. The crux of the SEC's Complaint here is that neither Mr. Friedland, Global, OWC, or any other person, disclosed to the public the fact that Mr. Friedland or Global received OWC stock as compensation for promoting OWC.

Between February 2016 and January 2017, Mr. Friedland made public appearances touting OWC. It is not necessary to quote, in detail, the representations that Mr. Friedland made during these appearances; it is sufficient to note generally that he indicated that he had made a personal investment in OWC (through Intiva), that he was bullish on the company and its prospects, and that investors should pay attention on OWC and buy its stock. The SEC does not allege that Mr. Friedland made any <u>affirmative</u> false representations during these appearances, but the SEC alleges that Mr. Friedland engaged in misleading omissions when he failed to disclose that he had been compensated for promoting OWC, with OWC stock.

In January 2017, Mr. Friedland began to move the 5.1 million shares of OWC stock from Global to a new entity, Relief Defendant Lane 6552, LLC ("Lane"), an entity that Mr. Friedland's wife had recently formed. In order to allow restrictive legends on that stock to be

removed, Mr. Friedland provided the Transfer Agent with a letter falsely stating that Global had paid OWC approximately $51,000 for the shares, when, in fact, Global had paid nothing. The letter also falsely stated that Lane would be paying Global some $200,000 as consideration for the stock, when, in fact, no such payment would occur. When the 5.1 million shares were transferred to Lane in February 2015, Mr. Friedland then directed Lane to sell OWC shares. Between March 2 and March 21, 2017, Lane liquidated most of the 5.1 million shares, with a rough return on the sales of $6.5 million.

Beginning in April 2017, Mr. Friedland also directed that Intiva sell its OWC shares. Again, Mr. Friedland made certain false representations in an effort to remove the restrictive legends on Intiva's OWC shares, including asserting that no one associated with Intiva had sold OWC shares in the past 3 months and denying that Intiva was promoting OWC securities through third parties. The restrictive legend was eventually removed and between June and September 2017, Mr. Friedland sold most of Intiva's holdings of OWC stock, receiving nearly $500,000 from those sales.

Throughout this time, and continuing to September 2017, Mr. Friedland promoted OWC in public appearances and written statements encouraging investors to purchase it's stock. Once again, the SEC does not allege that Mr. Friedland made any false affirmative representations during these appearances, but the SEC does allege that Mr. Friedland engaged in material misrepresentations by omission, insofar as the failed to disclose that he had received OWC stock as compensation for his activities and that he was in the course of selling the OWC stock that owned.

Based on these allegations, the SEC alleges three claims against Mr. Friedland, Global, and Intiva: (i) nondisclosure of compensation in violation of 15 U.S.C. § 77q(b); (ii) securities

fraud in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; and (iii) securities fraud in violation of 15U.S.C. § 77q(a).

**B. Motion for Asset Freeze**

Simultaneously with the Complaint, the SEC filed the instant *ex parte* Motion **(# 2)** seeking a freeze on assets of Mr. Friedland, Intiva, Global, and various Relief Defendants. According to the affidavits supplied by the SEC, the funds received from the sale of the OWC stock -- roughly $7.5 million worth – can be traced as follows:

• Lane received approximately $6.5 million from the sale of the OWC stock. *Docket # 3-2*. Nearly all of those funds were then wired from Lane's brokerage account into an account held by Lane at the First American State Bank ("the 426 account"). *Docket # 2-2, ¶ 4*. Between March 2017 and January 2018, the entire contents of the 426 account were disbursed through, the following traceable transactions [1]:

> • $168,000 was transferred to a bank account owned by Global at First American State Bank ("the 215 account")
>
> • $4.15 million was transferred to Lane's account at Fidelity ("the Fidelity 466 account")
>
> • $45,500 was paid by check to Kuni Lexus and $32,200 was paid to Groove Mazda. The SEC appears to assume that these payments are connected to the Friedlands' purchases of automobiles, but the SEC neither identifies the particular vehicles nor specifies how it associated particular automobiles with these payments.
>
> • $25,000 was transferred to Ms. Friedland's checking account (the account number is not specified).

