IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-00529-MSK

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

        v.

JEFFREY O. FRIEDLAND,
GLOBAL CORPORATE STRATEGIES LLC, and
INTIVA PHARMA LLC,

        Defendants,

AND

LANE 6552 LLC,
KATHY B. FRIEDLAND,
ASPEN UPPER RANCH LLC, and
THE JEFFREY AND KATHY FRIEDLAND IRREVOCABLE TRUST,

        Relief Defendants.

---

## AMENDED COMPLAINT

---

    Plaintiff Securities and Exchange Commission (the "SEC" or "Commission") alleges as follows against Jeffrey O. Friedland, Global Corporate Strategies LLC, and Intiva Pharma LLC (collectively, "Defendants"), and Lane 6552 LLC, Kathy B. Friedland, Aspen Upper Ranch LLC, and The Jeffrey And Kathy Friedland Irrevocable Trust (collectively, "Relief Defendants"):

## I.    SUMMARY

    1.    This is an illegal touting and securities fraud case.  Defendant Jeffrey O. Friedland ("Friedland") promoted the stock of OWC Pharmaceutical Research Corp. ("OWC"), an Israeli medical marijuana company, without disclosing – as required by the federal securities laws – that OWC paid him millions of shares of its stock to promote the stock.  Additionally, Friedland committed securities fraud by intentionally or recklessly making material

misrepresentations and omissions when promoting OWC stock, and by doing so when he was engaging in deceptive conduct and secretly selling his OWC holdings.

2.     At all relevant times, Friedland acted as a Managing Director of Defendant Global Corporate Strategies LLC ("Global"), a company that Friedland founded and controlled, and as a Manager and CEO of Defendant Intiva Pharma, LLC ("Intiva"), another company that Friedland founded and controlled.  Therefore, under principles of *respondeat superior*, Global and Intiva are liable for Friedland's violations of the federal securities laws.

3.     In August 2014, Friedland acquired more than 1.3 million shares of restricted OWC stock when he made an early investment in OWC through Intiva.

4.     Later, in February 2016, Friedland acquired another 5.1 million shares of restricted OWC stock through Global, as compensation for an agreement signed by Friedland to promote OWC and "***specifically target investors***."

5.     Between February 2016 and August 2017, Friedland made statements in emails, presentations, and interviews promoting OWC stock to investors without ever disclosing that OWC paid him 5.1 million shares of its stock to do so.

6.     Friedland knew, or was reckless in not knowing, that he had not made such disclosures and that investors would be misled by those omissions, because he knew of the agreement he signed to promote OWC in exchange for millions of shares of OWC stock.

7.     Reasonable investors would have considered it important to their investment decisions to know that Friedland had been paid millions of shares of stock to promote OWC's stock.  Indeed, actual OWC investors contacted by the SEC have stated that they purchased stock, and later held onto and did not sell their shares, based in whole or in part on Friedland's promotional efforts and recommendations.  Such investors have stated that knowing Friedland

had been paid millions of shares of stock to promote OWC would have been important to their investment decisions.

8. Friedland also never disclosed his efforts to liquidate his OWC holdings. Instead, Friedland misrepresented to investors that his investment in OWC was "long term" around the same time that he was preparing to sell, and then selling, OWC stock.

9. Friedland knew, or was reckless in not knowing, that such misstatements and omissions were false and misleading because he knew that, at or around the time of his statements, he was offering or selling, or directing the offer or sale, of OWC stock.

10. Reasonable investors would have considered it important to know that, at or around the time Friedland was promoting OWC as a "long term" investment, he was unloading his OWC shares. Here too, actual OWC investors contacted by the SEC have stated that it would have been important to their investment decisions to know that Friedland was selling OWC stock at the time he was promoting it.

11. At all relevant times, Friedland had ultimate authority over all of his statements and omissions referenced herein. Whether such statements were made in writing or orally, Friedland chose what statements to make or not make and the content of those statements.

12. Moreover, when Friedland made statements about OWC to potential or actual investors, he had a duty to provide truthful, complete, and non-misleading information. But Friedland failed to do that and instead provided false, incomplete, and/or misleading information.

13. Friedland compounded his material misrepresentations and omissions by taking deceptive steps to sell Global's OWC stock into the market that he actively promoted.

14. Rather than simply open a trading account for Global to sell its OWC stock, as he later arranged for Intiva to do to sell its OWC stock, Friedland (1) helped his wife open

brokerage accounts at two broker dealers for Lane 6552 LLC, a new company they created with no apparent business purpose and Kathy Friedland as its sole owner; (2) transferred ownership of Global's OWC stock to Lane 6552, providing materially false and misleading information to the transfer agent in order to get the "restricted" legend removed from the stock; and (3) deposited and sold Global's OWC's shares out of Lane 6552's second brokerage account after a prior broker dealer would not sell the stock because it believed that the stock had been earned by Global for doing investor relations that appeared to be ongoing.

15.     In total, Friedland received nearly $6.5 million in illicit proceeds directly or indirectly selling the OWC stock he acquired through Global as compensation for handling OWC's media and investor relations and "targeting investors," and generated nearly $500,000 in illicit proceeds doing the same with Intiva's OWC stock, in many cases at the same time he was misleading investors about his relationship with OWC and his and Intiva's investments in OWC.

16.     Friedland and his wife used these ill-gotten proceeds to (1) make an all-cash purchase of a $1.8 million home in Snowmass, Colorado; (2) make an all-cash purchase of a $687,000 Denver area condo; (3) pay off more than $350,000 of credit card and personal credit debt, and purchase two cars and a piano for $100,000; (4) transfer more than $300,000 to their children, their personal trust, and their family foundation; and (5) transfer more than $500,000 to Global and other entities and associates.  They also have more than $3 million of the ill-gotten proceeds invested in an account at Fidelity that they opened for Lane 6552.

17.     Because Friedland, in his role as Managing Director of Global, failed to disclose that OWC paid him and Global 5.1 million shares of stock to promote OWC stock to investors, Friedland and Global violated Section 17(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(b)].

18.     In addition, because Friedland, acting in his role as both Managing Director of Global and Manager or CEO of Intiva, (1) made materially false or misleading statements, or omitted to state material information, about both his relationship with and ownership interest in OWC; (2) directly or indirectly offered and sold OWC securities in the secondary market while at the same time touting OWC to investors; and (3) engaged in deceptive acts in order to sell Global's OWC stock, Friedland, Global, and Intiva violated Sections 17(a)(1)-(3) of the Securities Act [15 U.S.C. §77q(a)(1)-(3)], as well as Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a)-(c) thereunder [17 C.F.R. § 240.10b-5(a)-(c)].

19.     Because the Relief Defendants received proceeds from the Defendants' violations of the federal securities laws without providing consideration in exchange, they were unjustly enriched and must disgorge those ill-gotten gains.