---

[1] The Court has omitted payments made to credit card companies or checks written to family members or various other associates of the Friedlands who have not been named as Relief Defendants here. The Court also omits payments to persons whom the SEC has been unable to identify.

- $1.95 million was transferred to Stewart Title Company, apparently to purchase real property located at 466 Meadow Road in Snowmass, Colorado. The nominal purchaser appears to be Relief Defendant Aspen Upper Ranch, LLC.

- $112,000 was paid by check to the Jeffrey Friedland and Kathy Friedland Irrevocable Trust

- $22,400 was paid to an entity called Classic Pianos

As of January 31, 2018, the 426 account had a balance of $943.02. *Docket # 2-2, ¶5.*

- Of the $4.15 million deposited in the Fidelity 466 account, above, the following transactions are traceable:

    - $905,000 was returned to the 426 account at various points in time. Because those funds are accounted for in the listing above, the Court does not consider them further here.

    - $15,000 was paid to Global.

    - $400,000 was paid by check to Ms. Friedland with a memo line referring to "Condo #27, Cherry Hills 3."

    - $300,000 paid by check to Ms. Friedland. According to Docket # 2-1, ¶ 6-7, the combination of this transaction and the previous transaction were to complete the purchase of a condominium in Denver.

As of February 28, 2018, the balance in the Fidelity 466 account was $3,059,492.15. *Docket # 2-2, ¶ 6, 7.*

- Intiva received $479,000 from its sale of the OWC stock, deposited into its brokerage account. From June to September 2017, Intiva wired $475,000 from that brokerage account to an Intiva account at First American State Back ("the 657 account"). Between July and August 2017, the following pertinent transactions debited funds from the 657 account:

    - Several transfers were made to an entity called Intiva Real Estate LLC. Because that entity is not a named Relief Defendant

>and the SEC has not alleged that it is an alter ego of Intiva itself, the Court disregards those transfers.
>
>• $108,000 was transferred to an entity called Intiva Leasing, LLC. That entity is also not a Relief Defendant. The SEC alleges that, on that same date, Intiva Leasing, LLC transferred $108,100 to Relief Defendant Assurance Management, LLC. A similar transaction, involving approximately $100,000, occurred again the following day. A few weeks later, a third transaction involving $123,000 was transferred to Intiva Leasing. That amount was augmented by an additional transfer of funds from an entity called Intiva USA Inc., and the combined funds, totaling $146,500, were transferred to Assurance Management the following day.

As of January 31, 2018, the ending balance in the 657 account was $94,038.22. *Docket* # 2-2, ¶ 8-10.

## **ANALYSIS**

To obtain an *ex parte* temporary restraining order under Fed. R. Civ. P. 65(b), the SEC must: (i) demonstrate, by affidavit or verified complaint, that it will suffer immediate and irreparable injury before the Defendants could be heard in opposition to the motion; and (ii) provide a certification from its counsel identifying any efforts that the SEC has made to give notice of the motion to the Defendants and the reasons why such notice should not be required. Fed. R. Civ. P. 65(b)(1)(A), (B). In addition, the SEC must make a showing that it is likely to succeed on the merits of its claims against the Defendants. *Smith v. S.E.C.*, 653 F.3d 121, 127-28 (2d Cir. 2011). For the claims against Mr. Friedland, Intiva, and Global -- that is, the named Defendants -- this is satisfied by a showing that an inference can be drawn that the party has violated securities laws. *Id.* at 128. For the claims against the Relief Defendants, the SEC must show that the defendant has received ill-gotten funds and does not have a legitimate claim to them. *Id.*

The Court is satisfied that the SEC has made the required showing under Rule 65(b). As set forth below, the motion and supporting affidavits demonstrate a likelihood of success on the merits of the claims against Mr. Friedland (and, to a more limited extent, against Intiva and Global). The Court is satisfied that the affidavit of Charles Felker, *Docket* # 2-1, ¶ 9, indicates a basis for believing that, if notified of the motion and given the opportunity to be heard, Mr. Friedland could transfer assets to foreign bank accounts that he controls, making it effectively impossible for the SEC to retrieve such funds.