## II.     JURISDICTION AND VENUE

20.     This Court has jurisdiction pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78(e) and 78aa].

21.     The Defendants and the Relief Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the means or instruments of transportation or communication in interstate commerce, in connection with the acts, practices, and courses of business set forth in this Complaint.

22.     Venue lies in this Court pursuant to 15 U.S.C. §§ 77v(a) and 78aa, and 28 U.S.C. § 1391(b)(2).  Friedland and Relief Defendant Kathy Friedland are residents of Colorado, Defendants Global and Intiva are entities organized in Colorado, and the other Relief Defendants

are Colorado entities or residents as well.  Finally, many of the acts and practices described in this Complaint occurred in the District of Colorado, including an investor presentation made by Friedland featuring OWC as an investment opportunity to potential investors and a luncheon with OWC executives and prospective investors.

## III.   DEFENDANTS

23.   **Jeffrey Owen Friedland** ("Friedland"), age 67, is a Colorado businessman.  He is the founder and Managing Director of Global, and the founder, Manager, and self-described "CEO" of Intiva.  In November 2015, Friedland published a book called *Marijuana: The World's Most Misunderstood Plant*, based in part on his experience owning two retail cannabis stores in Colorado ski towns Breckenridge and Crested Butte, as well as a cannabis cultivation facility in Steamboat Springs.  Over the past ten years, Friedland has filed Reports of Foreign Bank and Financial Accounts (FBARs) with the Internal Revenue Service (IRS) disclosing his roles with or investments in foreign penny stock companies, as well as his ownership or control over numerous bank and investment accounts in foreign jurisdictions, including Hong Kong, Germany, and Switzerland.  In 1984, without admitting or denying liability, Friedland consented to the entry of Final Judgment in the U.S. District Court for the District of Columbia permanently enjoining him from violating, among other things, the antifraud provisions of the Securities Act.  *See SEC v. Gary A. Agron, et. al.*, Civil Action No. 84-3025 (D.D.C.); Litigation Release No. 10543, 31 SEC Docket 580, 1984 WL 470960 (Sept. 28, 1984).

24.   **Global Corporate Strategies LLC** ("Global"), is a Colorado company organized by Jeffrey Friedland, its founder and Managing Director, on April 15, 2011.  Kathy Friedland, Frielland's wife, is a member of Global.  Global has its principal office at 3773 Cherry Creek North Dr., Suite 575, Denver, CO 80209.

25.     **Intiva Pharma, LLC** ("Intiva"), is a Colorado company that Friedland organized on March 8, 2014 as Marijuana Brands LLC, before changing its name to Intiva Pharma LLC on April 30, 2014.  Friedland is the Manager of Intiva, and has described himself in interviews as the "CEO" of Intiva.  Intiva is a wholly-owned subsidiary of Intiva USA Inc., a Colorado company, which is a wholly-owned subsidiary of INTIVA Inc., a Canadian corporation, both of which Friedland founded in 2014 and has been the Chairman and CEO of since their inception. Intiva has its principal office at 3773 Cherry Creek North Dr., Suite 575, Denver, CO 80209.

## IV.     RELIEF DEFENDANTS

26.     **Kathy B. Friedland** ("Kathy Friedland"), age 67, is a Colorado resident and the wife of Friedland.  She is the founder and sole member and principal of Relief Defendant Lane 6552 LLC, and is the registered agent and principal of Relief Defendant Aspen Upper Ranch LLC.  She is also a member of Global.

27.     **Lane 6552 LLC** ("Lane 6552"), is a Colorado company organized on January 3, 2017, with Kathy Friedland listed as the sole member and principal.  Lane 5552 has an address of 7 Polo Field Lane, Denver, CO 80209, and appears to conduct no business operations.

28.     **Aspen Upper Ranch LLC** ("Aspen"), is a Colorado company organized on June 27, 2017, with Kathy Friedland listed as the registered agent and principal.  Aspen has an address of 7 Polo Field Lane, Denver, CO 80209, and appears to conduct no business operations.  The Friedlands used proceeds from the illegal sale of Global's OWC stock to purchase a Snowmass, Colorado property in Aspen's name, receiving no consideration from Aspen.

29.     **Jeffrey and Kathy Friedland Irrevocable Trust ("Friedland Trust")**, is a trust controlled by the Friedlands that received $112,000 of proceeds from Friedland's sale of OWC stock for no apparent consideration.

## V.      RELEVANT ENTITY

30.      **OWC Pharmaceutical Research Corp. ("OWC")** is a medical marijuana company with its principal office in Petach Tikva, Israel that was incorporated in Delaware in March 2008 under the name Dynamic Applications.  On February 13, 2013, its securities were registered with the Commission under Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)]. On November 25, 2014, Dynamic Applications changed its name to OWC Pharmaceutical Research Corp. – OWC stands for One World Cannabis – and OWC's stock is quoted on the OTCQB using the symbol "OWCP."  For the purposes of this Complaint, "OWC" will be used in reference to either Dynamic Applications or OWC.

## VI.      FACTS

**A.      FRIEDLAND OBTAINED OWC STOCK AS AN EARLY INVESTOR AND AS PAYMENT TO PROMOTE OWC TO INVESTORS**

31.      In June 2014, Friedland and his wife hosted a dinner at their home in Denver, Colorado, where a presentation was made about the developing field of medical marijuana research by a doctor who later became OWC's chief science officer.  The guests at this dinner included approximately 25 potential investors, among them doctors and business people, two of whom made private investments in OWC (then called Dynamic Applications) via subscription agreements shortly after the dinner at Friedland's house.

32.      In August 2014, Friedland, through Intiva, purchased 1,322,222 shares of restricted OWC stock for $119,000 pursuant to a subscription agreement that Friedland signed on behalf of Intiva, and the ownership of these securities was identified in OWC's SEC filings (albeit with "Invita" rather than Intiva).

33.      In November 2015, Friedland published a book called *Marijuana: The World's Most Misunderstood Plant*, based in part on his experience owning two retail cannabis stores in

Colorado ski towns Breckenridge and Crested Butte, as well as a cannabis cultivation facility in

Steamboat Springs.   In virtually all of the appearances and communications discussed below,

Friedland mentions his book and Intiva's early investment in OWC when discussing investment

opportunities in the medical marijuana industry in general and OWC in particular.

34.    On January 21, 2016, Friedland and his company, Global, entered into a two-year

"Media, Public Relations and Investor Relations Services Agreement" with OWC (hereinafter,

the "Global PR/IR Agreement"), which Friedland signed as Managing Director of Global.

35.    Under the terms of the Global PR/IR Agreement, Friedland and Global agreed to

"develop a media and public relations program and an interest in [OWC] with financial

journalists and institutional investors and the general investment community."  In this role,

Friedland and Global agreed to work with the media to "create a higher level awareness of

[OWC], as well as the anticipated *impact with investors*."  (Emphasis added.)   Further,

Friedland and Global agreed to work with the media introduce OWC "to the overall American

population," and to "*specifically target investors*."  (Emphasis added.)