The Court then turns to the each of the named Defendants and Relief Defendants, identifying the sufficiency of the SEC's showing as to each.

<u>Mr. Friedland</u>: The SEC's proffer demonstrates a likelihood that, at a minimum, Mr. Friedland has violated 15 U.S.C. § 77q(b). That statute provides that "It shall be unlawful for any person . . .to give publicity to [a security] for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt . . . of such consideration and the amount thereof." The SEC has adequately alleged that Mr. Friedland received consideration from OWC in exchange for giving publicity to it, and that Mr. Friedland did indeed publicize OWC's stock without disclosing the existence and amount of the consideration he had received.

Assuming that the SEC can prove that Mr. Friedland violated 15 U.S.C. § 77q(b), the Court must also consider the nature of the SEC's available remedy, as any pre-judgment asset freeze should not exceed the amount that the SEC could ultimately recover on the merits. The Court will assume – without finding at this time – that disgorgement of Mr. Friedland's "ill-gotten gains" from violation of §77q(b) is the appropriate remedy. The burden is on the SEC to articulate "a reasonable approximation" of those gains, at which point the burden shifts to the

7

defendant to demonstrate that the SEC's approximation is unreasonable. *S.E.C. v. Curshen*, 372 Fed.Appx. 872, 883 (10th Cir. 2010). This Court is aware of few authorities – and the SEC has cited none – that are instructive in determining how to assess what portion of stock sale proceeds would be considered "ill-gotten" in a § 77q(b) action. Cases such as *Curshen*, although not meeting the issue directly, at least suggest that disgorgement of the full amount of profits from the sale of the stock tendered to the defendant might be appropriate. This suggests that it might be appropriate to freeze assets reflecting the profits made by Mr. Friedland from the sale of the OWC stock that was paid to Global as compensation for his promotional services – a sum amounting to $6.5 million. But a claim under §77q(b) would not justify disgorgement of the $479,000 Mr. Friedland received (through Intiva) as profits on the sale of OWC stock that he had purchased as an investment.

That leads to the SEC's alternative contention that its Securities Fraud claims would allow it to reach the profits from the Intiva sales. In short, the SEC alleges that, wholly apart from Mr. Friedland's undisclosed promotions of OWC, he also committed securities fraud by making misrepresentations to Transfer Agents so as to allow the OWC stocks held by Global and Intiva to be reissued free of restrictive legends, thus facilitating their sale. The Court need not explore this question fully, as the record reflects that, to the extent that false statements were made to the Transfer Agent to facilitate the removal of the restrictive legend on the Intiva shares, those false statements were made by the otherwise-unidentified Chief Financial Officer of Intiva, not by Mr. Friedland. *See Docket* # 3, ¶ 61. The SEC has not alleged that the CFO acted at Mr. Friedland's direction, or even that Mr. Friedland was aware of the CFO's misrepresentations at any time. Thus, the Court will not find that the SEC is likely to succeed on a Securities Fraud

claim directed at the Intiva-held OWC stock and the Court will not include the proceeds from the sale of that stock in any asset freeze.

Having concluded that up to $6.5 million in Mr. Friedland's assets may be frozen, the last remaining question is determining what and where those assets are. The SEC's Motion offers a list of "the following bank accounts and real and personal property [that] should be frozen." *Docket* # 2 at 32. The list of bank accounts includes accounts belonging to the Friedlands' Irrevocable Trust, Lane, Global, Intiva, Ms. Friedland (and a non-party trust in her name), and Assurance Management, but none in Mr. Friedland's own name. The list also includes the Snowmass real estate (which the SEC admits is titled in the name of someone other than Mr. Friedland), the condo (for which the SEC does not make any allegations as to who holds title), and otherwise unspecified "Lexus and Mazda automobiles" (for which the SEC does not make any allegations as to who holds title). Thus, although the SEC has made a case for freezing the assets of Mr. Friedland, it has not identified any particular assets that are actually held by Mr. Friedland in his own name. There being identified as Mr. Friedland's asset, the Court declines to approve a freeze.