36.    The Global PR/IR Agreement also stated that Friedland and Global would assist

OWC in reaching investors by writing news releases, shareholder letters, corporate summaries,

profiles, and website copy, and would establish OWC's Facebook and Twitter accounts.

37.    The Global PR/IR Agreement stated that it could only be amended if executed by

the parties in writing.  No such amendment was executed.

38.    On March 8, 2018, OWC reported in an SEC filing that the two-year Global PR/IR

Agreement "expired by its terms in February 2018."

39.    Pursuant to the compensation section of the Global PR/IR Agreement, OWC

transferred 5,134,375 OWC shares to Global on February 5, 2016.  OWC provided an attorney

opinion letter to OWC's transfer agent from a disbarred attorney in connection with the issuance of OWC's stock to Global.

40.     OWC disclosed in reports it filed with the SEC in February 2016 that Global owned these shares of stock – 6.3% of OWC's common stock at that time – and that Friedland controlled them as Global's President and CEO.

41.     In those same reports filed with the SEC in February 2016, OWC did not disclose the existence of the Global PR/IR Agreement, nor that OWC paid Friedland and Global 5.1 million shares of OWC stock as compensation for undertaking media, public relations, and investor relations activities for OWC.

42.     By early February 2016, between the Intiva purchase of OWC stock in 2014 and the shares issued to Global pursuant to the Global PR/IR Agreement, Friedland directly or indirectly owned and controlled 6,456,597 shares of OWC stock.

## B.     FRIEDLAND PROMOTED OWC STOCK TO INVESTORS WITHOUT DISCLOSING HIS COMPENSATION FOR SUCH PROMOTION

43.     As set forth below, beginning in February 2016 and continuing thereafter, Friedland made numerous statements promoting OWC stock to investors without ever disclosing the existence of the Global PR/IR Agreement or the fact that OWC paid him 5.1 million shares of stock to promote OWC to investors and give publicity to its stock.

44.     Friedland knew, or was reckless in not knowing, that such disclosures were not made, and that those omissions would mislead investors, because he was aware of the Global PR/IR Agreement that he signed on behalf of Global and the stock compensation that OWC paid under the agreement "to specifically target investors."

45.     Reasonable investors would have wanted to know, before making investment decisions about OWC stock based on Friedland's statements, that he had been paid millions of

shares of stock to promote OWC.  Investors contacted by the SEC who purchased OWC stock based on Friedland's recommendations did not know that that he had received millions of shares of stock as compensation for promoting OWC to investors.  Additionally, those investors have stated that knowing Friedland had been paid millions of shares of stock as compensation for promoting OWC to investors would have been important to their investment decisions.

46.     On February 29, 2016, CFN Media Group ("Cannabis FN") in Seattle, Washington posted to its website a videotaped interview of Friedland promoting OWC stock to investors.  Cannabis FN disclosed on its website the compensation it received from OWC to promote OWC to investors, but made no disclosures about compensation paid by OWC to any other individuals or entities for such promotional efforts.

47.     At the outset of this Cannabis FN interview, Friedland was introduced as "Mr. Jeffrey Friedland from OWC Pharmaceutical Research Corp. and author of *Marijuana: The World's Most Misunderstood Plant*."

48.      During his Cannabis FN interview, Friedland mentioned, among other things, Intiva's 2014 investment in OWC and that he had recently become more involved with OWC: "Early on when OWC Pharmaceutical Research was being formed, *I invested in the company through a company I run in the United States called Intiva.  And quite a few of my friends invested.  We believed in the company's vision.*"  (Emphasis added.)  In this interview, Friedland further discussed his belief in OWC and promoted its stock as a long-term prospect for investors:

> [W]hat the world needs and what OWC Pharmaceutical Research is bringing to the table is real medicine based on real science....
>
> [I]nvestors need to take a look at what this company is truly about.  Number 1, it's about real pharmaceuticals, real delivery -- drug delivery systems based on real science ....  *This company, OWC Pharmaceutical Research leading edge, Israeli science tied into all of this.*  Virtually impossible to do research in the

United States still.  It's all about Israel.  Number 3, ***this company has a very pragmatic business plan.  And that pragmatic business plan is about generating revenues now***.

Mike, ***I think investors need to put this on the radar screen***....  (Emphasis added.)

49.     During his February 2016 Cannabis FN interview promoting OWC stock to investors, Friedland materially misled investors by not disclosing that OWC had just paid him 5.1 million shares of stock to promote its stock to investors.

50.     On March 15, 2016, OWC issued a press release via PR Newswire announcing that Friedland had joined OWC's Advisory Board to advise on business development efforts, and that Friedland would serve as the Company's U.S. representative.

51.     OWC's CEO stated in the press release, "Jeffrey is an active investor and advisor to the cannabis sector, bringing a wealth of knowledge and insight to OWC Pharmaceuticals.  His experience in both the cannabis and financial markets will be invaluable as we work to commercialize our proprietary products and technologies."  Friedland was quoted in the press release discussing OWC's competitive advantage:

> Because OWC Pharmaceutical is headquartered in Israel, where cannabis research is not only allowed, but encouraged, they have been able to implement a research and development program of the caliber associated with the pharmaceutical industry.  ***I believe this approach provides OWC Pharmaceutical with a significant competitive advantage*** and I look forward to working with the Company in their efforts to advance the medical use of cannabis.  (Emphasis added.)

52.     Friedland's statement promoting OWC to investors was materially misleading because he did not disclose that OWC had paid him 5.1 million shares of stock to promote its stock to investors, giving the false impression that he was only an "active investor" in OWC and not the company's paid promoter.

53.     On November 18, 2016, OWC issued a press release via PR Newswire announcing "OWC Pharmaceutical Research Advisory Board Member to Participate in the First Bloomberg

Intelligence Sponsored Cannabis Event."  The press release quoted Friedland promoting OWC stock to investors: "There are many cannabis companies that are publicly-traded, from GW Pharmaceuticals (GWPH) to smaller public companies such as OWC, which Intiva invested in during the summer of 2014….  I joined the Company's advisory board earlier this year."  The press release continued, "Subject to his schedule, Mr. Friedland may be available to meet privately with OWC shareholders to discuss his view of OWC's future."

54.     Friedland's quote in OWC's press release was materially misleading because he did not disclose that OWC paid him 5.1 million shares of stock to promote its stock to investors, giving the false impression that he was only an investor in OWC and not the company's paid promoter.

55.     On November 22, 2016, Friedland used his Global email to inform a listserve group of his participation in the "AFund Special Investments Conference in New York."  In the email, Friedland promoted OWC stock by stating that he is "a member of the advisory board of OWC Pharmaceutical Research . . . . [and] INTIVA Inc. made an early-stage investment in OWC Pharmaceutical Research during the summer of 2014."  Friedland's email included an extensive listing of his business activities in the cannabis industry, his role as CEO of Intiva Inc., and his international business experience.  The email was materially misleading, however, because it did not also disclose his role with Global or that OWC paid him 5.1 million shares of stock to promote its stock to investors, giving the false impression that Friedland was only an "early-stage" investor in OWC and not its paid promoter.