Global: The Court finds that the SEC has not made a showing that it is likely to succeed on any of its claims against Global, as an entity distinct from Mr. Friedland. It is difficult to conceive of how Global engaged in improper promotion of OWC under § 77q(b), insofar all of the SEC's allegations entail promotional statements made by Mr. Friedland himself. There are sporadic instances in which the SEC alleges that Mr. Friedland made certain written comments promoting OWC by use of a Global e-mail address, but those assertions merely open the door to more complex theories of liability that the SEC does not explore. The Court will not simply assume that Mr. Friedland and Global are alter egos, or that Global is vicariously liable for

9

Securities Fraud committed by Mr. Friedland, or otherwise hold Global liable for actions by Mr. Friedland without a more developed statement of the SEC's theory. Similarly, even assuming that Mr. Friedland made fraudulent statements to liberate the OWC stock held by Global so that it could then be conveyed to Lane, the Court cannot see how any remedy in disgorgement of any amount would lie against Global itself, particularly where the SEC has clearly alleged that Global received nothing in exchange for transferring its stock to Lane. Accordingly, the Court sees no basis to enter an asset freeze against Global based on Global's own liability for securities fraud.

That leaves the question of whether Global is subject to an asset freeze as a relief defendant. As noted above, Global received two disbursements from Lane's liquidation of the OWC stock: a $168,000 transfer from Lane 426 account to the Global-owned 215 account, and a second transfer of $15,000 from the Fidelity 466 account to an unspecified Global account. The Court will assume, for purposes of expediency, that both payments were made to the same account: the Global 215 account that is listed in the SEC's motion. The more difficult question is whether the SEC has shown that Global lacks any legitimate claim to these assets. The SEC argues that, to the extent that assets are held by Relief Defendants as Mr. Friedland's "nominees," such that Mr. Friedland himself is the beneficial owner of the assets, the SEC is not required to show that the Relief Defendant lacks a legitimate claim to the assets. *Citing SEC v. Heden*, 51 F.Supp.2d 296, 299 (S.D.N.Y. 1999). The Court has some doubt as to whether *Heden* squarely and persuasively stands for that proposition, but need not reach the question at this time. The SEC has not shown that Global's possession of the $183,000 in question here is strictly as a nominee for Mr. Friedland, nor has it shown that Global has no legitimate claim to the $183,000. Indeed, if anything, the SEC's own evidence shows the contrary: that Global should have

received some payment from Lane in exchange for surrendering the OWC stock, and that such payment would likely have exceeded $183,000. In such circumstances, the Court will not impose an asset freeze upon Global as a Relief Defendant.

Intiva: Intiva purchased its stake in OWC for value in 2014. The record does not support any §77q(b) claim against Intiva, as Intiva did not promote OWC stock in exchange for compensation. The Court has also considered whether the SEC has shown a likelihood of success on its claim that Intiva engaged in Securities Fraud by misleading the Transfer Agent into re-issuing the OWC stock without a restrictive legend. The elements of a garden-variety Securities Fraud claim for civil enforcement purposes are: (i) a false statement of fact, (ii) made with scienter, (iii) in conjunction with the purchase or sale of securities. *S.E.C. v. Goble.* 682 F.3d 934, 942-43 (11th Cir. 2012). Here, although the SEC devotes little effort to articulating its theories of Securities Fraud against Intiva, the Court understands the SEC to allege that Intiva, through its CFO, falsely stated that none of Intiva's affiliated persons had sold OWC stock in the three months prior to May 2017.[2] However, it is not clear that this statement was indeed false. Under the facts alleged herein, one, or arguably two, entities were selling OWC stock in the three months prior to May 2017: Lane was selling OWC stock into the market, and, arguably, Global was selling OWC stock to Lane. The SEC has not alleged facts showing that either Lane or Global entity would be considered "affiliated" with Intiva for purposes of the statements being made by Intiva's CFO, and thus, the Court cannot assume that the SEC has adequately alleged a