56.     Throughout 2017, including at times when Friedland was directly or indirectly making efforts to sell and in fact selling OWC stock, Friedland used his Global or Intiva email to advise recipients, actual and prospective OWC investors, of his upcoming events or appearances.

Dates in 2017 on which such emails were sent include at least January 4, January 12, January 21, February 8, February 22, March 5, March 15, March 21, March 23, April 27, May 30, June 17, June 26, July 21, July 31, August 6, and August 12.  As with his November 22, 2016 email, these emails discussed Friedland's background and early investment in OWC through Intiva but were materially misleading because they did not disclose the 5.1 million shares of stock that OWC paid him to promote its stock to investors, repeatedly giving the false impression that Friedland was merely an investor in OWC and not its paid promoter, and in many instances promoted OWC stock to investors at or around the same time Friedland was selling his OWC holdings.

## C.    FRIEDLAND CONTINUED PROMOTING OWC STOCK TO INVESTORS WHILE PREPARING TO UNLOAD HIS OWC SHARES

57.    In January 2017, just months after being quoted in OWC press releases and publicly touting that he was an "early stage" investor in OWC, Friedland began preparations to sell his 5.1 million shares of OWC stock held in the name of Global.

58.    On or about January 3, 2017, Friedland helped his wife, Kathy Friedland, organize Lane 6552 LLC, a company with no apparent business purpose or operations other than to receive and then sell Global's OWC stock, with Kathy Friedland listed as the company's sole member and principal.

59.    On January 4, 2017, Cannabis FN broadcast over the internet another video interview of Friedland, and OWC's Facebook and Twitter page posted a link to this interview that same day.  During this interview, Friedland promoted OWC stock to the host and investors viewing the broadcast:

> *I think that 2017 is going to be a fabulous, fabulous year* globally in the cannabis industry, and *especially for companies like OWC Pharmaceutical Research that have an incredibly good business model and business plan*....
>
> I think that ultimately the real money in this industry is not going to be on the recreational side, although that will be a very large industry, but it's really about

pharmaceuticals.  When people have the ability to obtain their medicine with dosage information tied to a specific medical condition or disorder.  ***And that's where the real future and the real potential of OWC is.  That's what I'm looking forward to, that's a long-term situation....***

So, we sat down with the management team and the company that I am still CEO of, Intiva, ***we made a private placement investment in OWC Pharmaceutical Research early summer of 2014.***  We bought the stock in a private placement.  It's restricted stock.  ***<u>We're still sitting with the stock.</u>***  ***<u>For us, it's a very, very long-term situation</u>*** . . . .

(Emphasis added.)

60.     At no point during his January 4, 2017 Cannabis FN interview promoting OWC stock did Friedland mention that OWC paid him 5.1 million shares of stock to promote its stock to investors, giving the false impression that he was simply a "long-term" investor in OWC and not its paid promoter.

61.     Various OWC investors contacted by the SEC observed Friedland's broadcasts on Cannabis FN and purchased OWC stock, or held onto and did not sell their OWC stock, based in whole or in part on Friedland's promotional efforts and recommendations.

62.     Continuing his preparations to sell Global's OWC stock, on or about January 14, 2017, Friedland submitted a request to OWC's transfer agent to reissue Global's 5,134,375 shares of restricted OWC stock to Lane 6552.

63.     Restricted securities are securities acquired in unregistered, private sales from the issuing company or from an affiliate of the issuer.  Investors typically receive restricted securities through private placement offerings, Regulation D offerings, employee stock benefit plans, as compensation for professional services, or in exchange for providing "seed money" or start-up capital to the company.  When investors acquire restricted securities, they must find an exemption from the SEC's registration requirements to sell the securities in a public marketplace.

64.     In order to sell Global's restricted shares in the public marketplace, Friedland needed OWC's transfer agent to remove the "restricted" legend on Global's 5,134,375 shares.

65.     Friedland provided the transfer agent with a purported attorney opinion letter that included inaccurate information about when Global acquired its OWC stock and misleading information about the economic relationship between Global and Lane 6552.  The letter was signed by a disbarred attorney.

66.     Friedland indicated on the transfer agent's form that he signed and provided to the transfer agent, that Global acquired the stock from OWC in January 2016 at a cost of $51,343.75, but the terms of the Global PR/IR Agreement indicate the stock was compensation for media and investor relations services and not in exchange for any payment, which Friedland knew because he signed the agreement.

67.     Friedland further represented to the transfer agent that the OWC stock was not being transferred from Global to Lane 6552 as a gift, inheritance, or wash sale, but were instead acquired by Lane 6552 on January 13, 2017 at a cost of $205,375.  In fact, there is no evidence of any payment to Global from Lane 6552 in that amount or on that date, which Friedland knew or was reckless in not knowing because he controlled Global and had access to Global's bank account at that time.

68.     Reasonable transfer agents would find it important to their decisions to facilitate the transfer of stock between parties, and remove "restricted" legends from securities, that they were being provided inaccurate or false information about when and how the securities were acquired and why they were being transferred.

69.     On January 21, 2017, Friedland continued targeting investors when he used his Intiva email to invite a listserve group to an OWC promotional lunch presentation that he would

(and later did) host in Denver on January 28, 2017.  In the email, Friedland stated, "In 2014 INTIVA invested in OWC Pharmaceutical Research."  Friedland's email was materially misleading because it did not that OWC paid him and Global 5.1 million shares of stock to promote its stock to investors, giving the false impression that Friedland was only an investor in OWC and not its paid promoter.

70.    On or around January 30, 2017, Friedland helped open a trading account for Lane 6552 with a broker dealer ("Broker Dealer A").  Friedland filled out and submitted various forms including the Seller's and Broker's Representation Letters, the Opinion Letter, and a Transfer Instruction Form, some of which Kathy Friedland signed on behalf of Lane 6552, and Friedland served as the sole point of contact between Lane 6552 and Broker Dealer A.

71.    On February 3, 2017, OWC's transfer agent, relying on the false or misleading information provided by Friedland, removed the "restricted" legend from the 5.1 million shares of OWC stock that Friedland transferred from Global to Lane 6552.

72.    After the "restricted" legend was removed from the 5. 1 million shares OWC stock that Friedland transferred to Lane 6552, Broker Dealer A, at Friedland's request, asked its clearing firm ("Clearing Firm A") to sell the shares out of the Lane 6552 account.

73.    Clearing Firm A declined to execute the sell order because it had concerns that Lane 6552 might be trying to sell into an inflated market and, among other things, the shares had been acquired by Friedland in exchange for performing investor relations services that appeared to be ongoing.  Additionally, the shares were being deposited after a spike in the stock price following OWC's release of a letter to shareholders and the clearing firm believed drafting and release of the letter may have been controlled by Friedland.