---

[2] The SEC also asserts that the CFO stated that "Intiva [was] not currently promoting" OWC stock, and that such an assertion is false. The Court is not sanguine that the facts alleged warrant that conclusion: it is clear that Mr. Friedland was promoting OWC stock, but the Court will not assume that Mr. Friedland and Intiva are necessarily alter-egos, such that Mr. Friedland's ongoing promotion of the OWC stock makes Intiva's statement false. Similarly, the SEC alleges that Intiva's CFO falsely stated that Intiva "does [not] plan to promote or engaged a third party to promote OWC securities." Once again, it is not clear how this statement is false as to Intiva, as opposed to Mr. Friedland.

false statement by Intiva. Absent a showing that the SEC is likely to succeed against Intiva, there is no showing in the record that Intiva is in possession of funds arising from the sale of the OWC stock by Lane, such that it could be treated as a Relief Defendant. Thus, there is no basis for an asset freeze against Intiva.

The Court now turns to the Relief Defendants, and will assume that the entire proceeds of Lane's $6.5 million sale of its OWC stock constitutes proceeds of Mr. Friedland's violation of § 77q(b).

<u>Lane:</u> The SEC has adequately alleged that all funds in Lane's accounts are traceable to the OWC stock sales, and has further shown that Lane has no legitimate claim to those funds by alleging that Lane has no other meaningful business operations beyond receiving and selling the OWC stock. Thus, the SEC has demonstrated that all funds in Lane's possession should be subject to a freeze. As recited above, Lane holds two accounts of interest here: the 426 account and the Fidelity 466 account, and the SEC has adequately shown that effectively all funds in either account were traceable to the OWC stock sales. The 426 account has a current balance of $943.02, and it is appropriate to enter an asset freeze in that amount as to that account. The Fidelity 466 account has a current balance of $3,059,492.15. Accordingly, the Court will direct that those accounts be frozen in the stated amounts.

<u>Ms. Friedland:</u> The Court is satisfied that the SEC has adequately alleged that Ms. Friedland has no legitimate claim to funds that were obtained from the sale of OWC stock and disbursed to Ms. Friedland by Lane. As set forth above, the record reflects that a disbursement of $25,000 was made from Lane's 426 account to an unspecified bank account belonging to Ms. Friedland. The Court will assume that that account is the First American State Bank account

ending in 7593 that is listed at page 32 of the Motion, and the Court will direct that that account be frozen in an amount not to exceed $25,000.

The record also reflects that Ms. Friedland received nearly $700,000 in disbursements from the Fidelity 455 account, but the SEC clearly asserts that Ms. Friedland promptly paid over those funds to purchase the Denver condo. Thus, there is no reason to believe that the additional $700,000 would be found in Ms. Friedland's account. As to the condo itself, the Court is once again confused by the SEC's failure to identify who holds the title to that condo. None of the three affidavits tendered by the SEC offer anything beyond the fact that Ms. Friedland wrote a check that was ostensibly for the purchase of the condo. Even if the Court were to assume that the condo is titled in Ms. Friedland's name, the Court has some doubt that the physical piece of property can be the subject of an effective "asset freeze." At most, if the Court were convinced that title to the condo remains in Ms. Friedland's name or control, the Court could grant the SEC leave to file a $700,000 lien against the title to the condo, ensuring that if the property is liquidated before the end of this litigation, the SEC could recover the value of the funds used by Ms. Friedland to purchase it. But the Court declines to do even that, given that the titled owner of the condo is unknown. Or, arguably, the Court could restrain Ms. Friedland from selling the condo. But that may have occurred. It is possible that Ms. Friedland quickly sold the condo for value to a third-party buyer, such that imposition of a lien against the condo's title would be inequitable here. Accordingly, the Court authorizes an asset freeze against Ms. Friedland, only with respect to her account ending in 7593, and only in the amount of $25,000.