74.     On February 6, 2017, Friedland sent Broker Dealer A an email asserting that while the "initial intent" of the Global PR/IR Agreement "was to provide public relations and related services, the agreed upon task was switched by mutual consent to one on assisting the company with strategic direction primarily in Canada, in approximately July 2016."  Friedland did not provide Broker Dealer A with any documentation showing this alleged change to his agreement, but further represented that he "ha[s] no role in the public relations or IR side, but at some events mention the company as well as other companies."

75.     Friedland knew or was reckless in not knowing that the information in his February 6, 2017 email to Broker Dealer A about the change to his role and relationship with OWC was materially false or misleading.  Indeed, the next day, February 7, 2017, OWC identified Friedland in a press release as its contact in the United States.  On March 8, 2018, OWC filed and 8-K with the SEC stating that its agreement with Friedland and Global "expired by its terms in February 2018."

76.     On or around February 16, 2017, after Broker Dealer A declined to sell the OWC shares out of the Lane 6552 account, Friedland helped open another trading account for Lane 6552 at a different broker dealer, Spencer Edwards Inc., and attempted to deposit for sale the 5.1 million shares of OWC stock.

77.     Friedland again acted as Lane 6552's sole point of contact with Spencer Edwards, filled out and sent all requisite forms, and requested all wire transfers.  In the process, Friedland disclosed that he and his wife already had been unsuccessful in selling the shares.

78.     As part of the materials provided to Spencer Edwards on or around February 16, 2017, Friedland filled out forms indicating that Lane 6552 acquired the OWC stock from OWC through Global and pursuant to Global's agreement with OWC and that the dollar amount of the

purchase price or value of services provided was $125,000.  Friedland also provided the opinion

letter from the same disbarred attorney that included materially inaccurate information about

when the stock was acquired by Global and materially misleading information suggesting no

economic interest by Global in Lane 6552, despite Friedland and his wife co-owning Global and

his wife ostensibly owning Lane 6552 on her own.

79.     On February 17, 2017, OWC issued a press release titled "OWC Pharmaceutical

Research to Present at Lyons Capital's Wall Street Conference" in Boca Raton, Florida, on

March 1, 2017, "the premiere conference in the venture capital arena and Small Cap

marketplace."  The sub-heading of OWC's press release stated, "Industry Leader And OWC

Advisory Board Member, Jeffrey Friedland, To Speak At The Conference And Introduce OWC

Management."  The press release further asserted:

> *Mr Friedland is CEO of Intiva Inc., which was an early-stage investor in*
> *OWC, and which made its investment in the Company during the summer*
> *of 2014.*  When asked about his participation at the conference, *Mr.*
> *Friedland stated*, "The legal cannabis market has expanded considerably
> over the past two years, generating significant and growing investor
> interest.  However, *there are only a handful of publicly-traded companies*
> *focused on cannabinoid-based, pharmaceutical development and a true*
> *scientific approach to product development.  I intend to discuss what I see*
> *as the publicly-traded cannabis opportunities at the Conference*."
> (Emphasis added.)

80.     Friedland's quote promoting OWC stock to investors was materially misleading

because he did not disclose that OWC paid him 5.1 million shares of stock to promote its stock

to investors, giving the false impression that he was only an investor in OWC and not its paid

promoter.

81.     On March 1, 2017, Friedland appeared at The Wall Street Conference and made a

presentation promoting OWC stock to investors while standing in front of a screen that displayed

the OWC logo, and a photo from Friedland's presentation in front of the OWC logo was publicized on OWC's Facebook and Twitter pages later that day.  Again, Friedland misleadingly did not disclose in his presentation that OWC had paid him 5.1 million shares of stock to promote its stock to investors.

**D.     FRIEDLAND CONTINUED PROMOTING OWC STOCK TO INVESTORS WHILE SECRETLY SELLING HIS OWC HOLDINGS**

82.     As set forth below, beginning in March 2017 and continuing thereafter, Friedland began selling off the OWC stock that he controlled while continuing to promote OWC stock to investors and not disclosing to investors that he was unloading his own shares.

83.     Friedland knew, or was reckless in not knowing, that he was misleading investors by stating or implying that they should buy or hold OWC stock at the same time that he secretly was selling the stock.

84.     Reasonable investors would have considered it important to their investment decisions to know that Friedland's promotion of OWC stock was contrary to his own efforts to sell the vast majority of OWC stock that he owned or controlled.  Actual OWC investors contacted by the SEC did not know that Friedland was selling his OWC stock at the same time he was encouraging investors to buy it.  Such investors have stated that it would have been important to their investment decision to know that Friedland was selling OWC stock.

85.     On March 2, 2017, the 5.1 million shares of now-unrestricted OWC stock were deposited into a Lane 6552 account at Spencer Edwards.  Immediately after the deposit, Friedland directly or indirectly offered and sold 173,807 shares for net proceeds of $284,817.

86.     On March 3, 2017, Friedland directly or indirectly offered and sold another 436,509 shares of OWC stock through the Lane 6552 account at Spencer Edwards for net proceeds of $562,190.

87.     On March 6, 2017, Friedland appeared as a featured speaker in an internet interview with New Jersey-based Pot Stock Radio to promote OWC stock to investors.

88.     Later that same day, OWC's Facebook and Twitter pages posted a link to Friedland's interview on Pot Stock Radio.

89.     At the outset of his hour-long Pot Stock Radio interview on March 6, 2017, Friedland told the host and listeners that he was not an officer or director of OWC, and materially misled investors by stating that he was "***not*** doing investor relations for the company." (Emphasis added.)  Friedland knew his statement was materially false and would mislead investors because, under the Global PR/IR Agreement that he signed, OWC paid 5.1 million shares of stock for Global and Friedland to "specifically target investors" through January 2018.

90.     During his Pot Stock Radio interview on March 6, 2017, Friedland said that he had been asked to join OWC's Advisory Board in February 2016 because Intiva "***invested in OWC Pharmaceutical Research during the early summer of 2014***, almost three years ago. ***So, we believed in it then, we believe in it now***."  He further explained how OWC asked, "'Would you join our advisory board?'  And I agreed to that about last February, because we had an investment in the company, and I was incredibly impressed with the management team, who I met in Israel."  (Emphasis added.)  Friedland added: "So that's sort of bringing it full circle to why I'm on tonight ....  We wrote a check, we made an investment in this company through Intiva in the early summer of '14."

91.     Friedland's Pot Stock Radio statements were materially misleading because he failed to disclose that he had been paid 5.1 million shares of OWC stock to promote OWC to investors the month before he joined OWC's advisory board, giving the false impression that he "wrote a check, [and] made an investment" in OWC and not that he was a paid promoter.

92.     Friedland's Pot Stock Radio statements also were materially misleading because he promoted OWC stock to investors while failing to disclose that he was in the process of selling the vast majority of OWC stock that he acquired through Global.