<u>Aspen Upper Ranch, LLC</u> ("Ranch"): The allegations against Ranch are scant. Mr. Grimes' affidavit indicates that Ranch is an entity formed by Ms. Friedland, and that she is its only member. The record also reflects that a disbursement was made from the Fidelity 466

13

account, in the amount of nearly $2 million, that seemed to suggest that it was for the purchase of the property in Snowmass in the name of Ranch. The SEC has not alleged that the property is indeed titled in Ranch's name, nor, if it is, that Ranch did not give value to Ms. Friedland in exchange for the title to the Snowmass property. Accordingly, the Court finds that, at this time, the SEC has not made a sufficient showing that a "freeze" of any property belonging to Ranch is appropriate.

<u>Assurance Management</u> ("Assurance"): What little information there is about the Ranch, there is even less about Assurance. Mr. Grimes' affidavit establishes that Assurance is a company organized by non-party Beryl Zyskind[3] and that its office location is the same as that of Global and Intiva. The SEC has established that, on three occasions, Intiva, through an intermediary entity, directed payments of roughly $100,000 each to Assurance. The SEC does not assert that Assurance is in any way affiliated with Mr. Friedland or any of the other Defendants here, nor does it allege that Assurance had no legitimate claim to the payments it received from Intiva.[4] Indeed, the SEC does not even describe what Assurance allegedly is or what it does. (For all the Court knows, Assurance could be Intiva's landlord.) The mere fact that an entity received payments indirectly from Intiva is not sufficient to warrant the conclusion that it is illegitimately in possession of ill-gotten funds. Thus, the Court denies the SEC's request for an asset freeze of any amount against Assurance.

<u>The Jeffrey and Kathy Friedland Irrevocable Trust</u> ("Trust"): Finally, the Court turns to the Trust. The only fact found in the SEC's supporting affidavits about the Trust is that it

---

[3] The SEC offers the entirely gratuitous fact that Mr. Ziskind was imprisoned for bank fraud in 1996.

[4] The SEC's Complaint alleges that the payment was made to Assurance "for not apparent consideration." That fact is not asserted in any of the SEC's supporting affidavits.

received one payment from the Fidelity 466 account, in the amount of $112,000. The SEC makes no specific assertion that the Trust does not have a legitimate claim to that sum; indeed, the SEC says nothing more about the Trust. Accordingly, the Court denies the SEC's request for a freeze of the Trust's assets.

## CONCLUSION

For the foregoing reasons, to the extent that the SEC's motion **(# 2)** seeks *ex parte* relief in the form of a Temporary Restraining Order, the Court **GRANTS IN PART** and **DENIES IN PART** that Motion as follows:

- The Fidelity 466 account, held by Lane, are frozen up to the amount of $3,059,492.15

- The 426 account, held by Lane, are frozen up to the amount of $943.02.

- Ms. Friedland's First American State Bank account, ending in 7593, are frozen up to the amount of $25,000.

Pursuant to Rule 65(b)(2), these freezes will remain in effect for a period no longer than 10 days, unless renewed by Order of the Court.

The Court will treat the remainder of the SEC's Motion as one seeking a preliminary injunction, and will hold a non-evidentiary hearing at **11:00 a.m.** on **March 13, 2018** for the purpose of addressing: (i) whether the *ex parte* asset freeze should be continued beyond 10 days, (ii) whether there are disputed facts as to the remaining portions of the SEC's motion, such that an evidentiary hearing is required, and (iii) if so, to schedule such an evidentiary hearing. To ensure that the Defendants (and Relief Defendants) are properly notified and heard in advance of the hearing, the Court directs that the SEC effectuate service of the Summons, Complaint, the Motion and its supporting materials, and a copy of this Order on each Defendant and Relief

Defendant, on or before 3:00 p.m. on **Friday, March 9, 2018**.  The Defendants and Relief Defendants may file a response to the Motion at or before **5:00 p.m. MDT** on **March 12, 2018**.

Dated this 8th day of March, 2018 at 8:37 a.m.

**BY THE COURT:**

_____

Marcia S. Krieger
Chief United States District Judge