93.     During the March 6, 2017 Pot Stock Radio interview promoting OWC stock to investors, Friedland discussed OWC's financial prospects and compared it to much larger NASDAQ-traded pharmaceutical companies:

> *[Y]ou know, how many of the stocks you have on have $2 million in the bank?* .... *OWC has $2 million in the bank.  How many companies are debt-free that you have – on your show?  OWC is – debt free*.  You know – those are facts....  I would tell, you know, your listeners, um, you know, look at the 10- the 8-Ks over the last twelve months.  Look at the news releases.  Do their research.  Come to their own conclusions, and if they can – *understand if they can buy into my vision – and my vision being that the real money's going to made in the cannabis sector in pharmaceutical development* – if people can be patient investors, they can see why I can talk about Insys Therapeutics, INSYS on NASDAQ – GW Pharm, GWPH, *and I can talk about OWC Pharmaceutical Research, OWCP in the same sentence* …. (Emphasis added.)

94.      Later in this Pot Stock Radio interview, Friedland added, "*I would say to investors, whether its OWC they want to buy*, or they want a bigger pharma player like GW, to *look at from a longer term perspective* stocks that are truly involved in real science in this cannabis space, because *that's where I believe the real money will be made*."  (Emphasis added.)

95.     On March 6, 2017, the same day as his Pot Stock Radio interview, Friedland directly or indirectly offered and sold 500,000 shares of Global's OWC stock through the Lane 6552 account at Spencer Edwards for net proceeds of $684,539.

96.     Reasonable investors would have considered it important to their investment decisions to know that Friedland's promotion of OWC stock was directly contrary to his own efforts – at or around the same time – to sell the vast majority of OWC stock that he owned or controlled.

97.     Indeed, actual OWC investors contacted by the SEC have stated that it would have been important to their investment decision to know that Friedland was selling OWC stock at or around the same time that he was promoting it to investors.

98.     On March 7, 2017, Friedland directly or indirectly offered and sold 80,000 shares of Global's OWC stock through the Lane 6552 at Spencer Edwards for net proceeds of $113,671.

99.     Also on March 7, 2017, Friedland and his wife opened an account at Fidelity in the name of Lane 6552 listing Kathy Friedland as the only owner on the account.

100.    Between March 8, 2017, and March 21, 2017, Friedland directly or indirectly offered and sold another 3,944,059 shares of Global's OWC stock through the Lane 6552 account at Spencer Edwards for net proceeds of $4,845,177.

101.    During this period of time, Friedland continued promoting OWC to investors.  For example, on March 9, 2017, and March 15, 2017, Friedland used his Global email address to inform a listserve group of his participation in the "'Investing in Israeli Know-How' at CannaTech in Tel Aviv.'"  As with Friedland's November 22, 2016 email, these emails discussed his background and early investment in OWC through Intiva but were materially misleading because they did not disclose the 5.1 million shares of stock that OWC paid him to promote its stock to investors, giving the false impression that he was merely an investor in OWC and not its paid promoter, and promoted OWC stock to investors at or around the same time Friedland was selling the vast majority of his OWC holdings.

102.     On March 15, 2017, a prospective investor responded to Friedland's CannaTech email from earlier that day, asking Friedland "do you recommend I take a look at OWCP?"  The investor also referenced the stock of another company in which Friedland had been an early investor through Intiva, and in which the investor had lost money, asking Friedland: "more

confidence in OWCP?"  Friedland sent a separate email forwarding to the investor a link to his Pot Stock Radio interview, and later that day emailed: "Did you [listen] to the weedstock radio interview I was on a couple weeks ago?  If so, it should answer your question!"

103.     In total, between March 2, 2017 and March 22, 2017, Friedland directly or indirectly offered and sold Global's 5,134,375 shares of OWC stock through the Lane 6552 account at Spencer Edwards for net proceeds of $6,490,396.

104.     Between March 7, 2017 and March 24, 2017, Friedland wire-transferred $6,489,798.73 of proceeds from the sale of Global's OWC stock out of the Lane 6552 account at Spencer Edwards into the Lane 6552 account at First American State Bank.

105.     Friedland directly or indirectly offered and sold Global's 5.1 million shares of OWC stock shortly after its price spiked at record highs (as reflected in the following chart):



106.     On March 27, 2017, Cannabis FN Media, an entity paid by OWC to promote OWC to cannabis stock investors, rebroadcast its January 4, 2017 interview with Friedland.

E.     **FRIEDLAND CONTINUED PROMOTING OWC STOCK TO INVESTORS WHILE SECRETLY LIQUIDATING INTIVA'S OWC STOCK**

107.     In April 2017, Friedland began taking steps to sell the restricted OWC stock that Intiva acquired in 2014.  On April 13, 2017, Friedland sent an email to a friend and fellow OWC investor – one of the investors present at Friedland's OWC dinner in 2014 – explaining that he [Friedland] "was speaking with [a Spencer Edwards broker] today as we're going to hopefully work with him in liquidating [I]ntiva's OWC position."

108.     On April 21, 2017, the Spencer Edwards broker emailed Friedland stating, "I hope your trip is going well.  Did you get squared away yet on the documents for Intiva on OWCP.  I haven't heard anything from your CFO."  Friedland responded, "Not yet.  I'm in China nie [sic] returning to Hong Kong today, and will be back in Denver Sunday."

109.     On May 10, 2017, Friedland sent a follow up email from his Intiva email address to the Spencer Edwards broker about opening an account for Intiva, confirming that "Intiva's CFO will handle this."

110.     On May 11, 2017, the same disbarred attorney signed a purported attorney opinion letter to facilitate the removal of the "restricted" legend from Intiva's OWC stock.

111.     On or around May 22, 2017, at Friedland's request or direction, Intiva's CFO opened an account with Spencer Edwards in the name of Intiva, listing himself as the primary authorized person on the account and Friedland as the secondary authorized person.

112.     On or around May 24, 2017, Intiva's CFO filed an OTC Securities Deposit Request for Intiva with the clearing broker for Spencer Edwards to deposit 1,322,222 shares of OWC stock.  Among other representations included with this submission, Intiva represented that neither it nor any person affiliated with the company had sold any securities of the same class during the prior 3 months.  Intiva and Friedland – Intiva's CEO – knew or were reckless

in not knowing that this representation was materially false or misleading because Friedland had sold Global's OWC stock during the prior three months.

113.     Despite Friedland's continued efforts to promote OWC and discuss Intiva's investment in OWC, Intiva represented to Spencer Edwards that Intiva is not currently promoting OWC securities nor does it plan to promote or engage a third party to promote OWC securities (whether through social media, print publications, emails, tweets, or other means or media).  Intiva and Friedland knew or were reckless in not knowing that this representation was materially false or misleading because Friedland, in his role with both Intiva and Global, was then promoting OWC stock to investors and had plans to (and did) continue doing so.

114.     On June 12, 2017, OWC's transfer agent relied on the disbarred attorney's opinion letter to remove the "restricted" legend from Intiva's OWC stock and issued new "clean" stock to Intiva for deposit at the clearing broker for Spencer Edwards.

115.     On June 27, 2017, Friedland directly or indirectly offered and sold 136,053 shares of Intiva's OWC stock for net proceeds of $93,804.85.

116.     On June 29, 2017, Friedland directly or indirectly offered and sold 1,710 shares of Intiva's OWC stock for net proceeds of $957.19.

117.     On Saturday, July 8, 2017, Friedland participated in an internet interview with by Minneapolis-based Wall Street Raw to promote OWC stock and discuss OWC's recent market readiness announcement regarding its topical cream.  OWC's Facebook and Twitter page posted a link to this interview.

118.     During his July 8 Wall Street Raw interview, Friedland was introduced as the managing director of Friedland Capital, an advisory board member of OWC, and the CEO of Intiva, which made an early stage investment in OWC in 2014.  During the interview,

Friedland touted a recent OWC announcement that it filed a full patent application with the U.S. Patent Office to replace the provisional patent on OWC's psoriasis cream and emphasized its connection to the leading-edge Israeli market:

> I think people have to understand about what – OWC is that it's a pharmaceutical development company, and they have to also understand that it's about Israel, it's about sciences, and it's about the cannabis space in Israel, and I think that is the key, and ***OWC and its management team over there, um, are incredibly plugged in to what's happening in Israel, which is leading edge on pharma development world-wide***. (Emphasis added.)

119.    At no point during his July 8 Wall Street Raw interview promoting OWC stock did Friedland mention that OWC paid him 5.1 million shares of stock to promote its stock to investors for the company, giving the false impression that he was only an "early-stage" investor in OWC and not the company's paid promoter.

120.    At no point during his July 8 Wall Street Raw interview did Friedland disclose that he had directly or indirectly sold millions of shares of OWC stock acquired through Global only a few months earlier nor that he was in the process of liquidating all of Intiva's OWC stock as well.

121.    On July 9, 2017, a purported investor relations representative for OWC sent an email from an OWC email account to Friedland's listserve group, that included employees of Spencer Edwards, with a link to Friedland's July 8 "Wall Street Raw" interview.

122.    Between July 10, 2017 and July 28, 2017, Friedland directly or indirectly offered and sold 609,459 shares of Intiva's OWC stock for net proceeds of $230,498.96.

123.    On July 29, 2017, the YouTube-based "Looking at the Markets" broadcast an interview with Friedland discussing the marijuana industry and promoting OWC stock to investors.  OWC's Twitter and Facebook page, as well as Friedland's personal webpage, posted a link to this interview.

124.     During the "Looking at the Markets" interview, Friedland made the following statements about OWC:

> ***Intiva, Inc., a company I've been CEO of since first quarter of 2014, we made an investment during the summer of 2014 in an Israeli company***, ... *[a]nd that company is OWC Pharmaceutical Research.... **We still own the stock**.*  A lot of the marijuana stocks have been hit over the last couple of weeks.  ***I like what they're doing.  I like that they're bringing in some science to this cannabis space***, and their first product, which they're seeking marketing and distribution globally with is a cream, a proprietary cream, for psoriasis.  ***<u>So with a full disclaimer, you know, we're shareholders.  I find it intriguing.  I think they're ready to go.</u>***   (Emphasis added.)

125.     At no point during his July 29 "Looking at the Markets" interview did Friedland mention OWC paid him 5.1 million shares of stock to promote its stock to investors, giving the materially false impression that he was only an investor in OWC and not its paid promoter.

126.     At no point during his July 29 "Looking at the Markets" interview – during which Friedland stated "we still own the stock," "we're shareholders," and "I think [OWC's] ready to go" – did Friedland disclose that only a few months earlier he had sold millions of shares of OWC stock that he acquired through Global nor that he was, directly or indirectly, in the process of selling all of Intiva's OWC stock as well.

127.     On July 31, 2017, Friedland directly or indirectly offered and sold 25,000 shares of Intiva's OWC stock for net proceeds of $8,041.53.

128.     On July 31, 2017 and August 6, 2017, Friedland used his Global email address to disseminate to a listserve group a link to his "Looking at the Markets" interview.  As with his November 22, 2016 email, Friedland's emails discussed his background and early investment in OWC through Intiva but were materially misleading because they did not disclose the 5.1 million shares of stock that OWC paid him to promote its stock to investors, giving the false impression that Friedland was merely an investor in OWC and not its paid promoter.

129.    Friedland's July 31 and August 6 emails also were materially misleading because they promoted OWC stock by sending a link to an interview during which Friedland promoted OWC stock to investors, but in neither the emails nor the linked interview being forwarded did Friedland disclose that he had directly or indirectly sold the vast majority of OWC stock that he acquired through Global and had begun to do the same with Intiva's OWC stock.

130.    Between August 11, 2017, and September 22, 2017, Friedland directly or indirectly offered and sold 525,000 shares of Intiva's OWC stock, virtually all of the remaining shares in its account, for net proceeds of $145,723.38

131.    In total, between June 27, 2017, and September 22, 2017, Friedland directly or indirectly offered and sold 1,297,222 shares of Intiva's OWC stock for total net proceeds of $479,025.91.

**F.    THE FRIEDLANDS USED PROCEEDS FROM THE FRAUDULENT OWC STOCK SALES FOR LARGE PURCHASES AND TO TRANSFER MONIES AND ASSETS TO RELIEF DEFENDANTS**

132.    As outlined above, between March 2, 2017 and March 22, 2017, Friedland directly or indirectly offered and sold 5,134,375 shares of Global's OWC stock through Lane 6552 for net proceeds of $6,490,396.

133.    Between March 7, 2017 and March 24, 2017, Kathy Friedland wire-transferred $6,489,793 from the Lane 6552 account at Spencer Edwards to the Lane 6552 account at First American State Bank.

134.    Between March 7, 2017 and March 24, 2017, Kathy Friedland deposited checks totaling $4,150,000 from the Lane 6552 account at First American State Bank into the Lane 6552 account at Fidelity, where more than $3 million remains as of February 22, 2018.

135.    The Friedlands also used the proceeds from the sale of OWC stock to make large purchases, withdrawals, and transfers, including:

- Paying cash for a nearly $2 million home in Snowmass, Colorado, which they then transferred to Relief Defendant Aspen in August 2017;

- Paying $687,000 cash for a Denver area condominium in February 2018;

- Paying off credit card and personal credit debt in excess of $350,000;

- Spending nearly $100,000 on two automobiles and a piano;

- Transferring more than $300,000 to The Jeffrey and Kathy Friedland Irrevocable Trust, The Kathy and Jeffrey Friedland Foundation, the Friedland's two children, and Kathy Friedland's personal bank account; and

- Transferring more than $500,000 to Global, other entities, and friends and associates.

## VI.    CLAIMS FOR RELIEF

### CLAIM ONE
### Liability for Nondisclosure of Touting Compensation
### Violations of Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)]
### (Against Friedland and Global)

136.    Paragraphs 1 through 135 are re-alleged and incorporated by reference.

137.    Section 17(b) of the Securities Act provides that it shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

138.    By reason of the foregoing, including *but not limited to* the allegations in paragraphs 34-38, 43, 48-56, 59-60, 80-81, 90-91, 93-94,101-102, 118-119, 124-125, and 128,

Friedland violated Section 17(b) of the Securities Act.  Because Friedland's misconduct occurred in his role as Managing Director and owner of Global, under *respondeat superior* Global violated Section 17(b) of the Securities Act.

**CLAIM TWO**
**False Statement or Misleading Omission in the Purchase or Sale of Securities**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b)]**
**(Against Friedland, Global, and Intiva)**

139.    Paragraphs 1 through 135 are re-alleged and incorporated by reference.

140.    Section 10(b) of the Exchange Act provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

141.    Rule 10b-5(b) provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

142.    By reason of the foregoing, including *but not limited to* the allegations in paragraphs 34-38, 43-45, 48-56, 59-62, 65-68, 74-75, 80-86, 89-103, 106, 109, 115-116, 118-122, and 124-131, Friedland violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.  Because Friedland's misconduct occurred in his role as Managing Director and

owner of Global and Manager or CEO of Intiva, or both, under principles of *respondeat superior*

Global and Intiva violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

**CLAIM THREE**
**Scheme to Defraud in the Purchase or Sale of Securities**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a) & (c)]**
**(Against Friedland, Global, and Intiva)**

143.    Paragraphs 1 through 135 are re-alleged and incorporated by reference.

144.    Section 10(b) of the Exchange Act provides that it shall be unlawful for any person,

directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the

mails, or of any facility of any national securities exchange to use or employ, in connection with

the purchase or sale of any security registered on a national securities exchange or any security not

so registered, or any securities-based swap agreement, any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the Commission may prescribe as

necessary or appropriate in the public interest or for the protection of investors.

145.    Rule 10b-5(a) and (c) provide that it shall be unlawful for any person, directly or

indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or

of any facility of any national securities exchange, to employ any device, scheme, or artifice to

defraud (Rule 10b-5(a)), or to engage in any act, practice, or course of business which operates

or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of

any security (Rule 10b-5(c)).

146.    By reason of the foregoing, including *but not limited to* the allegations in paragraphs

34-38, 43-45, 48-56, 58-62, 65-70, 74-78, 80-86, 89-103, 106, 109, 112-113, 115-116, 118-122, and

124-131, Friedland violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)

thereunder.  Because Friedland's misconduct occurred in his role as Managing Director and owner

of Global and as Manager or CEO of Intiva, or both, under *respondeat superior* Global and Intiva

violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.

### CLAIM FOUR
**Obtaining Money or Property by Means of False Statement or Misleading Omission in the Offer or Sale of Securities**
**Violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]**
**(Against Friedland, Global, and Intiva)**

147.    Paragraphs 1 through 135 are re-alleged and incorporated by reference.

148.    Section 17(a)(2) of the Securities Act provides that it shall be unlawful for any person in the offer in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, directly or indirectly to obtain money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

149.    By reason of the foregoing, including *but not limited to* the allegations in paragraphs 34-38, 43-45, 48-56, 59-62, 65-67, 74-75, 80-84, 89-103, 106, 109, 115-116, 118-122, and 124-131, Friedland violated Section 17(a)(2) of the Securities Act.  Because Friedland's misconduct occurred in his role as Managing Director and owner of Global and as Manager or CEO of Intiva, or both, under *respondeat superior* Global and Intiva violated Section 17(a)(2) of the Securities Act.

**CLAIM FIVE**
**Scheme to Defraud in the Offer or Sale of Securities**
**Violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) & (3)]**
**(Against Friedland, Global, and Intiva)**

150.     Paragraphs 1 through 135 are re-alleged and incorporated by reference.

151.     Section 17(a)(1) and (3) of the Securities Act provides that it shall be unlawful for any person in the offer in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, directly or indirectly: to employ any device, scheme or artifice to defraud (Section 17(a)(1)), or to engage in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities (Section 17(a)(3)).

152.     By reason of the foregoing, including *but not limited to* the allegations in paragraphs 34-38, 43-45, 48-56, 58-62, 65-70, 74-78, 80-86, 89-103, 106, 109, 112-113, 115-116, 118-122, and 124-131, Friedland violated Section 17(a)(1) and (3) of the Securities Act. Because Friedland's misconduct occurred in his role as Managing Director and owner of Global and as Manager or CEO of Intiva, or both, under *respondeat superior* Global and Intiva violated Section 17(a)(1) and (3) of the Securities Act.

**CLAIM SIX**
**Equitable Disgorgement to Prevent Unjust Enrichment**
**(Against the Relief Defendants)**

153.     Paragraphs 1 through 135 are re-alleged and incorporated by reference.

154.     The Relief Defendants received, directly or indirectly, funds and/or other property from Friedland, Global, and/or Intiva, which are either the proceeds of, or are traceable to the proceeds of, unlawful activities alleged in this Complaint to which the Relief Defendants have no legitimate claim.

155.    Under the circumstances, it would be inequitable for the Relief Defendants to retain the proceeds from violations of the federal securities laws.  Thus, to prevent unjust enrichment, such proceeds should be disgorged.

## VII.    PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

1.    Finding that the Defendants committed the securities law violations alleged in this Amended Complaint;

2.    Permanently enjoining Friedland and Global from violating, directly or indirectly, Sections 17(a) and 17(b) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5;

3.    Permanently enjoining Intiva from violating, directly or indirectly, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5;

4.    Prohibiting Friedland, Global, and Intiva, pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)(1)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)] , from participating in any offering of penny stock;

5.    Ordering that each of the Defendants and the Relief Defendants shall disgorge any and all ill-gotten gains, together with pre-judgment and post-judgment interest, derived from the securities law violations set forth in this Complaint;

6.    Imposing civil monetary penalties against Defendants for each of their securities law violations, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

7.    Granting such other relief as this Court may deem just or appropriate.

## VIII.   JURY DEMAND

The SEC demands a jury in this matter.

Dated:  May 10, 2018

Respectfully submitted,

*s/ Christian D. H. Schultz*
Christian D. H. Schultz
Assistant Chief Litigation Counsel
Timothy Halloran
Assistant Chief Litigation Counsel
Michael C. Grimes
Counsel
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-4740 (Schultz)
(202) 551-4414 (Halloran)
schultzc@sec.gov
hallorant@sec.gov

## CERTIFICATE OF SERVICE

I certify that on the 10th day of May, 2018, a true and correct copy of the foregoing document was filed electronically and served on all parties through the Court's e-filing/service system:

*s/ Christian D. H. Schultz*
Christian D. H. Schultz
Assistant Chief Litigation Counsel
U.S. Securities and Exchange Commission